## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| IRENE CONNOR, MICHAEL NEVIN, ALEX NOONAN, HERMAN DRESSEL, and ELEANOR HOLLMAN on behalf of RICHARD HOLLMAN, for themselves and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MARYLAND DEPARTMENT OF HEALTH, and SECRETARY LAURA HERRERA SCOTT, in her official Capacity as Secretary of Maryland Department of Health, <br><br> Defendants. | **Civil Action No. ___** <br><br> **CLASS ACTION COMPLAINT** <br><br> **REDACTED VERSION PUBLIC** |

## I.     INTRODUCTION

1.     Plaintiffs,[1] and the class they seek to represent, are nursing facility residents with mobility impairments living in Medicaid- and Medicare-participating facilities ("Plaintiffs"). Plaintiffs surrendered life in their community in favor of placement in an institutional care setting to ensure that they receive the

---

[1] Plaintiffs are concurrently filing a Motion to File under Seal and Proceed under Pseudonyms, due to the sensitive and highly personal nature of the details in this complaint, and concerns of retaliation for filing this suit from the nursing facilities in which they reside. The Memorandum of Law filed in support of that motion explains these reasons more fully. The publicly filed case caption states their pseudonyms.

round-the-clock medical care and assistance with toileting, hygiene, mobility, and other activities of daily living that they need to maintain their health, safety, and dignity. The Maryland Department of Health (MDH) is the government entity charged with regularly entering Maryland's nursing facilities to assess their operations and to ensure compliance with federal and state quality of care standards. Despite the importance of its oversight responsibilities, MDH has allowed more than 100 nursing facilities to go four years without an annual inspection (known as a "survey"),[2] with many more facilities overdue for an annual survey, and has allowed a backlog of thousands of uninvestigated complaints[3] from nursing facility residents to pile up. When MDH fails to carry out its oversight responsibilities, dangerously poor-quality care within nursing facilities goes undetected and uncorrected.

2.    For years, MDH has failed to conduct statutorily-mandated annual surveys or act on Plaintiffs' complaints within statutorily-prescribed time frames. As a result, Maryland's nursing facilities have not been held accountable when

---

[2] "Annual survey," as used in this case, is intended to include the full process of inspection, identification of deficiencies, and resolution of any deficiencies found in a given nursing facility, pursuant to 42 U.S.C. § 1396r(g)(1)(A), (h).

[3] "Complaint investigation," as used in this case, is intended to include the full process of investigation, identification of deficiencies, and resolution of any deficiencies related to the complaint, pursuant to 42 U.S.C. § 1396r(g)(4), § 1396r(h).

they fail to meet mandated federal and state standards related to resident rights, quality of care, and staffing. Because of Plaintiffs' mobility impairments, this lack of accountability leaves Plaintiffs in situations where they are vulnerable to neglect and mistreatment, which lead to pressure ulcers, falls, and unnecessary seclusion. Plaintiffs have suffered and continue to suffer personal degradation and significant physical and psychosocial harm as a result of Defendants' failures.

3.      MDH operates its mandated program of nursing facility oversight and enforcement to ensure that covered nursing facilities recognize and honor the rights of residents. 42 U.S.C. § 1396r(g); Md. Code Ann., Health – Gen. § 19-1408. Through this oversight role, MDH acts as the State's designated eyes and ears to assess quality of care in nursing facilities. MDH's program of annual surveys and complaint investigations in nursing facilities, related plans of correction to cure any deficiencies, and enforcement through appropriate remedial action are designed to ensure that conditions violative of residents' rights are effectively addressed.

4.      MDH's performance in timely completing annual surveys is among the worst among the states. Its failure has left the residents of a vast majority of the state's nursing facilities without the benefit of annual surveys designed to protect their rights.

5.      Similarly, MDH has failed to investigate Plaintiffs' complaints within mandated time frames. Many serious complaints alleging harm go uninvestigated for months or years, leaving the residents across nursing facilities without an independent governmental review of allegations related to neglect and other violations of resident rights.

6.      Plaintiffs do not receive the benefit of state oversight when the survey and complaint investigation processes and corrective action process called for in federal and state law do not occur, leaving nursing facilities to violate Plaintiffs' rights with impunity.

7.      Plaintiffs are uniquely impacted by this vicious cycle. Due to their mobility impairments, Plaintiffs rely to a greater extent than other residents on the nursing facility to provide essential care. For example, Plaintiffs must rely on nursing staff assistance on a daily basis to leave their rooms and interact with others, to take a shower, for toileting and incontinence care, to receive needed pain medicine, and even to have a drink of water. Where that care is lacking, Plaintiffs experience higher levels of harm, including skin problems such as skin breakdown and pressure sores, falls, and seclusion relative to residents without mobility impairments. They experience personal loss of dignity when their hygiene and incontinence needs are not met by the nursing facility.

4

8.     The heightened nature of Plaintiffs' care needs stem from their mobility impairments and result in increased demand for the time of facility staff. When the facility is short-staffed, Plaintiffs are uniquely vulnerable to neglect when those care needs are not met.

9.     Many of Maryland's nursing facilities have a record of repeated poor performance over numerous review cycles. This is particularly true of nursing facilities located in Black communities.

10.    MDH's methods of administering its nursing facility oversight program deny Plaintiffs meaningful enforcement of their federal rights delineated in the Nursing Home Reform Act (NHRA), 42 U.S.C. § 1396r(g)(1)(A), and their state rights found in the Resident Bill of Rights Act, Md. Code Ann., Health – Gen., § 19-343, because of their disability. MDH's disability discrimination results in a failure to detect and address violations within nursing facilities, and as a result Plaintiffs suffer unique and unaddressed harm due to the nature of their disability. As such, MDH's administration of the program defeats the purpose of or substantially impairs the accomplishment of nursing facility oversight and enforcement of federal and state protections for Plaintiffs.

## II.     JURISDICTION AND VENUE

11.    This action is brought pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation

Act (Section 504), 29 U.S.C. § 794. Defendants are public entities subject to Title II of the ADA. Defendants are recipients of federal financial assistance subject to Section 504. This Court has jurisdiction over the claims under the ADA pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 12133, and 29 U.S.C. § 794a.

12.     Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983, and Federal Rule of Civil Procedure 65.

13.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b).

### III.   PARTIES

a.     Individually Named Plaintiffs

14.     Plaintiff Irene Connor is a fifty-four-year-old Black woman with a disability involving mobility impairment, who resides in a Medicaid- and Medicare-participating nursing facility licensed by MDH. The nursing facility is located at ████████████████████████████████████ ████████████.

15.     Plaintiff Michael Nevin is a sixty-one-year-old Black man with a disability involving mobility impairment, who resides in a Medicaid- and Medicare-participating nursing facility licensed by MDH. The nursing facility is located at ████████████████████████████████████ ████████████.

16.     Plaintiff Alex Noonan is an eighty-five-year-old white man with a disability involving mobility impairment, who resides in a Medicare- and Medicaid-participating nursing facility licensed by MDH. The nursing facility is located at ███████████████████████████████████████████.

17.     Plaintiff Herman Dressel is a seventy-five-year-old white man with a disability involving mobility impairment, who resides in a Medicaid- and Medicare-participating nursing facility licensed by MDH. The nursing facility at ██████████████████████████████████████████.

18.     Plaintiff Richard Hollman is a fifty-seven-year-old white man with a disability involving mobility impairment, who resides in a Medicaid- and Medicare-participating nursing facility licensed by MDH. The nursing facility is located at ███████████████████████████████████████████.

b.      <u>Defendants</u>

19.     Defendant MDH is a recipient of federal financial assistance that is responsible for ensuring that annual survey and complaint investigation activities are conducted pursuant to state and federal law.

20.     Defendant Laura Herrera Scott, in her official capacity as Secretary of the Maryland Department of Health, is responsible for the administration of MDH's program of nursing facility oversight and enforcement.

7

## IV.   **STATUTORY FRAMEWORK**

a.   MDH's Duty to Enforce the Rights of Residents under Federal and State Law

i.   Federal Law

21.    MDH is the designated state survey agency charged with specific oversight and enforcement functions of the NHRA, including annual surveys and complaint investigations. 42 U.S.C. § 1395aa(a); 42 C.F.R. § 488.11.

22.    MDH is required by federal law to conduct an annual survey of each Medicaid- and Medicare-participating nursing facility in Maryland to certify each facility's compliance with federal standards, including standards related to resident rights, quality of care, and minimum staffing standards. 42 U.S.C. § 1396r(g)(1)(A) (referencing 42 U.S.C. § 1396r(b), (c), and (d)).

23.    Federal law requires also MDH to investigate complaints relating to nursing facility services. 42 U.S.C. § 1396r(g)(1)(C), (g)(4).

24.    The central purpose of the federal annual surveys and complaint investigation requirements is to "improve the quality of care for Medicaid-eligible nursing home residents, and either to bring substandard facilities into compliance with Medicaid quality of care requirements or to exclude them from the program." Staff of Subcomm. on Health and the Env't of the H.R. Comm. on Energy and Com., 100th Cong., 1st Sess., Rep. on Medicare and Medicaid Health Budget Reconciliation Amendments of 1987, 77 (Comm. Print 1987).

8

25.     The focus of these federal protections is to ensure that residents receive quality care: "The purpose of the unannounced 'annual' standard survey is not to determine whether every nursing facility is in compliance with every requirement of participation. Instead, its purpose is to detect facilities where residents are not receiving quality care." *Id* at 93. This focus on ensuring that nursing facilities meet the needs of residents became part of the implementing regulations. "The survey process uses resident and patient outcomes as the primary means to establish . . . compliance . . . . Specifically, surveyors will directly observe the actual provision of care and services to residents . . . , and the effects of that care, to assess whether the care provided meets the needs of the individual residents . . . ." 42 C.F.R. § 488.26(c)(2).

26.     There are three objectives for the complaint investigatory process. The first is protective oversight to identify and respond to allegations that appear to pose the greatest potential for harming residents. The second is prevention in cases where serious harm has not been alleged, to identify and correct less serious complaints and prevent escalation of those problems and potential for future harm. The third is promotion of efficiency and quality within the health care delivery system. Center for Medicare and Medicaid Services (CMS), Ch. 5 - Complaint Procedures, State Operations Manual (SOM) 6 (Rev. 212, Feb. 10, 2023) [hereinafter SOM, Ch. 5].

9

27.     Complaints are triaged as "Immediate Jeopardy" when they allege that the facility has failed to meet one or more federal health, safety, and/or quality regulations; and where as a result, serious injury, serious harm, serious impairment, or death has occurred, is occurring, or is likely to occur to one or more identified residents-at-risk; and where there is a need for immediate corrective action to prevent such harms from occurring or recurring. *Id.* at 15. Under federal guidance, MDH is required to initiate an onsite investigation of a complaint alleging Immediate Jeopardy within three business days. *Id.* at 23.

28.     Complaints alleging a provider's noncompliance that "may have caused harm that negatively impacts [a resident]'s mental, physical and/or psychosocial status and are of such consequence to the [resident]'s well-being that a rapid response by the SA [survey agency] is indicated" are triaged as "Non-Immediate Jeopardy – High" or "high priority." *Id.* at 17. For such high priority complaints, MDH "must initiate an onsite survey within an annual average of 15 business days of receipt of the initial report, not to exceed 18 business days." *Id.*

29.     The facts available when the complaint is triaged by MDH determine whether a complaint alleging harm is characterized as Immediate Jeopardy or high priority. Where there continues to be an immediate risk of serious harm or death, the complaint should be triaged as Immediate Jeopardy, and an investigation must be initiated within three business days. Where there is no longer on-going risk of

further harm necessitating immediate action, the complaint is to be identified as high priority and must be investigated within fifteen days under federal law.

30.     Federal law requires MDH to establish procedures and maintain adequate staff to investigate complaints of violations. 42 C.F.R. § 488.332(a)(1). Further, MDH must review all allegations of resident neglect and abuse or misappropriation of resident property and follow procedures specified in 42 C.F.R. § 488.332. 42 C.F.R. § 488.335(a)(3); *see also* SOM, Ch. 5, at 7. While federal law provides the "maximum time frames" to investigate complaints from nursing facility residents, when a state's "time frames for the investigation of a complaint/incident are more stringent than the Federal time frames, the intake is prioritized using the State's timeframes [sic]." SOM, Ch. 5, at 7.

ii.     <u>State Law</u>

31.     In addition to federal law requirements, Maryland state law also requires oversight of all licensed nursing facilities, including annual surveys and complaint investigations.

32.     Maryland law requires MDH to conduct a full survey of each licensed nursing facility at least once per calendar year. Md. Code Ann., Health – Gen. § 19-1408(a)(1).

33.     MDH is also charged with conducting investigations stemming from nursing facility complaints. Md. Code Ann., Health – Gen. § 19-1408(b).

34.     Under state law, MDH has specific time frames within which it must initiate an on-site investigation, depending on the severity of the allegations in the complaint. For the most serious allegations involving immediate jeopardy to a resident, MDH must initiate its investigation within 48 hours of receipt of the complaint, but must make "every effort" to investigate within 24 hours of receipt. Md. Code Ann., Health – Gen. § 19-1408(b)(2)(i), (ii).

35.     Maryland law further requires that complaints which allege that a resident experienced actual harm that do not involve immediate jeopardy concerns, MDH "shall initiate an investigation . . . within 10 business days after receiving the complaint." Md. Code Ann., Health – Gen. § 19-1408(b)(1).

36.     When MDH determines that the nursing facility has failed to ensure that resident rights are protected or that it has failed to meet quality care standards, among other potential failures, it cites the nursing facility with a deficiency. When citing a deficiency, MDH determines whether a resident experienced harm (the level of severity), as well as the number of residents impacted or potentially impacted (the scope).

37.     MDH has many tools available under state and federal law to remedy deficiencies and enforce resident rights. Nursing facilities can face the potential loss of Medicaid funds during the period that they are out of compliance. 42 U.S.C. § 1396r(h)(1). Depending on the seriousness of the deficiencies, nursing facilities

also can be subject to Sanction or Corrective Enforcement Actions, including fines, installation of temporary outside management for the facility, state monitoring, transfer of residents, a directed plan of correction, termination of the facility's provider agreement, and closure of the facility. 42 U.S.C. § 1396r(h)(2); 42 C.F.R. § 488.406; Md. Code Ann., Health – Gen. § 19-1402(a).

38.    The annual surveys form one of the three foundations for assessing a nursing facility's performance rating, ranging from one (1) to five (5) stars, which are posted publicly and on the CMS Care Compare website. Centers for Medicare & Medicaid Services, Design for *Care Compare* Nursing Home Five-Star Quality Rating System: Technical Users' Guide 1 (Apr. 2024) [hereinafter Five-Star Rating Guide]; 42 U.S.C. § 1396r(g)(5)(A), (i)(1)(A)(ii).

39.    Each facility's star-rating is based on facility-reported information on quality, on staffing data based on payroll reporting, and on the results of the facility's annual survey, with the results from the annual survey weighted the most heavily. Five-Star Rating Guide at 1.

40.    The star rating is intended to be a resource to the public in deciding where to receive long-term care for themselves or their family members. *Id.*

b.    <u>MDH's Oversight and Enforcement Activities Must Be in Compliance with the ADA and Section 504</u>

41.    Title II of the ADA prohibits discrimination against people with disabilities, stating that "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination

by any such public entity." 42 U.S.C. § 12132.

42.    Section 504 of the Rehabilitation Act prohibits discrimination on the

basis of disability by recipients of federal financial assistance, stating "[n]o

otherwise qualified individual with a disability . . . shall, solely by reason of her or

his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity." 29 U.S.C. § 794(a).

43.    Courts have recognized that protections afforded disabled people

under the ADA and Section 504 mirror one another. Legal claims brought under

both the ADA and Section 504 based upon the same set of facts are generally

considered in tandem.

44.    The ADA and Section 504 prohibit programs from discriminating

against individuals with disabilities, and similarly prohibit discrimination against

classes of individuals with disabilities, with respect to the opportunity to access the

full range of benefits or services provided by the program. *See* 28 C.F.R. §

35.130(b); 45 C.F.R. § 84.4(b).

45.    Congress's express purpose in enacting the ADA was "to provide a

clear and comprehensive national mandate for the elimination of discrimination

against individuals with disabilities," 42 U.S.C. § 12101(b)(1), including

discrimination related to institutionalization and discrimination in health services, 42 U.S.C. § 12101(a)(3). Congress found that discrimination against individuals with disabilities includes the failure to make modifications to existing facilities and practices, and relegation to lesser services and programs. 42 U.S.C. § 12101(a)(5).

46.     Both the ADA's implementing regulations and Section 504's implementing regulations prohibit discriminatory methods of administering public programs. Specifically, a "public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: . . . (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii); *see also id.* § 35.130(b)(3)(i); 45 C.F.R. § 84.4(b)(4).

47.     MDH's duties under the ADA are proactive. State programs and those that receive federal financial assistance must not only remedy discrimination once it has occurred; they also have an affirmative duty to modify "policies, practices, or procedures" to "avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7); *see also* 45 C.F.R. § 84.4(a).

# V.     STATEMENT OF FACTS

a.     Overview of Maryland's Nursing Facility Population

48.     Maryland has 225 licensed nursing facilities that participate in Medicaid or Medicare. MDH is charged with certifying annually that each of these facilities is in compliance with federal requirements and therefore eligible to participate in the Medicaid and Medicare programs.

49.     Nursing facilities in Maryland provide care to residents requiring "maximal nursing care." Md. Code Ann. Health – Gen. § 19-1401(e).

50.     According to CMS data, there are at least 9,056 people with mobility impairment residing in nursing facilities in Maryland. *See* CMS, *Minimum Data Set Frequency, Q1 2024*, Data.CMS.gov, https://data.cms.gov/quality-of-care/minimum-data-set-frequency/data (last visited May 13, 2024) (the number of persons requiring "Extensive assistance" or "Total dependence" for MDS Item Question/Description "G0110B1: Functional Status - Activities of Daily Living (ADL) Assistance - Transfer - Self Performance"). Many Maryland nursing facility residents with mobility limitations need assistance with numerous care tasks: 86% require help from one or more staff members to get into or out of bed, 54% require the help of another to eat a meal, and 94% require help from one or more staff members to toilet. *Id.* These care needs reflect the heightened reliance that Plaintiffs have on staff assistance.

51.     In fiscal year 2022, there were 51,656 residents in nursing facilities in Maryland; statewide, 35.7% of them were identified as Black residents. Center for Quality Measurement and Reporting, Maryland Health Care Commission, Nursing Home Utilization 2022, at 2 (Feb. 2023), https://mhcc.maryland.gov/mhcc/pages/apcd/apcd_quality/documents/CQM_LTC_ NH_CY2021_Utilization_TABLES_20230228.pdf (last visited May 13, 2024).

52.     The percentage of Black residents varies by county or region. In Baltimore City, 62.9% of nursing facility residents are Black. *Id.* at 2. Meanwhile, Baltimore City has just six nursing facilities that provide care to ventilator-dependent people. *Maryland Quality Reporting: Nursing Homes*, Maryland Health Care Commission, https://healthcarequality.mhcc.maryland.gov/NursingHome/List?searchBy=name& sCol=name&sDir=ASC&countyCode=510&hasVentilatorSvc=true (last visited May 14, 2024). All of these facilities have majority Black resident populations and are low-performing 1- or 2-star facilities.

53.     Many 1- and 2-star facilities have a poor record of ensuring residents receive care in accord with their federal and state rights, and Black nursing facility residents are often in 1- or 2-star facilities.

b.    MDH Has Not Conducted Annual Surveys in a Vast Majority of Nursing Facilities

54.    According to CMS data, MDH has not completed an annual survey in 181 of Maryland's 225 licensed nursing facilities in the last sixteen (16) months. These uninspected facilities account for 81.5% of nursing facilities in Maryland. *See Overdue Recertification Surveys Report*, Quality, Certification and Oversight Reports (QCOR), Centers for Medicare and Medicaid Services, https://qcor.cms.gov/main.jsp (last visited May 13, 2024).

55.    Maryland is one of only four states in the country that have failed to conduct annual surveys in over 70% of their nursing facilities; in this regard, only one other state (Kentucky) is more delinquent than Maryland. *Id.*

56.    Many facilities have not had an annual certification survey for years. As of May 13, 2024, over 100 nursing facilities have not been surveyed by MDH during the past four years. *Id.*

57.    MDH's failure to conduct annual surveys is concerning where facilities with a prior history of numerous deficiencies, a history of resident abuse and neglect, patterns of failures to provide residents with quality care, and violations of residents' rights are not regularly monitored. Without annual surveys, any new rights violations in these troubled facilities may never come to MDH's attention, unless a complaint is made.

c.     Plaintiffs' Complaints Are Uninvestigated and Unaddressed

58.    MDH has a backlog of complaints that have not been investigated.

Over the past three fiscal years, MDH reported approximately 13,173 complaints

and facility-reported incidents, including serious allegations of harm to residents,

of which fewer than half have been investigated. Maryland Department of Health

Office of Health Care Quality, Annual Report and Staffing Analysis Fiscal Year

2023, at 9 (2024).

59.    Rather than following state and federal maximum time frames for

initiating a complaint investigation, MDH regularly allows all but those complaints

triaged as immediate jeopardy to await investigation until the facility's next annual

survey. This results in nursing facility residents waiting months, or even years, for

their complaints that they were harmed by abuse, neglect, poor-quality care, or

rights violations, to be investigated.

60.    Plaintiffs are harmed by these delayed complaint investigations.

Delays between the incident and the investigation often result in a finding of no

violations and no citations due only to difficulties locating documents, staff

turnover, or the subsequent discharge or death of the resident.

d.     MDH Surveys Are Designed to Address Violations of Plaintiffs' Rights

61.     When MDH surveyors conduct their annual reviews, they look at resident rights, quality of life, medication management, skin care, the resident assessments, and other compliance areas.

62.     In doing so, MDH can identify rights violations including, but not limited to, the failure to treat residents with respect and dignity (28 C.F.R. § 483.10; Md. Code Ann., Health – Gen. § 19-343(b)(2)(i)), insufficient nursing staff (28 C.F.R. § 483.35; COMAR 10.07.02.19), physical, sexual, and verbal abuse (28 C.F.R. § 483.12; Md. Code Ann., Health – Gen. § 19-343(b)(2)(iv)), failure to provide care pursuant to the plan of care (28 C.F.R. 483.10(c)(2)(vi); Md. Code Ann., Health – Gen. § 19-343(b)(2)(ii)), and failure to provide assistance completing activities of daily living, such as bathing, toileting, transferring, and ambulation (28 C.F.R. § 483.24; Md. Code Ann., Health – Gen. § 19-343(b)(2)(ii)).

63.     Plaintiffs' mobility impairment can impact their ability to move from a lying position or turn from side to side in bed. Their Plans of Care regularly require periodic repositioning, assistance with getting into or out of their bed, and help using the bathroom or attending to incontinence care. Plans of Care also address any assistance needed in leaving their room to socialize and engage with the community in or outside the facility.

64.     Plaintiffs' reliance on facility staff to meet daily care needs leaves them feeling uniquely vulnerable to retaliation for grievances and complaints. MDH surveyors are charged with ensuring that nursing facilities "tak[e] immediate action to prevent further potential violations of any resident right while the alleged violation is being investigated." 42 C.F.R. § 483.10(j)(4)(iii).

e.     MDH Fails to Ensure Plaintiffs' Rights Are Honored

65.     The nursing facilities where the Named Plaintiffs reside have failed to protect their rights or ensure the implementation of their Plans of Care.

66.     Had MDH complied with its oversight obligations through annual inspections and timely complaint investigations, it would have reviewed records, met with personnel, and spoken with residents. The failure to engage in this process means that MDH is unaware of these violations in facilities. The discovery of such violations would mandate MDH's implementation of corrective action, including the implementation and enforcement of a facility plan of correction.

**Irene Connor**

67.     Ms. Connor is a fifty-four-year-old Black woman who is diagnosed with a wedge compression of her first lumbar vertebra and muscular dystrophy. She relies upon a wheelchair for mobility. She also has diagnoses of acute and chronic respiratory failure, dysphagia, generalized anxiety disorder, post-traumatic

stress disorder, and asthma. She depends upon a ventilator for respiration for a portion of the day and has a tracheostomy.

68.    Ms. Connor resides in a nursing facility located in ███████████.

69.    Ms. Connor is a mother to two adult children, including a developmentally disabled son. Ms. Connor acted as her son's primary caregiver until she was no longer able due to her disabilities.

70.    Before her disability, Ms. Connor worked as a nursing assistant in a nursing facility before earning a college degree in chemical dependence with a concentration in drug and alcohol counseling. Ms. Connor worked as a drug and alcohol counselor until she became too disabled to work in 2013 due to muscular dystrophy.

71.    While Ms. Connor's disabilities prevent her from working, she has continued to serve nursing facility residents and use her education and experience as a volunteer. In 2014, Ms. Connor began volunteering to assist nursing facility residents to return to the community. In 2015, Ms. Connor began volunteering with an organization which assists nursing facility residents to return to the community.

72.    Born and raised in ███████████, Ms. Connor thrived on community and family life prior to entering the nursing facility. She attended church, the movies, and events at her local community center, such as comedy shows. Ms. Connor spent time with family at gatherings large and small.

73.     Ms. Connor entered the nursing facility on January 4, 2023, for rehabilitation following a fall in her apartment. Ms. Connor hopes to discharge from the nursing facility into a subsidized apartment.

74.     Defendant MDH last conducted an annual survey at the nursing facility on August 8, 2022.

75.     Ms. Connor is unable to meet her own basic care needs due to her disability and mobility impairment. She is incontinent of bladder and bowel. She relies upon facility staff to transfer her into and out of bed, to assist her with tracheostomy care, to assist her to reposition in bed to prevent pressure ulcers and maintain skin integrity, as outlined in her Plan of Care.

76.     The nursing facility often fails to meet Ms. Connor's documented care needs, increasing her risk of developing pressure ulcers, complications related to her ventilator and tracheostomy, and falls.

77.     Ms. Connor has waited hours for the facility to provide her with incontinence care. When facility staff do not change Ms. Connor's incontinence briefs, she experiences a loss of dignity and humiliation. She has at times been provided with a fresh incontinence brief placed over the soiled one.

78.     Due to her mobility impairment, Ms. Connor relies on the facility to respond to a call bell to assist her with transferring out of her bed into a wheelchair, attending to her incontinence and respiratory needs, and other daily

care tasks. Ms. Connor often waits from thirty minutes to two hours for staff to respond to her call bell. For the past several months, the facility has failed to keep Ms. Connor's call bell in working order.

79.     The nursing facility is often without hot water. On or around September 26, 2023, Ms. Connor filed a complaint with MDH after the facility failed to provide hot water, because all personal care or cleaning of the environment was being done with cold water.

80.     MDH has not yet investigated Ms. Connor's September 26, 2023, complaint, and the facility's problems maintaining adequate hot water continue.

**Michael Nevin**

81.     Mr. Nevin is a sixty-one-year-old Black man who is diagnosed with quadriplegia following a cerebral infarction, epilepsy, diabetes, anxiety disorder, major depressive disorder, obstructive sleep apnea, generalized muscular weakness, rosacea, gastro-esophageal reflux disease, high blood pressure, and cataracts, among other conditions.

82.     Mr. Nevin was admitted to the nursing facility located in ██████████ ████, on December 14, 2012. He has resided there ever since.

83.     MDH last conducted an annual survey of the facility on November 20, 2020.

24

84.     Before entering the nursing facility, Mr. Nevin worked as a journalist and in technology. He attended his church and enjoyed visiting with loved ones while participating in family gatherings.

85.     Mr. Nevin struggles to maintain his social network and relationships while living in the facility due to a lack of privacy for verbal and video conversations, and due to the facility's failure to provide Mr. Nevin with the support he needs to attend events in the community.

86.     The nursing facility similarly fails to provide Mr. Nevin the support he needs to create new social relationships. The nursing facility does not provide staff to assist Mr. Nevin to go to common areas of the facility to interact with other residents.

87.     Mr. Nevin is unable to meet his own basic care needs due to his disability and mobility impairment. Mr. Nevin relies on the facility to assist him with bathing, dressing, personal hygiene, medication management, repositioning in bed, transitioning into and out of bed, and for general mobility, as outlined in his Plan of Care.

88.     Mr. Nevin has been unnecessarily secluded in his room, away from everyone other than his roommate, against his wishes and without medical justification. For more than a year, the facility has failed to provide him with the transition and mobility assistance required by his Plan of Care. It has failed to

provide him with a wheelchair so that he can transition out of his bed and engage with other residents or leave the facility. It has denied his requests for using the facility's Geri-chair to leave his room.

89.    As a result, he has been confined to his bed in his shared room in the nursing facility since March 2023, with the exception of some medical appointments.

90.    The nursing facility's failure to provide Mr. Nevin with transfer and mobility assistance has kept him from important family events and meaningful community activities. For example, Mr. Nevin was recently honored by a leading long-term care advocacy organization with its Leadership Award for his advocacy on behalf of his fellow nursing facility residents. Mr. Nevin secured transportation to take him to the award ceremony, but he was unable to attend because the facility did not provide him with a wheelchair.

91.    The nursing facility assigned Mr. Nevin a roommate with apparent cognitive disorder who was physically aggressive with other residents. Because of his disability, Mr. Nevin is unable to defend himself against any assault and was traumatized by having an aggressive roommate in his room.

92.    While missing out on social and community events and relationships due to the facility's failure to provide him with transfer and mobility assistance,

Mr. Nevin is confined to his bed, unable to leave the facility to breathe fresh air and feel sunlight.

93.     Mr. Nevin is considered at risk for falling, and he has experienced several falls at the nursing facility.

94.     Due to his immobility and to reduce his fall risk, Mr. Nevin's Plan of Care requires that staff anticipate his care needs and respond promptly to his requests for assistance, including incontinence care, and that his call bell be kept reachable and in working order.

95.     The nursing facility frequently fails to provide "prompt response to all requests for assistance," including incontinence care. Mr. Nevin often goes an entire eight (8) hour shift or longer without incontinence care.

96.     At any given time, particularly during night shifts and on weekends, a single staff member is often responsible for the care of many residents. Mr. Nevin often waits an hour or more for a response to his call bell during these shifts.

97.     Mr. Nevin filed a complaint with MDH on April 30, 2024, regarding lack of notice as to roommate changes and failure to accommodate his technology-dependent communication needs, specifically the lack of privacy required by that means of communication. He also noted the prolonged denial of sunlight he has experienced because the privacy curtain is continuously closed across the window

27

in his room and he cannot independently adjust it. Mr. Nevin's complaint has not yet been investigated.

98.    Based on his experience, Mr. Nevin is very afraid that if he were to have another stroke or medical emergency, staff would not respond to his call bell in time to provide him with life-sustaining care.

***Alex Noonan***

99.    Mr. Noonan is an eight-five year old Navy veteran who is diagnosed with Parkinson's disease, anxiety disorder, major depressive disorder, claustrophobia, post-traumatic stress disorder, a spine condition, mild cognitive impairment, osteoporosis, vision impairment, and muscle wasting/atrophy, among other conditions.

100.    Before his retirement, Mr. Noonan worked for a municipal finance department for 35 years. A lifelong athlete, Mr. Noonan loved to run cross-country and exercise. Even into his 80s, Mr. Noonan maintained a strict daily regimen of pushups and calisthenics to maintain his strength and physical conditioning.

101.    Following a surgery in 2020, Mr. Noonan was admitted for rehabilitation to the nursing facility in ███████████ . He has resided there since March 21, 2020.

102.    Defendant MDH last conducted an annual survey at the nursing facility on June 30, 2021.

103.   Mr. Noonan is unable to meet his own basic care needs due to his disability and mobility impairment. He relies upon the nursing facility to help him transfer into and out of bed; reposition in bed to prevent pressure ulcers and provide him with incontinence care at least every two hours (as he cannot walk to the toilet), to maintain his skin integrity and prevent infection; and assist him with mobility, personal hygiene, support for socialization, nutrition, and medication administration, as outlined in his Plan of Care.

104.   Mr. Noonan is unable to walk on his own. He uses a wheelchair and relies on staff to navigate the wheelchair.

105.   Mr. Noonan is reliant on the facility to safely transfer into and out of bed. According to his Plan of Care, two staff are required to use a mechanical lift in order to safely transfer him into and out of bed.

106.   Mr. Noonan has frequently been told by nursing facility staff that there was insufficient staff available to help him transfer out of his bed and into the common areas of the facility. Many days, Mr. Noonan does not leave his bed at all. He rarely leaves his room. When Mr. Noonan is transferred out of bed, the nursing facility often fails to provide two staff to transfer him, instead subjecting him to a one-person transfer.

107.   Because Mr. Noonan rarely leaves his bed and even more rarely leaves his room, Mr. Noonan is seldom able to breathe fresh air and feel sunlight.

108.   Mr. Noonan is unnecessarily secluded in his room when staff fail to transfer him out of his bed.

109.   Mr. Noonan's personal hygiene and appearance are very important to him, especially his hair, which he keeps long. Mr. Noonan's Plan of Care requires that he be "clean, well-groomed and appropriately dressed daily with staff assistance." However, the nursing facility often fails to provide Mr. Noonan with this required care.

110.   Mr. Noonan's Plan of Care requires staff to offer him a shower no fewer than twice per week. Despite this requirement, Mr. Noonan reports that he wants to be showered twice a week, but he is not regularly showered.

111.   Because Mr. Noonan is not showered regularly, he is not able to maintain his personal hygiene and hair cleanliness as he prefers.

112.   Mr. Noonan currently has multiple pressure ulcers and has a history of fungal skin infections and developing pressure ulcers.

113.   Mr. Noonan's Plan of Care requires that staff assist him to reposition in bed at least every two hours to prevent the development of pressure ulcers. He requires the assistance of two facility staff to be safely repositioned.

114.   The facility often fails to reposition Mr. Noonan in bed every two hours as required by his Plan of Care.

115.    Mr. Noonan's Plan of Care requires that staff provide him with incontinence care, including application of a barrier cream, at least every two hours to prevent the development of pressure ulcers.

116.    The nursing facility often fails to provide Mr. Noonan with required incontinence care, leaving him on at least one occasion in incontinence briefs soiled with urine and feces for more than twelve hours.

117.    In addition to the risk of developing pressure ulcers, Mr. Noonan experiences psychosocial harm, emotional distress, and a loss of dignity due to having been left in soiled clothing and linens.

118.    Mr. Noonan's Plan of Care requires that his call bell be kept within reach at all times. However, when Mr. Noonan uses the call bell to request assistance, he often waits more than an hour for help.

119.    Mr. Noonan believes that the facility does not have enough staff to respond promptly to his call bell, so he limits himself to using his call bell only once or twice per day when he requires incontinence care.

120.    Mr. Noonan's Plan of Care recognizes that he should be evaluated for physical therapy to help treat his Parkinson's disease. Mr. Noonan has not been evaluated for or received any physical therapy to treat his Parkinson's disease, contractures, and other conditions related to his immobility.

### Herman Dressel

121.   Mr. Dressel is a fifty-seven-year-old white man who is diagnosed with

left-side weakness due to a stroke, ambulatory dysfunction, hand contracture,

diabetes, deep vein thrombosis, urinary incontinence, bowel incontinence, chronic

kidney disease, dizziness, sleep apnea, obesity, generalized anxiety disorder, and

insomnia.

122.   Before his disability, Mr. Dressel worked in sales for a paper goods

company. His real passions, though, were community service and sports. Mr.

Dressel was an active member of his church and a local fraternal organization,

where he led youth activities. Throughout the 1990's, Mr. Dressel served as the

volunteer chairman of the local recreation department's soccer and baseball

leagues. Mr. Dressel was a fixture of his local recreational sports leagues,

participating in the same bowling league for 25 years.

123.   On November 30, 2021, Mr. Dressel was admitted to the nursing

facility located in ███████████████ following a hospitalization for kidney failure.

He has resided in the facility ever since.

124.   Defendant MDH last conducted an annual survey at the nursing

facility on November 15, 2022.

125.   Mr. Dressel is unable to meet his own basic care needs due to his

medical conditions and mobility impairments. His Plan of Care requires staff to

assist him with bathing, dressing, transferring into and out of bed, mobility, personal hygiene, and medication management.

126.   Mr. Dressel's Plan of Care requires that he get out of bed every day with the assistance of two staff and a mechanical lift. Mr. Dressel often does not receive the assistance that he needs to transfer safely into and out of bed. Two to three times a month he is left in his bed for the entire day.

127.   On those occasions when Mr. Dressel is left in his bed for the day, he is unnecessarily secluded in his room when staff fail to transfer him out of his bed.

128.   Mr. Dressel has a history of falls. On March 2, 2023, Mr. Dressel was injured when the nursing facility attempted an inappropriate one-person transfer using a mechanical lift, contrary to his Plan of Care. During the botched lift, Mr. Dressel struck his head and experienced dizziness and nausea. His injuries were so significant that Mr. Dressel was sent to the hospital for treatment, where he was admitted.

129.   MDH has not yet investigated the circumstances which led to Mr. Dressel's March 2, 2023, injuries.

130.   On or about May, 2023, Mr. Dressel's wife filed a complaint on his behalf with MDH concerning the poor care that Mr. Dressel was receiving at the facility. The complaint alleged that on April 16, 2023, Mr. Dressel did not receive incontinence care for more than 15 hours, and that facility staff did not timely

respond to Mr. Dressel's call bell. The complaint further alleged several additional instances where facility staff did not respond to his call bell for prolonged periods of time, and that Mr. Dressel did not have access to the hoyer lift he needs to transfer out of bed.

131.   MDH has not yet investigated the May 2023 complaint.

132.   According to Mr. Dressel's Plan of Care, he must receive specialized incontinence care and repositioning to reduce his risk of developing pressure ulcers. Mr. Dressel often goes entire shifts or longer without incontinence care.

133.   On a regular basis, Mr. Dressel often waits 30 minutes to an hour for a response to a call bell, and often, when facility staff arrive, they ask what he needs and say they will come back, but they never do.

134.   When Mr. Dressel requests facility staff assistance to change his incontinence brief, he is frequently told that if staff assist him into his bed for the change, he will have to remain in bed for the rest of the day. Because he does not want to be stuck in bed for the day, he now puts a towel inside his brief to capture urine during the day and avoid the need to change the brief. This means that he must tolerate the urine-soaked towel all day instead.

135.   Mr. Dressel is scheduled for a shower twice a week, on Mondays and Thursdays. Despite the fact that Mr. Dressel's Plan of Care requires staff assistance

with showering, facility records show that the facility often fails to shower Mr. Dressel twice a week.

136.   Despite the fact that Mr. Dressel's Plan of Care requires staff assistance with personal hygiene, the facility does not ensure that staff regularly assist him to brush his teeth, despite the contractures in his hands and weakness in his arms. Facility staff have told him that they do not have time to assist him with dental care. As a result, his dental health has deteriorated significantly.

137.   Mr. Dressel has requested, but not received, therapy to increase muscle strength so that he can be more independent, for many months. His muscle strength has continued to deteriorate.

### Richard Hollman

138.   Mr. Hollman is a fifty-seven-year-old white man who experienced a devastating traumatic brain injury during a boating accident in 2002. As a result of his brain injuries, Mr. Hollman is diagnosed as living in a "persistent vegetative state" and experiences seizures. He is non-verbal and unable to communicate his wants and needs. Mr. Hollman is incontinent of bladder and bowel. He uses a urinary condom catheter.

139.   Eleanor Hollman, Mr. Hollman's mother, is his legal guardian.

140.   Mr. Hollman has resided at the nursing facility since 2003.

141.   MDH last conducted an annual survey at the facility in October 2022.

142.   Before becoming disabled, Mr. Hollman lived for boating and time in the sun and on the water. Mr. Hollman performed maintenance and repairs on his boat and his two jet skis. Mr. Hollman was in his second year of studying to become a marine electrician at the time of the accident.

143.   When Mr. Hollman was not spending time on the water, he enjoyed watching NASCAR races, football, and baseball, his beloved Chevrolet, and collecting Budweiser beer memorabilia.

144.   Due to his disabilities, Mr. Hollman relies on the facility to anticipate and meet all of his care needs, including mobility, transfers into and out of bed, incontinence and catheter care, personal hygiene, socialization, mental stimulation, nutrition, and medication administration, as outlined in his Plan of Care.

145.   Mr. Hollman is unable to walk. He is reliant upon the nursing facility to help him move from place to place using a wheelchair. He is unable to support himself while sitting in the wheelchair and relies on staff to use straps to secure him in place.

146.   Mr. Hollman has a history of pressure ulcers.

147.   Mr. Hollman's Plan of Care requires that specific care be provided to prevent new pressure ulcers from developing: that he be repositioned in bed at least every two hours (other than during overnight hours), that he receives incontinence care every two hours, that he receives daily skin checks by qualified staff, that he

36

receives weekly skin checks by a nurse, and that nursing staff employ pressure relieving devices on his bed and wheelchair.

148.    Mr. Hollman's records indicate that the nursing facility often fails to ensure that he receives this required care, placing him at greater risk of developing pressure ulcers.

149.    Most recently, in January 2024, Mr. Hollman developed a new stage 2 pressure ulcer.

f.    MDH's Administration of Facility Oversight Discriminates Against Residents with Mobility Impairments.

150.    MDH abdicates its duty to ensure that Plaintiffs' rights are honored in nursing facilities when it fails to conduct the survey and complaint investigations.

151.    MDH's failure to timely investigate complaints is a chronic and well-documented problem. The U.S. Department of Health and Human Services Office of Inspector General found that Maryland was one of only ten (10) states that failed to meet CMS performance "timeliness threshold" requirements for nursing facility complaint investigations each year from 2011 through 2018.

152.    The pattern of failed oversight has continued in the most recent CMS report on state agency performance. *See* Center for Clinical Standards and Quality, CMS, Admin Info: 23-10-ALL: Fiscal Year 2022 (FY22) State Performance Standards System (SPSS) Findings 7 (July 20, 2023). CMS found that MDH did

not meet four of the five measures relating to effective nursing facility survey and complaint process administration. *Id.*

153.   In 2018, the Maryland Legislature enacted legislation to mandate increased staffing in the MDH unit responsible for surveys and complaints, the Office of Health Care Quality (OHCQ). In doing so, the Legislature cited "[t]he lack of commitment to investigating complaints regarding nursing homes and other facilities by the State [which] is evident in the longstanding understaffing of nurse surveyors in the Maryland Office of Health Care Quality," and stated that "[t]here appears to be no commitment to change the deficient and dangerous conditions in terms of the timeliness of investigating nursing home complaints, which affects the health and well-being of vulnerable Marylanders who reside in nursing homes." Maryland Nursing Home Resident Protection Act of 2018, S.B. 386, 2018 Reg. Sess. (Md. 2018).

154.   In response to the legislation, MDH instituted a "7-Year Staffing Plan" beginning in fiscal year 2018, under which the Long Term Care Unit would receive twenty (20) new, full-time surveyor positions between fiscal years 2020 and 2024. Office of Health Care Quality, Maryland Department of Health, Analysis of the FY 2024 Maryland Executive Budget, 2023, at 14 [hereinafter FY 2024 Md. Exec. Budget]. Despite MDH's "7-Year Staffing Plan," the nursing facility survey unit has been understaffed, with many nursing facilities not

surveyed. *See id.* at 15; Office of Health Care Quality, Maryland Department of
Health, Analysis of the FY 2025 Maryland Executive Budget, 2024, at 5
[hereinafter FY 2025 Md. Exec. Budget].

155.   In fiscal year 2023, state legislative reports estimated that MDH
retained an unspent $3.2 million, which had been budgeted for unfilled surveyor
position salaries and benefits. FY 2024 Md. Exec. Budget at 8.

156.   Over the years, MDH has exacerbated the backlog in annual surveys,
complaint investigations, and related enforcement activities by permitting
surveyors to transfer out of the Long Term Care Unit without replacement, and not
requesting the full funding from the Legislature needed to fully staff the Long
Term Care Unit so that all annual surveys are completed each year and all
complaints are timely investigated. *See id.* at 14-15.

157.   Further reducing its ability to timely conduct annual surveys and
complaint investigations, MDH canceled its memorandum of understanding with
Montgomery County Commission on Aging on or about March 2021, eliminating
10 county-based surveyors who operated under the agreement, and replacing them
with only 4 state nursing facility surveyors. *See* Chitra Kalyandurg & Kaitlyn
Simmons, Office of Legislative Oversight, Nursing Homes in Montgomery
County: Regulatory Framework and Issues Impacting the Quality of Care 82, 98
(July 25, 2023); Letter from Barbara Seller, Montgomery County Commission on

Aging, to Dr. Patricia Tomsko Nay, Executive Director, Office of Health Care Quality 1 (Mar. 29, 2021).

158.   According to the most recent publicly available data, the Long-Term Care Unit remains significantly understaffed. *See* FY 2025 Md. Exec. Budget at 5.

## VI.   CLASS ALLEGATIONS

159.   This action is properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

160.   Plaintiffs seek certification of a class of similarly situated individuals who are:

> Residents of nursing facilities, who have disabilities with mobility impairment, and who live in nursing facilities that operate under the oversight authority of MDH.

161.   The class is sufficiently numerous to make joinder impracticable. According to CMS data, there are at least 9,056 people with mobility impairment residing in nursing facilities in Maryland. *See* CMS, *Minimum Data Set Frequency, Q1 2024*, Data.CMS.gov, https://data.cms.gov/quality-of-care/minimum-data-set-frequency/data (last visited May 13, 2024); *see also supra* at Paragraph 50 and accompanying text. The questions of law and fact are common to and typical of those of members of the putative class they seek to represent.

162.    The Plaintiffs and the putative class members rely on Defendants for oversight and enforcement of their federal and state rights relating to the provision of nursing facility services.

163.    Defendants' long-standing and well-documented failure to conduct annual surveys and timely complaint investigations departs from their state and federally mandated duties and violates the legal rights of Plaintiffs and the putative class members they seek to represent.

164.    Questions of fact common to the class include:

a.      Does MDH substantially deny the plaintiff class enforcement of their resident rights and quality of life standards under state and federal law by failing to conduct annual surveys of nursing facilities?

b.      Does MDH substantially deny the plaintiff class their resident rights and quality of life standards under state and federal law by failing to timely investigate complaints in nursing facilities?

c.      Does MDH's failure to conduct timely annual surveys and investigations of complaints have a disparate impact on the plaintiff class of nursing facility residents with mobility impairments?

165.    Questions of law common to the class include:

a.      Does Defendants' administration of MDH's nursing facility oversight and corrective enforcement program violate the ADA's requirement that

"[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities"? 28 C.F.R. § 35.130 (b)(3)(ii).

      b.     Does Defendants' administration of MDH's program of oversight and enforcement of nursing facilities fail to protect Plaintiffs' right to participate in social, religious, and community activities that do not interfere with the rights of other residents in the facility?

      c.     Does Defendants' administration of MDH's program of oversight and enforcement fail to protect Plaintiffs' rights and ensure compliance with quality of care standards under the NHRA?

      d.     Does Defendants' administration of MDH's program of oversight and enforcement fail to protect Plaintiffs' rights and ensure compliance with quality of care standards under the Maryland Resident Bill of Rights Act, Md. Code Ann., Health – Gen., § 19-343?

166.   The violations of law and resulting types of harm and risks of harm alleged by Plaintiffs are typical of the legal violations and types of harms and risks of harm experienced by all members of the proposed class.

167.   The Plaintiffs will fairly and adequately protect the interests of the class that they seek to represent.

168.   There is no conflict between the interests of the Plaintiffs and the class they seek to represent.

169.   The Plaintiffs are represented by attorneys who are competent and experienced in class action litigation, the Americans with Disabilities Act, nursing facility law, and complex civil litigation.

170.   Defendants have acted or failed to act on grounds applicable to the class, necessitating class-wide declaratory and injunctive relief.

## VII.   LEGAL CLAIMS

Count I
Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*
(Methods of Administration Violation)

171.   Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 170 above as if fully set forth herein.

172.   Title II of the ADA prohibits discrimination against people with disabilities: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

173.   Plaintiffs are qualified individuals with disabilities within the meaning of the ADA due to their physical, mental, or cognitive disabilities. 42 U.S.C. § 12131(2).

174.   The regulation implementing the ADA prohibits Defendants from "directly or through contractual or other arrangements, utiliz[ing] criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii).

175.   As residents of Medicaid-funded nursing facilities, Plaintiffs meet the essential eligibility requirements as qualified individuals with disabilities to receive and benefit from the oversight and corrective enforcement activities and programs of MDH. *See* 42 U.S.C. § 12131(2).

176.   Defendants are a public entity under the ADA, charged under federal and state law with protecting the health and safety of Maryland's nursing facility residents.

177.   As a result of MDH's conduct, Plaintiffs are denied meaningful access to and the benefit of MDH's nursing facility oversight and enforcement activities. Defendants' methods of administration of its oversight and enforcement duties have the effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with mobility-

44

related disabilities, and thereby subject Plaintiffs to discrimination on the basis of

disability. Such methods of administration include the failure to conduct annual

surveys and the failure to timely investigate many complaints. Taken together or

separately, these failures defeat or substantially impair the purpose of MDH's

oversight program, *i.e.*, to protect the rights of nursing facility residents and to

ensure that nursing facility residents receive quality care.

### Count II
### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*.
### (Methods of Administration Violation)

178.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1

through 170 above as if fully set forth herein.

179.    Plaintiffs are individuals with disabilities under Section 504 of the

Rehabilitation Act. 29 U.S.C. § 794(a).

180.    As residents of nursing facilities subject to Defendants' oversight,

Plaintiffs are otherwise qualified to receive and benefit from the oversight and

corrective enforcement activities and programs of MDH. 29 U.S.C. § 794(a).

181.    Defendants are recipients of federal financial assistance subject to the

requirements of Section 504. *Id*.

182.    The regulations implementing Section 504 of the Rehabilitation Act

prohibit recipients of federal financial assistance from "utiliz[ing] criteria or

methods of administration (i) that have the effect of subjecting qualified

handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 45 C.F.R. § 84.4(b)(4)(i), (ii).

183.   As a result of MDH's conduct, Plaintiffs are denied meaningful access to and the benefit of MDH's nursing facility oversight and enforcement activities. Defendants' methods of administration of its oversight and enforcement duties have the effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with mobility-related disabilities, and thereby subject Plaintiffs to discrimination on the basis of disability. Such methods of administration include the failure to conduct annual surveys and the failure to timely investigate many complaints. Taken together or separately, these failures defeat or substantially impair the purpose of MDH's oversight program, *i.e.*, to protect the rights of nursing facility residents and to ensure that nursing facility residents receive quality care.

## **RELIEF SOUGHT**

Plaintiffs, on behalf of themselves and the Plaintiff Class, request that the Court:

a.   Assume jurisdiction over this action and maintain continuing jurisdiction until the Defendants are in full compliance with the order of this Court;

46

b.      Certify the Plaintiff Class as defined in Paragraph 160 pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c.      Declare that Defendants' policies, practices, acts, and omissions, as set forth above in Paragraphs 1 through 158, violate Plaintiffs' rights under the Americans with Disabilities Act;

d.      Grant preliminary and permanent injunctive relief, requiring Defendants to:

(1)     Completely and accurately conduct annual surveys of nursing facilities on a twelve-month cycle, and complete related enforcement activities of nursing facilities relating to compliance with the requirements of the Nursing Home Reform Act, 42 U.S.C. § 1396r(g) (referencing 42 U.S.C. § 1396r(b), (c), and (d)). Such surveys and enforcement activities are to be conducted to ensure that nursing facilities that have resident populations which are majority Black are subject to enforcement activities to ensure compliance with nursing facility requirements.

(2)     Timely, completely, and accurately investigate complaints (including, as required by Md. Code Ann., Health – Gen. § 19-1408(b), initiating within 48 hours for Immediate Jeopardy, and within 10 days for other serious allegations) and complete related enforcement activities regarding nursing facility care, such investigations to include complaints where physical or psychosocial

harm is alleged. Such complaint investigation and enforcement activities are to be conducted to ensure that nursing facilities serving Plaintiffs that have resident populations which are majority Black are subject to enforcement activities to ensure compliance with nursing facility requirements.

(3)     Conduct timely, complete, annual surveys, and related enforcement activities to ensure that nursing facilities are in compliance with state licensing standards under Md. Code Ann., Health – Gen. § 19-1408(a), including compliance with the protections afforded nursing facility residents in the Maryland Resident Bill of Rights Act, Md. Code Ann., Health – Gen. § 19-343. Such enforcement activities are to use all available remedies necessary to ensure nursing facility compliance, including nursing facilities serving Plaintiffs that have resident populations which are majority Black.

(4)     Conduct timely, complete investigations of complaints and related enforcement activities to ensure that nursing facilities are in compliance with state licensing standards under Md. Code Ann., Health – Gen. § 19-1408(b), and include complaints related to the protections afforded nursing facility residents in the Maryland Resident Bill of Rights Act, Md. Code Ann., Health – Gen. § 19-343. Such enforcement activities are to use all available remedies necessary to ensure nursing facility compliance, including nursing facilities that have resident populations which are majority Black.

(5)     Timely make available to the public information respecting all nursing facility surveys, complaint investigations, and certifications made with respect to nursing facilities, including facility sanctions and corrective enforcement actions.

e.     Award the Plaintiffs the costs of this action and reasonable attorneys' fees pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12133 and as otherwise permitted by law.

f.     Grant such other relief that this Court deems appropriate.


Dated: May 15, 2024

*/s/ Debra Lynn Gardner*

Debra Lynn Gardner (Fed. Bar No. 24239)
PUBLIC JUSTICE CENTER
201 North Charles Street, Suite 1200
Baltimore, Maryland 21201
Telephone: (410) 625-9409
Facsimile: (410) 625-9423
gardnerd@publicjustice.org

Regan Bailey*
Liam McGivern*
JUSTICE IN AGING
1444 I Street, NW, Suite 1100
Washington, DC  20005
Telephone: (202) 683-1990
RBailey@justiceinaging.org
LMcGivern@justiceinaging.org

Sheila S. Boston*
Samuel Lonergan*
Robert Grass*
ARNOLD & PORTER KAYE
    SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
Sheila.Boston@arnoldporter.com
Samuel.Lonergan@arnoldporter.com
Robert.Grass@arnoldporter.com

*Attorneys for Plaintiffs*

*Applications for Admission *Pro Hac Vice*
pending