**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

```
-------------------------------------------------------x
IRENE CONNOR, et al. for themselves        :
and those similarly situated,              :
                                           :        Civil Action No. 1:24-cv-01423-MJM
        Plaintiffs,                        :
                                           :
            v.                             :
                                           :
MARYLAND DEPARTMENT OF                     :
HEALTH, et al.,                            :
                                           :
        Defendants.                        :
-------------------------------------------------------x
```

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
**CLASS CERTIFICATION**
**REDACTED VERSION PUBLIC**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

FACTS ..................................................................................................................................3

    A.    MDH Has Oversight Authority Over Maryland Nursing Facilities for the Benefit of Residents........................................................................................................3

        1.    Under Federal Law, MDH is Required to Conduct Unannounced Annual Surveys and Investigate Complaints at Each Nursing Facility...................4

        2.    Under State Law, MDH is Required to Conduct Unannounced Annual Surveys and Investigate Complaints at Each Nursing Facility...................7

        3.    MDH's Enforcement Powers ...............................................................7

    B.    MDH Has Failed to Conduct Annual Surveys and to Investigate Complaints Timely...............................................................................................................8

    C.    Defendants' Oversight Failures Have a Disparate Impact on Plaintiffs and Other Nursing Facility Residents with Mobility Impairments........................................11

        1.    ███████████ ...............................................................12

        2.    ██████████████ ........................................................14

        3.    ██████████████ ........................................................15

        4.    ██████████████ ........................................................17

        5.    ███████████████████████████ .........................18

        6.    Other Nursing Facility Residents with Mobility Impairments .................19

    D.    Plaintiffs' Claims ...........................................................................................21

LEGAL STANDARD..............................................................................................................22

ARGUMENT..........................................................................................................................22

I.    THE PROPOSED CLASS SATISFIES ALL THE RULE 23(a) PREREQUISITES.......22

    A.    The Proposed Class is So Numerous that Joinder of All Class Members Would Be Impracticable...................................................................................................22

    B.    There are Questions of Law or Fact Common to the Proposed Class ..................23

    C.    The Plaintiffs' Claims are Typical of the Proposed Class Members' Claims .......26

    D.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Proposed Class Members ......................................................................................................28

II.    THE PROPOSED CLASS SATISFIES RULE 23(b)(2)................................................29

CONCLUSION.......................................................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basta v. Novant Health Inc.*,
  56 F.4th 307 (4th Cir. 2022) .................................................................................................... 24

*Brown v. Nucor Corp.*,
  576 F.3d 149 (4th Cir. 2009), *cert. denied*, 559 U.S. 974 (2010)............................................ 26

*Buffkin v. Hooks*,
  No. 1:18CV502, 2018 WL 6271855 (M.D.N.C. Nov. 30, 2018) ............................................. 26

*Bumgarner v. NCDOC*,
  276 F.R.D. 452 (E.D.N.C. 2011) ....................................................................................... 26, 29

*J.O.P. v. U.S. Dep't of Homeland Security*,
  338 F.R.D. 33 (D. Md. 2020).......................................................................................... *passim*

*Jackson v. Am. Elec. Warfare Assocs., Inc.*,
  Civil Action No. TDC-22-1456, 2024 WL 556230 (D. Md. Feb. 12, 2024)........................... 27

*Joseph R. v. Justice*,
  344 F.R.D. 294 (S.D. W. Va. 2023)......................................................................................... 26

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) (en banc) ................................................................................. 22

*Koon v. North Carolina*,
  50 F.4th 398 (4th Cir. 2022) .................................................................................................... 24

*Krakauer v. Dish Network, L.L.C.*,
  925 F.3d 643 (4th Cir.), *cert. denied*, 140 S. Ct. 676 (2019)................................................... 22

*Levy v. Mote*,
  104 F. Supp. 2d 538 (D. Md. 2000).......................................................................................... 25

*In re Marriott Int'l, Inc. v. Customer Data Security Breach Litig.*,
  341 F.R.D. 128 (D. Md. 2022).................................................................................................. 28

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) .................................................................................................... 25

*Pashby v. Cansler*,
  279 F.R.D. 347 (E.D.N.C. 2011) .............................................................................................. 26

*Peters v. Aetna, Inc.*,
   2 F.4th 199 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022)................................2, 24, 25

*In re Under Armour Secs. Litig.*,
   631 F. Supp. 3d 285 (D. Md. 2022) ...........................................................................................23

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...........................................................................................................2, 30

*In re Zetia (Exetimibe) Antitrust Litig.*,
   7 F.4th 227 (4th Cir. 2021) ...............................................................................................2, 23

**Statutes**

29 U.S.C. § 705(20) ..................................................................................................................25

29 U.S.C. § 794 ..........................................................................................................................2

29 U.S.C. § 794(a) .....................................................................................................................24

42 U.S.C. § 1395aa(a) .................................................................................................................4

42 U.S.C. § 1396r(b)(2)(C) .........................................................................................................3

42 U.S.C. § 1396r(g)(1)(A) .........................................................................................................3

42 U.S.C. § 1396r(g)(1)(A) .........................................................................................................4

42 U.S.C. § 1396r(g)(2) ...............................................................................................................4

42 U.S.C. § 1396r(g)(1)(A) .........................................................................................................5

42 U.S.C. § 1396r(g)(1)(C) .........................................................................................................6

42 U.S.C. § 1396r(g)(4) ...............................................................................................................6

42 U.S.C. § 1396r(g)(5)(E) .........................................................................................................5

42 U.S.C. § 1396r(h) ...............................................................................................................5, 6

42 U.S.C. § 1396r(h)(2) ...............................................................................................................8

42 U.S.C. § 12102(2)(A) ............................................................................................................25

42 U.S.C. § 12131 .......................................................................................................................2

42 U.S.C. § 12132 ......................................................................................................................24

Md. Code Ann., Health – Gen. § 19-343 ...................................................................................3

Md. Code Ann., Health – Gen. § 19-343(b)(2)(i)................................................................3, 21

Md. Code Ann., Health – Gen. § 19-343(b)(2)(ii)...........................................................3, 4, 21

Md. Code Ann., Health – Gen. § 19-343(b)(2)(iv)....................................................................3

Md. Code Ann., Health – Gen. § 19-1401(e)(1) ......................................................................3

Md. Code Ann., Health – Gen. § 19-1402(a)............................................................................8

Md. Code Ann., Health – Gen. § 19-1408(a)(1)........................................................................7

Md. Code Ann., Health – Gen. § 19-1408(b) ...........................................................................7

Md. Code Ann., Health – Gen. § 19-1408(b)(1)........................................................................7

Md. Code Ann., Health – Gen. § 19-1408(b)(2)(i)....................................................................7

Md. Code Ann., Health – Gen. § 19-1408(b)(2)(ii)...................................................................7

**Rules and Regulationss**

12 C.F.R. § 268.303 ...............................................................................................................25

28 C.F.R. § 35.130(b)(3)(ii)....................................................................................................24

28 C.F.R. § 483.10..............................................................................................................3, 21

28 C.F.R. § 483.24..................................................................................................................21

29 C.F.R. § 1630.2(i) ..............................................................................................................25

29 C.F.R. § 1630.2(j)(1)(A).....................................................................................................25

42 C.F.R. § 483.10(c)(2)(vi) ...............................................................................................3, 21

42 C.F.R. § 483.12....................................................................................................................3

42 C.F.R. § 483.21(a)................................................................................................................3

42 C.F.R. § 483.21(b) ...............................................................................................................3

42 C.F.R. § 483.24(b) ...............................................................................................................4

42 C.F.R. § 483.25(b) ...............................................................................................................4

42 C.F.R. § 483.35..............................................................................................................4, 21

42 C.F.R. § 488.11 ............................................................................................................4, 5

42 C.F.R. § 488.26(b) ............................................................................................................5

42 C.F.R. § 488.26(c)(2) ........................................................................................................5

42 C.F.R. § 488.332(a)(1) ......................................................................................................6

42 C.F.R. § 488.332(a)(2) ......................................................................................................6

42 C.F.R. § 488.335 ...............................................................................................................6

42 C.F.R. § 488.335(a) ...........................................................................................................6

42 C.F.R. § 488.406 ...............................................................................................................8

42 C.F.R. § 489.3 ...............................................................................................................6, 7

Fed. R. Civ. P. 23 .............................................................................................................1, 30

Fed. R. Civ. P. 23(a) ..................................................................................................2, 22, 27

Fed. R. Civ. P. 23(a)(1) ..........................................................................................................2

Fed. R. Civ. P. 23(a)(2) ...................................................................................................2, 23

Fed. R. Civ. P. 23(a)(4) ...................................................................................................2, 28

Fed. R. Civ. P. 23(b) .............................................................................................................22

Fed. R. Civ. P. 23(b)(2) ..............................................................................................2, 22, 30

Fed. R. Civ. P. 23(b)(3) .........................................................................................................23

Md. Code Regs. 10.07.02.19 (2021) ................................................................................4, 21

**Other Authorities**

Rachel M. Werner, *et al.*, *Changes in Consumer Demand Following Public
    Reporting of Summary Quality Ratings: An Evaluation in Nursing Homes*,
    HSR: Health Service Research 51:3; Part II 1291 (2016) ..........................................5

v

# INDEX OF EXHIBITS

Exhibit 1       Declaration of Marie Boltz

Exhibit 2       Staff of Subcomm. on Health and the Env't of the H.R. Comm. on Energy and
                Com., 100th Cong., 1st Sess. Rep. on Medicare and Medicaid Health Budget
                Reconciliation Amendments of 1987 (Comm. Print 1987) (Excerpts)

Exhibit 3       CMS, Design for *Care Compare* Nursing Home Five-Star Quality Rating System:
                Technical Users' Guide (Apr. 2024)

Exhibit 4       Rachel M. Werner, *et al.*, *Changes in Consumer Demand Following Public
                Reporting of Summary Quality Ratings: An Evaluation in Nursing Homes*, HSR:
                Health Service Research 51:3; Part II 1291 (2016)

Exhibit 5       Complaint Procedures, State Operations Manual, Chapter 5 (Excerpts)

Exhibit 6       Medicare State Operations Manual, Chapter 7 (Excerpts)

Exhibit 7       Maryland Department of Health Office of Health Care Quality, Annual Report
                and Staffing Analysis Fiscal Year 2023 (2024)

Exhibit 8       Statement of Deficiencies and Plan of Correction, Pines Nursing and Rehab,
                09/28/2022 (Excerpts)

Exhibit 9       Statement of Deficiencies and Plan of Correction, Copper Ridge Nursing and
                Assisted Living Center, 11/23/2022 (Excerpts)

Exhibit 10      Statement of Deficiencies and Plan of Correction, Autumn Lake Healthcare
                Center at Oakview, 11/3/23 (Excerpts)

Exhibit 11      Center for Clinical Standards and Quality, CMS Admin Info: 23-10-ALL: Fiscal
                Year (2022) (FY22) State Performance Standards System (SPSS) Findings (July
                20, 2023)

Exhibit 12      Maryland Nursing Home Resident Protection Act of 2018, S.B. 386, 2018 Reg.
                Sess. (Md. 2018)

Exhibit 13      OHCQ Analysis of the FY 2024 Maryland Executive Budget, 2023

Exhibit 14      OHCQ Analysis of the FY 2025 Maryland Executive Budget, 2024

Exhibit 15      Declaration of ▮▮▮▮▮▮▮

Exhibit 16      Declaration of ▮▮▮▮▮▮▮▮

Exhibit 17      Declaration of ▮▮▮▮▮▮▮

Exhibit 18     Declaration of ███████████

Exhibit 19     Declaration of ████████

Exhibit 20     Declaration of █████████████

Exhibit 21     Declaration of ██████████

Exhibit 22     Declaration of ███████████

Exhibit 23     Declaration of ████████

Exhibit 24     Declaration of ██████████

Exhibit 25     Declaration of ██████████

Plaintiffs submit this memorandum of law in support of their motion for class certification under Federal Rule of Civil Procedure 23.

## INTRODUCTION

Plaintiffs seek to represent a class of more than 9,000 people with disabilities involving mobility impairment who reside and receive care in Maryland nursing facilities under the oversight authority of Defendant Maryland Department of Health ("MDH"). As residents of Maryland nursing facilities, Plaintiffs and the proposed class members have rights under federal and state law to be treated with respect and dignity and to receive care consistent with individualized Plans of Care based on an assessment of their needs and desires.

MDH has corresponding oversight obligations under federal and state law to ensure that the proposed class members' rights are respected and that they receive the quality of life and the quality of care to which they are entitled. As relevant here, MDH is required to conduct unannounced annual surveys of each Maryland nursing facility and to conduct investigations of complaints within time frames established by federal and state law to uncover potential violations of residents' rights and of standards for quality of life and quality of care and correct them. But MDH has not conducted an annual survey in nearly 80% of Maryland nursing facilities within the past 16 months and in nearly 50% of Maryland nursing facilities in the last four years. And MDH's record regarding complaint investigations is equally woeful.

MDH's failure to comply with its obligations has a disparate impact on Plaintiffs and the class members who rely extensively on nursing facility staff to meet their most basic needs. Given their mobility impairments, Plaintiffs and the proposed class members require assistance with all aspects of daily living and have unique health and safety risks. As a result, when nursing facilities violate their rights, members of the proposed class suffer unique harms. Plaintiffs assert claims

1

on behalf of themselves and the proposed class members against MDH and its Secretary for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.* and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, *et seq.*, and they seek declaratory and injunctive relief requiring MDH to conduct annual surveys and to investigate complaints within the required time frames in each Maryland nursing facility, and to take appropriate corrective and/or enforcement action when needed.

The proposed class satisfies each prerequisite in Rule 23(a). The class of approximately 9,000 plainly satisfies the numerosity requirement of Rule 23(a)(1). *See In re Zetia (Exetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021). Rule 23(a)(2)'s commonality requirement is satisfied because Plaintiffs' claims involve questions of fact and law that are common to the class members' claims and that will "generate common *answers* apt to drive the resolution of the litigation." *Peters v. Aetna, Inc.*, 2 F.4th 199, 242 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original)). Plaintiff's claims are typical because they "arise[] from the same . . . course of conduct [of MDH] that gives rise to the claims of other class members" and they seek the same relief. *J.O.P. v. U.S. Dep't of Homeland Security*, 338 F.R.D. 33, 55 (D. Md. 2020) (internal quotation marks and citations omitted). And Plaintiffs have no conflicts with the proposed class members and will adequately represent their interests. *See* Fed. R. Civ. P. 23(a)(4).

The proposed class also satisfies Rule 23(b)(2). MDH's failure to comply with its obligations applies generally to the class. MDH's conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them" and Plaintiffs seek "a single injunction or declaratory judgment [that] would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

FACTS

### A.   MDH Has Oversight Authority Over Maryland Nursing Facilities for the Benefit of Residents

There are 222 licensed nursing facilities in Maryland that participate in Medicaid or Medicare and that provide care to about 50,000 residents. *See* Center for Quality Measurement and Reporting, Maryland Health Care Commission, Nursing Home Utilization 2022, at 1, https://mhcc.maryland.gov/mhcc/pages/apcd/apcd_quality/documents/CQM_LTC_NH_CY2021 _Utilization_TABLES_20230228.pdf (last visited July 1, 2024).[1]   Federal law guarantees those residents certain rights, which are found in the Nursing Home Reform Act ("NHRA") and regulations promulgated thereunder. *See* 42 U.S.C. § 1396r(g)(1)(A).  Similar rights guaranteed by state law are found in the Resident Bill of Rights Act ("RBRA") and regulations promulgated thereunder. *See* Md. Code Ann., Health – Gen. §19-343.  Among other things, under both federal and state law, nursing facility residents have the right to: (i) be treated with respect and dignity (28 C.F.R. § 483.10; Md. Code Ann., Health – Gen. § 19-343(b)(2)(i)); (ii) participate in the development and implementation of their personalized care plan and receive the services included in their care plan (42 C.F.R. § 483.10(c)(2)(vi); Md. Code Ann., Health – Gen. § 19-343(b)(2)(ii))[2]; and (iii) be free from mental, sexual, or physical abuse, or involuntary seclusion (42 C.F.R. § 483.12; Md. Code Ann., Health – Gen. § 19-343(b)(2)(iv)).

---

[1] A nursing facility is "a facility . . . which offers nonacute inpatient care to patients suffering from a disease, chronic illness, condition, disability of advanced age, or terminal disease requiring maximal nursing care without continuous hospital services and who require medical and nursing services rendered by or under the supervision of a licensed nurse together with convalescent, restorative, or rehabilitative services." Md. Code Ann., Health – Gen. § 19-1401(e)(1).

[2] A nursing facility must develop a person-centered care plan for each resident within 48 hours of the resident's admission and a comprehensive care plan within 7 days thereafter, subject to periodic review and revision. *See* 42 C.F.R. § 483.21(a), (b); 42 U.S.C. § 1396r(b)(2)(C).  The "Plan of Care" is based on the Minimum Data Set, which is a standardized federally mandated assessment tool used to identify the health and functional capability of each nursing facility resident. *See* Boltz Dec. ¶ 10 (Ex. 1).

3

To ensure residents enjoy these rights, each nursing facility has corresponding quality of life obligations to ensure that "[e]ach resident . . . receive[s] . . . the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care," including for activities of daily living such as bathing, transfer and ambulation, toileting, and eating. *See* 42 C.F.R. § 483.24(b); Md. Code Ann., Health – Gen. § 19-343(b)(2)(ii). Each nursing facility also has corresponding quality of care obligations to "ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices," including for skin integrity "to prevent pressure ulcers" and, if they occur, to ensure that the resident "receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing." 42 C.F.R. § 483.25(b); Md. Code Ann., Health – Gen. § 19-343(b)(2)(ii). Each nursing facility also must comply with minimum requirements for on-site nursing staffing. *See* 42 C.F.R. § 483.35; Md. Code Regs. 10.07.02.19 (2021).

### 1.    Under Federal Law, MDH is Required to Conduct Unannounced Annual Surveys and Investigate Complaints at Each Nursing Facility

MDH is the state agency responsible for oversight and enforcement of the rights and obligations provided in the NHRA. *See* 42 U.S.C. § 1395aa(a); 42 C.F.R. § 488.11. In that capacity, MDH is required to conduct an unannounced annual survey of each Medicaid- and Medicare-participating nursing facility in Maryland to ensure its compliance with resident rights, quality of life, quality of care, and minimum staffing standards in the NHRA. *See* 42 U.S.C. § 1396r(g)(1)(A), (g)(2); Boltz Dec. ¶ 16. "The survey process uses resident and patient outcomes as the primary means to establish . . . compliance . . . . Specifically, surveyors will directly observe the actual provision of care and services to residents . . . , and the effects of that care, to assess

4

whether the care provided meets the needs of the individual residents . . . ." 42 C.F.R. § 488.26(c)(2).[3]

Annual evaluation of each nursing facility's performance against NHRA standards "enables [MDH] to document the nature and extent of deficiencies, if any, with respect to a particular function, and to assess the need for improvement . . . ." 42 C.F.R. § 488.26(b). The annual surveys thereby serve the critical purpose to "improve the quality of care for Medicaid-eligible nursing home residents, and either to bring substandard facilities into compliance with Medicaid quality of care requirements or to exclude them from the program." Staff of Subcomm. on Health and the Env't of the H.R. Comm. on Energy and Com., 100th Cong., 1st Sess. Rep. on Medicare and Medicaid Health Budget Reconciliation Amendments of 1987, 77 (Comm. Print 1987) (Ex. 2).

MDH must report and certify its annual survey findings to the Centers for Medicare and Medicaid Services ("CMS"). *See* 42 U.S.C. § 1396r(g)(5)(E); 42 C.F.R. § 488.11. CMS weighs the results of the annual surveys most heavily of the three bases to rate each nursing facility's performance from one (1) to five (5) stars on the CMS Care Compare website. *See* CMS, Design for *Care Compare* Nursing Home Five-Star Quality Rating System: Technical Users' Guide 1 (Apr. 2024) (Ex. 3).[4] CMS posts the ratings as a resource for consumers to consider in making long-term care decisions. *See id.*; *see also* Rachel M. Werner, *et al.*, *Changes in Consumer Demand Following Public Reporting of Summary Quality Ratings: An Evaluation in Nursing Homes*, HSR: Health Service Research 51:3; Part II 1291, 1303–04 (2016) (finding that "the

---

[3] An annual survey includes the full process of inspection, identification of deficiencies, and resolution of any deficiencies found in a nursing facility. *See* 42 U.S.C. § 1396r(g)(1)(A), (h).

[4] The other two bases for the ratings are facility-reported information on quality and staffing data based on payroll reporting. *See id.*

release of this summary rating system [on the CMS Compare website] was associated with a significant change in consumer demand for low- and high-scoring [nursing] facilities for both postacute care and long-term care admissions") (Ex. 4).

MDH also is responsible for investigating complaints of neglect and abuse in nursing facilities or any other allegation of noncompliance with federal or state standards. *See* 42 U.S.C. §§ 1396r(g)(1)(C), (g)(4), 42 C.F.R. § 488.335(a); CMS, Ch.5 – Complaint Procedures, State Operations Manual 7 (Rev. 212, Feb. 10, 2023) ("SOM, Ch. 5") (Ex. 5).[5] MDH must establish procedures and maintain adequate staff to investigate such complaints and, if possible, take precautions to protect the complaining resident's anonymity. *See* 42 U.S.C. § 1396r(g)(4); 42 C.F.R. §§ 488.332(a)(1), (2); 42 C.F.R. § 488.335; *see also* SOM, Ch. 5 at 7. The complaint investigatory process' objectives are (1) protective oversight (to identify and correct complaints that pose the greatest potential for harming residents); (2) prevention (to identify and correct less serious complaints and prevent escalation and future harm); and (3) promoting efficiency and quality of care. *See* SOM, Ch. 5 at 6.

MDH "determines the severity and urgency of the allegations, so that appropriate and timely action can be pursued." *Id.* at 7. A complaint alleging a violation of federal health, safety, and/or quality regulations that has or is likely to cause serious injury, serious harm, serious impairment, or death and where immediate corrective action is necessary to prevent such harm from occurring or recurring is characterized as "Immediate Jeopardy." *See id.* at 15; 42 C.F.R. § 489.3. MDH must begin an onsite investigation of such complaints within three business days. *See* SOM, Ch. 5 at 23. A complaint alleging a violation that "may have caused harm that

---

[5] A complaint investigation includes the full process of investigation, identification of deficiencies, and resolution of any deficiencies related to the complaint. *See* 42 U.S.C. § 1396r(g)(4), (h).

negatively impacts [a resident's] mental, physical and/or psychosocial status and [is] of such consequence to the [resident's] well-being that a rapid response by the SA [survey agency] is indicated" is characterized as "Non-Immediate Jeopardy – High Priority." *Id.* 17. MDH must begin an onsite investigation of such complaints "within an annual average of 15 business days of receipt of the initial report, not to exceed 18 business days." *Id.* These federal guidelines serve as "maximum time frames" for investigating resident complaints. *See id.* at 23. If a State's "time frames for the investigation of a complaint/incident are more stringent than the Federal time frames, the intake is prioritized using the State's timeframes." *Id.* at 7.

**2.    Under State Law, MDH is Required to Conduct Unannounced Annual Surveys and Investigate Complaints at Each Nursing Facility**

MDH has parallel state law obligations under the RBRA, which require MDH to conduct unannounced annual surveys and investigate complaints in each licensed nursing facility. *See* Md. Code Ann., Health – Gen. § 19-1408(a)(1), (b). Under state law, for the most serious complaints involving immediate jeopardy to a resident, MDH must make "every effort" to begin its investigation within 24 hours of receipt, but, in all events, must do so within 48 hours of receipt. *See* Md. Code Ann., Health – Gen. § 19-1408(b)(2)(i), (ii). For complaints that allege actual harm to a resident, but do not involve immediate jeopardy, MDH must begin an investigation "within 10 business days after receiving the complaint." Md. Code Ann., Health – Gen. § 19-1408(b)(1).

**3.    MDH's Enforcement Powers**

Dr. Marie Boltz is a licensed nurse and nursing home administrator in Pennsylvania with a Ph.D. in nursing from New York University and a Master of Science degree from the Gerontological Nurse Clinician program at the University of Pennsylvania. *See* Boltz Dec. ¶ 2. Currently, she is the Elouise Ross Eberly and Robert Eberly Endowed Professor at the Ross and Carol Nese College of Nursing at Pennsylvania State University. *See id.* She has over 39 years

of experience caring for patients in nursing facilities and working to achieve and maintain compliance with federal nursing facility requirements. *See id.* Based on her extensive experience and expertise, Dr. Boltz states that "thorough and timely surveys and complaint investigations can identify violations so that corrective actions can be taken to protect resident rights and mitigate the risks of immobility . . . ." Boltz Dec. ¶ 53. MDH has broad enforcement powers to achieve those goals.

If MDH determines that a nursing facility has violated resident rights, failed to meet quality of life or care standards, or otherwise is non-compliant with the NHRA or RBRA, it is required to cite the nursing facility for a deficiency. *See, e.g.,* Medicare State Operations Manual, Chapter 7 secs. 7001, 7212.3(5) (Ex. 5). Depending on the seriousness of the deficiency, MDH can impose remedies, including fines, installation of temporary outside management for the facility, state monitoring, transfer of residents, a directed plan of correction, termination of the facility's agreement to participate in the Medicaid program, and closure of the facility. *See* 42 U.S.C. § 1396r(h)(2); 42 C.F.R. § 488.406; Md. Code Ann., Health – Gen. § 19-1402(a). In the absence of oversight and enforcement, violations are not identified and corrected, and quality of life and care received by residents suffer.

## B. MDH Has Failed to Conduct Annual Surveys and to Investigate Complaints Timely

According to CMS data, MDH has not completed an annual survey in 174 of Maryland's 222 nursing facilities (or 78.4%) in the last sixteen months. *See Overdue Recertification Surveys Report,* Quality, Certification and Oversight Reports (QCOR), CMS, https://qcor.cms.gov/main.jsp (last visited July 18, 2024). The same data shows that MDH has not completed an annual survey in 149 (or 67.1%) of its nursing facilities in the last 24 months, in 123 (or 55.4%) of its nursing facilities in the last 36 months, and in 96 of its nursing facilities (or

8

43.2%) in the last 48 months. *See id.* By way of comparison, the national average across all states for failing to complete annual surveys in nursing facilities is 23.2% in the last 16 months, 11.3% in the last 24 months, 4.2% in the last 36 months, and 2.7% in the last 48 months. Maryland is one of only three states that has failed to conduct annual surveys in more than 70% of its nursing facilities in the last 16 months and in more than 60% of its nursing facilities in the last 24 months. And Maryland is one of only two states that have failed to conduct annual surveys in more than 50% of its nursing facilities in the last 36 months and in more than 40% of its nursing facilities in the last 48 months.

MDH also has failed to comply with its obligation to conduct timely complaint investigations in Maryland nursing facilities, resulting in a substantial backlog. In the last three fiscal years, MDH reported approximately 13,173 complaints or facility reported incidents in nursing facilities—only 6,685 (or just over 50%) of which have been investigated. *See* Maryland Department of Health Office of Health Care Quality, Annual Report and Staffing Analysis Fiscal Year 2023 at 9 (2024) (Ex. 7). Indeed, in violation of federal and state law, MDH often defers complaint investigations until the next annual survey. *See* Barry Simms, *'We just felt frustrated and ignored': Family says nursing home complaint went unanswered*, WBALTV11 (July 17, 2024) ("Individual complaints are often lumped in with an annual survey as part of a federal mandate."), https://www.wbaltv.com/article/nursing-home-complaint-no-answer-maryland/60649711# (last visited July 17, 2024). And, as noted above, MDH has not conducted an annual survey in the majority of Maryland nursing homes for more than three years. These delays in annual and complaint surveys compromise investigations through loss of evidence, staff

turnover, or the discharge or death of the complaining resident, and lead to violations remaining undiscovered and uncorrected, thereby harming residents.[6]

MDH's failure to comply with its obligations is long-standing and well documented. The U.S. Department of Health and Human Services ("HHS") Office of Inspector General found that Maryland was one of only ten (10) states that failed to meet CMS performance "timeliness threshold" requirements for nursing facility complaint investigations each year from 2011 through 2018. HHS, Office of Inspector General, *States Continued to Fall Short in Meeting Required Timeframes for Investigating Nursing Home Complaints: 2016-2018,* Data Brief, September 2020, OEI-01-19-00421, *available at* https://oig.hhs.gov/oei/reports/OEI-01-19-00421.pdf (accessed July 17, 2024). Subsequently, CMS found that MDH failed to meet four of the five measures relating to effective nursing facility survey and complaint process administration. *See* Center for Clinical Standards and Quality, CMS Admin Info: 23-10-ALL: Fiscal Year (2022) (FY22) State Performance Standards System (SPSS) Findings 7 (July 20, 2023) (Ex. 11).

In 2018, Maryland enacted legislation to mandate increased staffing in the Office of Health Care Quality("OHCQ")—the agency MDH has tasked with conducting annual surveys and complaint investigations—due to "the longstanding understaffing of nurse surveyors" and the apparent lack of "commitment to change the deficient and dangerous conditions in terms of the timeliness of investigating nursing home complaints, which affects the health and well-being of

---

[6] *See, e.g.*, Statement of Deficiencies and Plan of Correction, Pines Nursing and Rehab, 09/28/2022, at 44, 48, 92, 134 (18 months to investigate allegations of lack of care and inappropriate care, delay resulted in loss of medical records) (Ex. 8); Statement of Deficiencies and Plan of Correction, Copper Ridge Nursing and Assisted Living Center, 11/23/2022, at 2, 8, 19-20 (243 days to investigate a report of sexual abuse, delay resulted in loss of witnesses) (Ex. 9); Statement of Deficiencies and Plan of Correction, Autumn Lake Healthcare Center at Oakview, 11/3/23, at 2-3, 19-22 (22-month delay in investigating eloped resident resulted in loss of witnesses, facility failed to investigate, one witness responded to surveys "by asking how he was supposed to remember what happened 2 years ago.") (Ex. 10).

vulnerable Marylanders who reside in nursing homes." Maryland Nursing Home Resident Protection Act of 2018, S.B. 386, 2018 Reg. Sess. (Md. 2018) (Ex. 12). Despite that legislation, OHCQ remains understaffed. *See* OHCQ Analysis of the FY 2024 Maryland Executive Budget, 2023 at 15; OHCQ Analysis of the FY 2025 Executive Budget, 2024 at 5 (Exs. 13, 14); *see also* Barry Simms, *'We just felt frustrated and ignored': Family says nursing home complaint went unanswered*, WBALTV11 (July 17, 2024) ("The state said OHCQ was short-staffed, with only 64 of 75 surveyor positions filled."), https://www.wbaltv.com/article/nursing-home-complaint-no-answer-maryland/60649711# (last visited July 17, 2024).

### C. Defendants' Oversight Failures Have a Disparate Impact on Plaintiffs and Other Nursing Facility Residents with Mobility Impairments

MDH's failure to comply with its obligations to conduct annual surveys of nursing facilities and to investigate residents' complaints timely has a particularly pernicious impact on the approximately 9,000 residents in Maryland nursing facilities with disabilities involving mobility impairments, *i.e.*, they require extensive assistance from or totally depend on staff for mobility. *See* CMS, *Minimum Data Set Frequency, Q1 2024*, Data.CMS.gov, https://data.cms.gov/quality-of-care/minimum-data-set-frequency/data/q1-2024 (last visited July 17, 2024). Maryland nursing facility residents with mobility impairments require assistance with numerous tasks of daily living: 86% require assistance from one or more staff members to get into and out of bed and 94% require assistance for toileting. *See id.* And given their unique needs, residents with mobility impairments are at heightened risk for "social isolation, anxiety/depression, skin breakdown, urinary tract infection, respiratory complications, and falls." Boltz Dec. ¶ 48. Consequently, they are particularly impacted when violations of their rights go undiscovered and uncorrected due to MDH's failure to conduct annual surveys and to investigate complaints timely at nursing facilities. *See id.* ¶¶ 53–54. The facts relating to Plaintiffs are representative of that impact.

11

1. ███████

Since January 4, 2023, ███████ has resided and received care in ███████

███████. *See* ███ Dec. ¶ 6

(Ex. 15). MDH has not conducted an annual survey at that facility since ███████. Boltz

Dec. ¶ 17.

███████ who has a wedge compression of her first

lumbar vertebra, muscular dystrophy, chronic renal failure, acute and chronic respiratory failure,

generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), and dysphagia. *See* ███

Dec. ¶¶ 2–3; Boltz Dec. ¶ 17. Given her acute and chronic respiratory failure, ███████ has a

tracheostomy, which is connected to a mechanical ventilator at bedtime. *See* ███ Dec. ¶¶ 4, 5;

Boltz Dec. ¶ 17. ███████ uses a wheelchair for mobility. *See* Boltz Dec. ¶ 17. ███████ is

unable to transfer into or out of bed or into her wheelchair without assistance and also needs

assistance to reposition herself in bed. *See* ███ Dec. ¶ 3; Boltz Dec. ¶ 19. And she is incontinent

of bladder and bowel with a history of urinary tract infections. *See* Boltz Dec. ¶ 19.

Given her conditions, ███████ Plan of Care requires that nursing facility staff use a

mechanical lift to assist her with transferring into and out of bed, assist her with tracheostomy care,

assist her with repositioning in bed to prevent pressure ulcers and maintain her skin integrity, assist

her with range of motion exercises, anticipate her toileting needs, and make frequent rounds each

shift. ███ Dec. ¶¶ 9, 12; Boltz Dec. ¶¶ 17, 19. But there have been numerous deviations from

███████ Plan of Care.

For example, ███████ has ongoing problems receiving assistance when she is

incontinent and to reposition in bed, which is exacerbated at night when there are few staff on

duty. *See* ███ Dec. ¶ 9; Boltz Dec. ¶ 19. At times, facility staff simply place a fresh

incontinence brief over her soiled one. *See* Boltz Dec. ¶ 19.  These failures expose ▮▮▮▮▮ to the avoidable risk of skin breakdown and urinary tract infections and violate her right to be treated with dignity. *See id.*

In addition, the facility rarely complies with her Plan of Care requirement that at least two staff use a mechanical lift to transfer her into and out of bed. *See* ▮▮▮▮ Dec. ¶¶ 11, 12.  Ordinarily, she receives such assistance from only one staff member. *Id.*  She also does not receive assistance with the range of mobility exercises in the frequency that her Plan of Care requires, which puts her at risk for avoidable pain, loss of strength, and joint deformities. *See* Boltz Dec. ¶ 17.

Given her mobility impairment, ▮▮▮▮ relies on facility staff to respond to a call light when she needs assistance with daily care tasks. *See* ▮▮▮▮ Dec. ¶ 9; Boltz Dec. ¶ 18.  But ▮▮▮▮ call light has been broken for months, requiring her to use her neighbor's call light. *See* ▮▮▮ Dec. ¶ 9; Boltz Dec. ¶ 18. ▮▮▮▮ often waits at least 30 to 40 minutes, but often several hours for staff to respond, which exacerbates her preexisting anxiety. ▮▮▮ Dec. ¶¶ 9–11. On three occasions, ▮▮▮▮ was left waiting more than 8 hours for staff to respond to her call light to provide her with incontinence care. ▮▮▮ Dec. ¶¶ 10, 11; Boltz Dec. ¶ 18. And when staff do respond, ▮▮▮▮ has been subject to emotional abuse by staff who leave the room before she can adjust her tracheostomy and verbalize requests for assistance. *See* Boltz Dec. ¶ 20.

In September 2023, ▮▮▮▮ complained to MDH that the facility failed to provide hot water for four consecutive days—a frequent occurrence at the facility. *See id.* ¶ 13; Boltz Dec. ¶ 21.  MDH has failed to investigate ▮▮▮▮ complaint and the facility continues to fail to maintain sufficient hot water. *See* Burris Dec. ¶ 13; Boltz Dec. ¶ 21.

**2.** ▮▮▮▮▮▮▮▮▮▮

Since December 2012, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Miller Dec. ¶ 5

(Ex. 16); Boltz Dec. ¶ 23.  MDH has not conducted an annual survey at that facility since

▮▮▮▮▮▮▮▮▮▮.  *See* Boltz Dec. ¶ 23.

▮▮▮▮▮▮ is a ▮▮▮▮▮▮▮▮▮▮ who has quadriplegia following a cerebral

infarction, epilepsy, type 2 diabetes, generalized muscle weakness, anxiety disorder, major

depressive disorder, obstructive sleep apnea, anemia, schizoaffective disorder, benign prostatic

hyperplasia, Ogilvie Syndrome, rosacea, gastro-esophageal reflux disease, high blood pressure,

hand contracture in both hands, and keratoconus with cataracts. ▮▮▮▮ Dec. ¶ 3; Boltz Dec. ¶ 23.

▮▮▮▮▮▮ uses a computer adapted to his limited hand mobility for engagement with advocacy

groups, colleagues, and friends.  *See* Boltz Dec. ¶ 23.

According to his Plan of Care, ▮▮▮▮▮▮ depends on nursing facility staff to assist him

with all activities of daily living, including bathing, dressing, grooming, eating, repositioning in

bed, transitioning into and out of bed, general mobility, and toileting.  *See* ▮▮▮▮ Dec. ¶ 4; Boltz

Dec. ¶ 23.  But there have been numerous deviations from ▮▮▮▮▮▮ Plan of Care.

For example, given his need for assistance with all activities of daily living, his Plan of

Care requires that staff anticipate his needs and respond to his requests for assistance promptly.

*See* Boltz Dec. ¶ 26.  Staff nevertheless fails to respond to his call light in a timely manner; he

sometimes waits up to three hours for a response.  *See id.*; ▮▮▮▮ Dec. ¶ 6.

In addition, for fourteen months while he was denied access to a wheelchair and had only

limited access to the facility's Geri-chair, with the exception of some medical appointments,

Mr. Miller was confined to his bed in the room he shares and did not receive a shower, causing

him great distress by depriving him of the support he needs to maintain existing social relationships and create new ones. *See* ██ Dec. ¶¶ 10–12; Boltz Dec. ¶ 24.[7] ██ confinement resulted in his absence from important events (including, but not limited to, receiving a national award) and left him isolated and lonely. ██ Dec. ¶¶ 13–14.

The facility also has failed to safeguard ██ privacy and safety by failing to supervise residents with dementia who entered ██ room and defecated near his bed and manipulated his computer. *See* Boltz Dec. ¶ 25. The facility further imperiled ██ safety by assigning him a roommate with a history of physical aggression against which ██ is unable to defend given his disabilities. ██Dec. ¶ 15. Although that roommate recently left the facility, the experience traumatized ██ and exacerbated his preexisting conditions. *Id.*

On April 30, 2024, ██ filed a complaint with MDH about the facility's failure to notify him of roommate changes, failure to accommodate his technology-dependent communication needs, and denial of sunlight caused by a privacy curtain that is continuously closed across the window in his room. *See id.* ¶ 16. To date, MDH has not investigated ██ complaint. *See id.*

**3.** ██

Since March 21, 2020, ██ ████████████████████████████

████████████████████████████████████████

██ *See* ██ Dec. ¶ 4 (Ex. 17); Boltz Dec. ¶ 28. MDH has not conducted an annual survey at that facility since ██ Boltz Dec. ¶ 28.

██ ██████████████████████ who has a pacemaker, Parkinson's disease, anxiety disorder, major depressive disorder, claustrophobia, PTSD, low back pain, mild

---

[7] Mr. Miller only recently was provided with a functioning wheelchair. *See* Boltz Dec. ¶ 24.

cognitive impairment, schizophrenia, claustrophobia, insomnia, osteoporosis, limited vision, hearing loss, and muscle wasting/atrophy. *See* ▇ Dec. ¶¶ 3, 5; Boltz Dec. ¶ 28. ▇ uses a wheelchair for mobility and requires assistance to navigate the wheelchair. He also requires assistance to transfer into and out of bed, reposition in bed to prevent pressure ulcers and infection, and with incontinence care at least every two hours because he cannot walk to the toilet. *See* ▇ Dec. ¶ 6; Boltz Dec. ¶ 29. ▇ also relies on facility staff to assist him with personal hygiene, support for socialization, nutrition, and medication administration. ▇ Dec. ¶ 6; Boltz Dec. ¶ 29.

The nursing facility often fails to provide ▇ with the assistance he needs. For example, ▇ Plan of Care requires two nursing facility staff to use a mechanical lift to transfer him into and out of bed. *See* Boltz Dec. ¶ 29. It is important that ▇ be transferred out of bed because his Plan of Care states that staff should facilitate social activity and engagement given his history of depression and anxiety. *See id.* But staff rarely transfer him out of his bed. *See id.* As a result, he spends many days secluded in his room, which increases his risk for depression. *See* ▇ Dec. ¶¶ 8–9; Boltz Dec. ¶ 29.

The nursing facility also often fails to provide ▇ with the incontinence care he requires, leaving him once in soiled incontinence briefs for twelve hours. *See* ▇ Dec. ¶ 10. Because it can take more than one hour for staff to respond to his call light, ▇ limits use of his call light to one or two times daily when he needs incontinence care. *See id.* ¶ 13. The nursing facility often fails to reposition him in bed every two hours despite his history of pressure ulcers and fungal skin infections, which results in painful bed sores. *See id.* ¶¶ 14–15. Finally, ▇ has not received the physical therapy he needs to treat his Parkinson's disease. *See id.* ¶ 16.

16

**4.** ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████  *See* ████ Dec. ¶ 3 (Ex. 18); Boltz Dec. ¶ 34.

MDH has not conducted an annual survey at that facility since November 15, 2022.  *See* Boltz

Dec. ¶ 34.

████████████████████████████████████  with left-side weakness due to a stroke,

ambulatory dysfunction, diabetes, deep vein thrombosis, chronic kidney disease, dizziness,

obstructive sleep apnea, peripheral vascular disease, and urinary and bowel incontinence.  *See*

████ Dec. ¶¶ 3, 5; Boltz Dec. ¶ 34.  ████████ Plan of Care states that he requires extensive

assistance with bathing, dressing, transferring into and out of bed, repositioning in bed, mobility,

and personal hygiene.  Boltz Dec. ¶ 34.

████████ often did not receive the care required by his Plan of Care.  For example, his

Plan of Care required that he get out of bed every day with the assistance of two staff and a

mechanical lift, but he often did not receive that assistance and was left in bed all day.  *See* ████

Dec. ¶¶ 10, 15; Boltz Dec. ¶ 35.  And when he was helped out of his bed, there were rarely two

staff members available to assist him.  ████ Dec. ¶ 15.  On March 2, 2023, ████████ was injured

when only one staff member attempted to transfer him out of bed using a mechanical lift and

████████ struck his head, causing his hospitalization with dizziness and nausea.  *See id.* ¶ 15;

Boltz Dec. ¶ 39.

████████ also did not receive the specialized incontinence care required by his Plan of

Care.  On days when he was assisted out of bed, he was not able to receive incontinence care unless

he agreed to return to bed for the rest of the day.  *See* Boltz Dec. ¶ 35.  Consequently, he waited

17

until the evening to receive incontinence care, which frequently left him in soiled incontinence briefs for entire shifts or longer. *See* ▮▮▮ Dec. ¶¶ 8–9; Boltz Dec. ¶¶ 35–36.   And the facility often failed to shower ▮▮▮▮ twice a week and to assist with brushing his teeth as required by his Plan of Care. *See* ▮▮▮ Dec. ¶¶ 12–13; Boltz Dec. ¶ 38.

In May 2023, ▮▮▮▮ wife filed a complaint with MDH, which alleged, among other things, that on April 16, 2023, ▮▮▮▮ did not receive incontinence care for more than 15 hours and that the nursing facility staff did not timely respond to his call bell. *See* ▮▮▮ Dec.  ¶ 11; Boltz Dec. ¶ 40.  MDH has not yet investigated that complaint. *See id.*

**5.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ Dec. ¶ 5

(Ex. 19); Boltz Dec. ¶ 43.   MDH has not conducted an annual survey at that facility since ▮▮▮▮▮. *See* Boltz Dec. ¶ 43.

▮▮▮▮▮▮▮▮▮▮▮ who is in a persistent vegetative state as a result of traumatic brain injuries suffered during a boating accident. *See* ▮▮▮ Dec. ¶¶ 3–4; Boltz Dec. ¶ 43.   In addition, he has peripheral vascular disease, hypertension, gastroesophageal reflux disease, and seizure disorder. *See* Boltz Dec. ¶ 43.  He is nonverbal and unable to communicate. *See id.*  And he is incontinent of bladder and bowel and uses a urinary condom catheter. *See id.*

Given his conditions, his Plan of Care indicates that he requires total care, including in mobility, transfers into and out of bed, incontinence and catheter care, personal hygiene, socialization, mental stimulation, nutrition, and medication administration. *See* ▮▮ Dec. ¶ 13; Boltz Dec. ¶ 45.  But the nursing facility often fails to provide that required care.

18

For example, ███████ — ███████ mother and legal guardian—has found ███████ poorly positioned in bed, and fed dry food with no liquids despite the requirement in his Plan of Care that he be out of bed for lunch and dinner and that he be sitting upright and alternating liquid and solid swallows to prevent aspiration. *See* Boltz Dec. ¶ 45. In addition, facility staff have failed to provide ███████ with his own cup he uses to prevent choking, which his Plan of Care requires. *See* ███ Dec. ¶ 12; Boltz Dec. ¶ 45. Likewise, facility staff has failed to comply with the requirement in ███████ Plan of Care that he wear a clothing protector to limit his behavior of chewing on his clothing. *See* ███ Dec. ¶ 16. And, in January 2024, ███████ developed a new stage 2 pressure ulcer despite the requirement in his Plan of Care that he be repositioned in bed at least every two hours, receive weekly skin checks by a nurse, and that nursing staff use pressure relieving devices on his bed and wheelchair. *Id.* ¶¶ 7, 18.

In early November 2023, ███████ found her son soaked in urine when she arrived at 11:30 a.m. because his catheter tube was incorrectly positioned. *See id.* ¶ 20. Even though ███████ asked the staff for assistance and even though ███████ is supposed to receive incontinence care every two hours, ███████ was not changed until the next shift of nurses started duty at 3:00 p.m. because she was told none were available until that time. *See id.*

### 6.  Other Nursing Facility Residents with Mobility Impairments

Plaintiffs' experiences are not isolated instances. Their experiences are typical of nursing facility residents with mobility impairments "who are at particular risk given their special needs" when "annual surveys and complaints are not conducted in a timely manner." Boltz Dec. ¶ 54. Other nursing facility residents with mobility impairments, residing in a nursing facility that has not had an annual inspection in the last sixteen months or having made a complaint, which MDH has not responded to, or both, are similarly harmed by MDH's failure to timely address violations

19

of their rights under federal and state law.  *See* ▓▓▓▓▓ Dec. ¶¶ 9–10 (Ex. 20); ▓▓▓▓▓ Dec. ¶ 6 (Ex. 21); ▓▓▓▓▓ Dec. ¶ 10 (Ex. 22); ▓▓▓▓▓ Dec. ¶ 5 (Ex. 23).

For example, similarly situated nursing facility residents report similar experiences of prolonged delays in staff response to call lights and other requests for assistance with activities of daily living. ▓▓▓▓▓ Dec. ¶ 6 ("I often wait for over an hour before a staff member responds to my call light.  Multiple times, I have had to wait until the end of aides' shifts, which can take so long that I fall asleep and am awoken much later to be changed.  Staff have also refused to change me more than one time per shift."); ▓▓▓▓▓ Dec. ¶ 10; ▓▓▓▓▓ Dec. ¶ 7; ▓▓▓▓▓ Dec. ¶¶ 7–8. In addition, they report that their Plans of Care or treatment protocols are not followed. ▓▓▓▓▓ Dec. ¶¶ 8–10 (describing extensive gaps in providing physical and occupational therapies); ▓▓▓▓▓ Dec. ¶¶ 6–11 (Ex. 24); ▓▓▓▓▓ Dec. ¶¶ 6–9; ▓▓▓▓▓ Dec. ¶ 7; ▓▓▓▓▓ Dec. ¶¶ 7–8, 11–13 (Ex. 25).  Further, they report loss of dignity and other harms. ▓▓▓▓▓ Dec. ¶ 9 ("I am forced to sit in wet linens in my bed"); ▓▓▓▓▓ Dec. ¶ 12; ▓▓▓▓▓ Dec. ¶¶ 7a, b; ▓▓▓▓▓ Dec. ¶ 7; ▓▓▓▓▓ Dec. ¶ 7; ▓▓▓▓▓ Dec. ¶ 7.  Residents with mobility impairments experience unique harms when the nursing facility fails to have sufficient staff on duty to meet the needs of the residents. ▓▓▓▓▓ Dec. ¶¶ 7c, 8 ("I informed OHCQ that the geriatric nurse aid (GNA) ratio on the West Wing was 1 GNA for every 18 or 19 residents. The nurse ratio was 1 nurse for every 25 residents. ... is often left in soiled diapers for 3-6 hours."); ▓▓▓▓▓ Dec. ¶¶ 8, 10; ▓▓▓▓▓ Dec. ¶¶ 11–12; ▓▓▓▓▓ Dec. ¶¶ 8–9; ▓▓▓▓▓ Dec. ¶ 6; ▓▓▓▓▓ Dec. ¶ 6; *see also* Barry Simms, *'We just felt frustrated and ignored': Family says nursing home complaint went unanswered*, WBALTV11 (July 17, 2024), https://www.wbaltv.com/article/nursing-home-complaint-no-answer-maryland/60649711# (last visited June 28, 2024); Barry Simms, *Families with loved ones under nursing home care concerned over complaint process in Maryland*, WBALTV (Feb. 13,

2024), https://www.wbaltv.com/article/nursing-home-care-complaint-process-maryland/46772248 (last visited July 17, 2024)..

Each Plaintiff and Declarant has a disability involving mobility impairment and has experienced care in the nursing facility that does not comply with federal and state nursing facility requirements, including the right to: (i) implementation of their Plan of Care (28 C.F.R. § 483.10(c)(2)(vi); Md. Code Ann., Health – Gen 19-343(b)(2)(ii)); (ii) receive assistance in completing activities of daily living, such as bathing and toileting (28 C.F.R. § 483.24; Md. Code Ann., Health – Gen. § 19-343(b)(2)(ii)), (iii) be treated with dignity and respect, (28 C.F.R. § 483.10; Md. Code Ann., Health – Gen 19-343(b)(2)(i)); and (iv) sufficient staff with the appropriate competencies and skill sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident (42 C.F.R. § 483.35, Md. Code Regs. 10.07.02.19 (2021). As a result of these violations, each Plaintiff has suffered physical harm, psychosocial harm or humiliation, and harm that was uniquely related to their mobility impairment.  *See* Boltz Dec. ¶ 15.  These violations should have, but were not, investigated and corrected due to MDH's failure to conduct annual surveys and investigate complaints timely in Maryland nursing facilities.  "In the absence of such surveillance and investigation, when nursing facilities violate resident rights, the harms experience by Plaintiff are typical of mobility impaired residents." Boltz Dec. ¶ 54.

**D.      Plaintiffs' Claims**

Plaintiffs seek to represent a class comprised of "Residents of nursing facilities, who have disabilities with mobility impairment, and who live in nursing facilities that operate under the oversight authority of MDH."  Compl. ¶ 160.  Plaintiffs assert claims on behalf of themselves and the proposed class for violations of Title II of the ADA and Section 504 of the RA.  Plaintiffs seek

declaratory and injunctive relief requiring MDH to conduct annual surveys and timely investigate complaints in Maryland nursing facilities and impose appropriate corrective and enforcement remedies consistent with its obligations under federal and state law.

**LEGAL STANDARD**

Plaintiffs seeking class certification must satisfy each of the prerequisites of Rule 23(a), which are "commonly referred to as 'numerosity,' 'commonality,' typicality,' and 'adequacy.'" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir.), *cert. denied*, 140 S. Ct. 676 (2019) (citing Fed. R. Civ. P. 23(a)). Plaintiffs then must "demonstrate[] that the proposed class fits into one of the specific forms of class adjudication provided by Rule 23(b)." *Id.* at 655 (citation omitted). As relevant here, Plaintiffs invoke Rule 23(b)(2), which provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2).[8] As explained below, Plaintiffs have satisfied all the requirements for certification of the proposed class.

**ARGUMENT**

**I.   THE PROPOSED CLASS SATISFIES ALL THE RULE 23(a) PREREQUISITES**

**A.   The Proposed Class is So Numerous that Joinder of All Class Members Would Be Impracticable**

To satisfy the numerosity requirement, "a class [must] be 'so numerous that joinder of all members is impracticable.'" *In re Zetia (Exetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir.

---

[8] In some cases plaintiffs also are required to satisfy an "'ascertainability'" requirement by showing that the Court "'can readily identify the class members in reference to objective criteria.'" *Krakauer*. 925 F.3d at 654–55 (citations omitted). However, "[t]here is no threshold ascertainability requirement in [a] Rule 23(b)(2) case [like this], which seeks only declaratory and injunctive relief from a discriminatory policy." *Kadel v. Folwell*, 100 F.4th 122, 161 (4th Cir. 2024) (en banc).

2021) (quoting Fed. R. Civ. P. 23(a)(1)).  "Though [n]o specified number is needed to maintain a class action, [a]s a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone."  *Id.* (citations and internal quotation marks omitted); *see also In re Under Armour Secs. Litig.*, 631 F. Supp. 3d 285, 300 (D. Md. 2022) ("'[G]enerally, courts find classes of at least 40 members sufficiently large to satisfy the impracticability requirement . . . .'" (citation omitted)).

Based on data supplied by Maryland nursing facilities to CMS, there are more than 9,000 members of the proposed class—residents of nursing facilities who have mobility impairments and who reside in nursing facilities operated under MDH's authority.  *See* CMS, *Minimum Data Set Frequency, Q1 2024*, Data.CMS.gov, https://data.cms.gov/qualitty-of-care/minimum-data-set-frequency/data (last visited July 17, 2024).  Joinder of each of them in this action plainly would be impracticable.  Accordingly, the proposed class satisfies the numerosity requirement.

### B.    There are Questions of Law or Fact Common to the Proposed Class

"'[T]he commonality requirement is not a high bar.'"  *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 53 (D. Md. 2020) (citation omitted).  "To establish commonality, the party seeking certification must demonstrate that the class members have suffered the same injury and that their claims depend upon a common contention."  *Id.* (internal quotation marks and citations omitted).  As distinct from Rule 23(b)(3), which requires a showing that "'common questions or law or fact predominate,'" the commonality requirement in Rule 23(a)(2), requires "'only [that] such questions exist.'"  *Id.* (citation omitted).  And the common question(s) must "'generate common *answers* apt to drive the resolution of the litigation.'"  *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 350 (2011) (emphasis in original)).  Thus, "a single common question will suffice" as long as "its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the RA contains nearly identical language:  "No otherwise qualified individual with a disability . . . shall, solely, by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . ."  29 U.S.C. § 794(a).  And the implementing regulations of both statutes prohibit discrimination in methods of administering public programs: "a public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(ii).  Given the common language in the statutes, courts in this Circuit "interpret[] the ADA and the RA in lockstep.  *Basta v. Novant Health Inc.*, 56 F.4th 307, 316 (4th Cir. 2022); *see also Koon v. North Carolina*, 50 F.4th 398, 403 n.2 (4th Cir. 2022) ("The Fourth Circuit treats claims under the Rehabilitation Act and the ADA as the same.").

To establish a violation of Title II of the ADA and Section 504 of the RA, "plaintiffs must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability."  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) (citation omitted).  Plaintiffs' claims raise

questions of fact and law common to the proposed class members, which will "generate common *answers* apt to drive the resolution of the litigation." *Peters*, 2 F.4th at 242 (emphasis in original, citation omitted).

*First*, do Plaintiffs and the proposed class members have a "disability" within the meaning of the ADA and RA? A "disability" includes "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A), 29 U.S.C. § 705(20). And "substantially limits" means "[s]ignificantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity," including "caring for oneself" and "walking." 29 C.F.R. §§ 1630.2(j)(1)(ii), 1630.2(i), 12 C.F.R. § 268.303. Each Plaintiff has been assessed by the nursing facility in which they reside as requiring extensive assistance from or being totally dependent on staff for transfer. In other words, each Plaintiff has a mobility impairment. By virtue of their mobility impairments, Plaintiffs have a disability. And that answers the question for the proposed class members—each of whom has been assessed by their nursing facility as having a mobility impairment in the same way as Plaintiffs.

*Second*, are Plaintiffs and the proposed class members qualified to receive the benefits of a public service, program, or activity? "Although the ADA does not define the phrase 'services, programs, or activities,' courts have held that the phrase 'encompasses virtually everything that a public entity does.'" *Levy v. Mote*, 104 F. Supp. 2d 538, 543 (D. Md. 2000) (citations omitted). MDH's oversight and enforcement activities are a public service program and/or activity, and each Plaintiff as a resident of a Maryland nursing facility that participates in Medicare and Medicaid is qualified to receive that benefit. And that answers the question for the proposed class members— each of whom resides in a Maryland nursing facility that participates in Medicare and Medicaid.

*Third*, does MDH's administration of its responsibilities under the NHRA and RBRA deny Plaintiffs and the proposed class members the benefit of oversight and enforcement of their rights on the basis of their disability? The resolution of that question for Plaintiffs will resolve the same questions for each proposed class member. Thus, a factual determination of whether MDH's abrogation of its oversight activities significantly decreases the likelihood that nursing facilities would honor resident rights and provide care consistent with their Plans of Care necessarily will determine the same question for each proposed class member. *See* Compl. ¶¶ 164a, 164b. Similarly, a determination whether MDH's failure to comply with its oversight obligations has a disparate impact on Plaintiffs given their unique needs and risks due to their mobility impairments necessarily will determine the same question for each proposed class member. *See* Compl. ¶ 164c. And the corresponding legal determinations whether, if the foregoing facts are proved, they constitute violations of Title II of the ADA and Section 504 of the RA likewise will be established as to each proposed class member if they are established as to Plaintiffs.

Courts in this Circuit routinely have found commonality in putative class actions involving claims for ADA violations seeking declaratory and injunctive relief based on conduct applying uniformly across the class. *See, e.g.*, *Joseph R. v. Justice*, 344 F.R.D. 294, 313 (S.D. W. Va. 2023); *Buffkin v. Hooks*, No. 1:18CV502, 2018 WL 6271855, at *6 (M.D.N.C. Nov. 30, 2018), *adopted in relevant part*, 2019 WL 1282785 (M.D.N.C. Mar. 20, 2019); *Pashby v. Cansler*, 279 F.R.D. 347, 353 (E.D.N.C. 2011); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 456–57 (E.D.N.C. 2011).

### C.     The Plaintiffs' Claims are Typical of the Proposed Class Members' Claims

"[T]he inquiries under the typicality and commonality requirements of Rule 23(a) 'tend to merge.'" *J.O.P.*, 338 F.R.D. at 56 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)); *see also Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009), *cert. denied*, 559

U.S. 974 (2010) ("the final three requirements of Rule 23(a) tend to merge, with commonality and typicality serving as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence" (internal quotation marks and citations omitted, alterations in original)).   The typicality requirement "'determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.'" *J.O.P.*, 338 F.R.D. at 55 (citation omitted); *see also Jackson v. Am. Elec. Warfare Assocs., Inc.*, Civil Action No. TDC-22-1456, 2024 WL 556230, at *4 (D. Md. Feb. 12, 2024) (same).   "The plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *J.O.P.*, 338 F.R.D. at 56 (cleaned up, internal quotation marks and citations omitted).

Plaintiffs' claims are typical of the claims of the proposed class members.   Plaintiffs and the proposed class members are each residents of Maryland nursing facilities with mobility impairments. *See* Boltz Dec. ¶ 15.   As such, they require substantial assistance with daily living tasks and are at heightened risk for the same complications: "social isolation, anxiety/depression, skin breakdown, urinary tract infection, respiratory complications, and falls." *Id.* ¶ 48.   And they require staff to respond to a call light to access assistance. *See id.* ¶ 50.

Each Plaintiff resides and receives care in a nursing facility that MDH has not surveyed in more than one year, has suffered physical harm uniquely related to their mobility impairments, and were subjected to psychosocial harm or humiliation due to violations of the NHRA and RBRA. *See id.* ¶ 15.   Plaintiffs' claims are typical of those of the proposed class members because "when annual surveys and complaints are not conducted in a timely manner, mobility-impaired residents

27

are at particular risk given their special needs" and experience harm like the Plaintiffs experienced. *Id.* ¶ 54. That is confirmed by press reports and declarations from proposed class members. *See supra* Facts, C.6.

That there may be differences in the specific harms to which class members are exposed by MDH's failure to conduct annual surveys and timely investigate complaints does not defeat typicality. "A claim may differ factually and still be typical of the claims of class members if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members." *J.O.P.*, 338 F.R.D. at 55 (internal quotation marks and citations omitted); *see also In re Marriott Int'l, Inc. v. Customer Data Security Breach Litig.*, 341 F.R.D. 128, 148 (D. Md. 2022) ("'Factual differences do not necessarily render a claim atypical, but the claims must be based on the same course of conduct and legal theory.'" (citation omitted)). Plaintiffs' and each class member's claims are based on the MDH's failure to comply with its obligations and the disparate impact that failure has on Maryland nursing facility residents with mobility impairments. Accordingly, Plaintiffs' claims are typical of the proposed class members' claims.

### D.  Plaintiffs Will Fairly and Adequately Protect the Interests of the Proposed Class Members

The adequacy requirement in Rule 23(a)(4) is met "'if: (1) the named plaintiffs' interests are not opposed to those of other class members, and (2) the plaintiffs' attorneys are qualified, experienced and able to conduct the litigation.'" *J.O.P.*, 338 F.R.D. at 57 (citation omitted). Both criteria are satisfied here.

Each Plaintiff or their guardian has been informed of their responsibilities as a class representative and is able and willing to fulfill that role. *See* ▮ Dec. ¶ 14; ▮ Dec. ¶ 17; ▮ Dec. ¶ 17; ▮ Dec. ¶ 17; ▮ Dec. ¶ 20. And Plaintiffs' interests are aligned with those of the proposed class members. Each has the same interest in MDH complying with its obligations

under federal and state law to conduct annual surveys and to investigate complaints in a timely fashion in the Maryland nursing facilities in which they reside. There are no conflicts between Plaintiffs and the proposed class members.

Moreover, Plaintiffs' counsel have experience in class litigation. Counsel at Maryland's Public Justice Center have extensive experience in Medicaid access as well as complex civil litigation, including class actions in both state and federal courts. Justice in Aging is a nonprofit legal advocacy firm representing low-income older adults on issues relating to income stability and access to health care, with experience and expertise in public benefit programs relied upon by older adults, and experience in class action litigation across the country, including ADA matters. Finally, Arnold & Porter Kaye Scholer LLP, a law firm with extensive global reach, experience, and deep knowledge across geographic, cultural, technological, and ideological borders, has extensive experience in class-action cases, and has previously served as co-counsel with Justice in Aging in a case against a government agency on behalf of a class of plaintiffs. *See Bumgarner*, 276 F.R.D. at 458 (finding named plaintiffs adequate where "they are aware of their duties as class representatives, will fairly and adequately represent the interests of the class as a whole, have no conflicts of interest, . . . have a genuine personal interest in the outcome of this action," and are represented by counsel with "the requisite experience . . . ").

## II.     THE PROPOSED CLASS SATISFIES RULE 23(b)(2)

Under Rule 23(b)(2), a class may be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Advisory Committee Notes to Rule 23 provide, "[a]ction or inaction is directed to a class within the meaning of [Rule 23(b)(2)] even if it has taken effect or is threatened only as

to one or a few members of the class, provided it is based on grounds which have general application to the class." Fed. R. Civ. P. 23, Advisory Committee Note to 1966 Amendment of Subdivision (b)(2). "'The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *J.O.P.*, 338 F.R.D. at 57 (quoting *Wal-Mart*, 564 U.S. at 360). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

MDH's failure to comply with its obligations to conduct annual surveys and investigate complaints timely "appl[ies] generally to the class," and the requested declaratory and injunctive relief requiring MDH to comply with those obligations "'would provide the same relief to all class members[.]'" *J.O.P.*, 338 F.R.D. at 57 (citation omitted). The requested relief does not require the Court to differentiate among class members. A declaration or injunction requiring MDH to comply with its obligations necessarily would apply to each proposed class member. The Court should certify a class under Rule 23(b)(2) because "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

## CONCLUSION

For the foregoing reasons, this Court should certify a class consisting of residents of nursing facilities who have disabilities with mobility impairment and who live in nursing facilities that operate under the oversight authority of MDH.

Dated:  July 19, 2024

*/s/ Debra Lynn Gardner*

Debra Lynn Gardner (Fed. Bar No. 24239)
PUBLIC JUSTICE CENTER
201 North Charles Street, Suite 1200
Baltimore, MD 21201
Telephone: (410) 625-9409
Facsimile: (410) 625-9423
gardnerd@publicjustice.org

*Regan Bailey
*Liam McGivern
JUSTICE IN AGING
1444 I Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 683-1990
RBailey@justiceinaging.org
LMcGivern@justiceinaging.org

*Sheila S. Boston
*Samuel Lonergan
*Robert Grass
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
Sheila.Boston@arnoldporter.com
Samuel.Lonergan@arnoldporter.com
Robert.Grass@arnoldporter.com

*Admitted *Pro Hac Vice*

31

## CERTIFICATE OF SERVICE

I certify that I served the foregoing Plaintiffs' Memorandum in Support of Their Motion for Class Certification by filing the document with the Clerk of the Court on the CM/ECF system, which sends notification to all counsel of record.

/s/ Debra Lynn Gardner
Debra Lynn Gardner (Fed. Bar No. 24239)