## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| IRENE CONNOR, *et al.,* | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.: 1:24-CV-01423-MJM |
| MARYLAND DEPARTMENT OF HEALTH, *et al.,* | * | |
| | * | |
| Defendants. | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**ANTHONY G. BROWN**
**Attorney General of Maryland**

*/s/* David E. Wagner
DAVID E. WAGNER
Assistant Attorney General
Federal Bar No. 13386
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
david.wagner@maryland.gov
(410) 767-5205 (telephone)
(410) 333-7894 (facsimile)

*/s/* Nicole Lugo Clark
NICOLE LUGO CLARK
Federal Bar No. 26983
Assistant Attorney General
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
Nicole.LugoClark@maryland.gov
(410) 767-5292 (direct)
(410) 333-7894 (facsimile)

*/s/* Brandy J. Gray
BRANDY J. GRAY
Federal Bar No. 28455
Assistant Attorney General
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
Brandy.Gray1@maryland.gov
(410) 767-1861 (direct)
(410) 333-7894 (facsimile)


Attorneys for the Maryland Department
of Health and Secretary of Health

## TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………… 1

BACKGROUND …………………………………………………………………….... 3

Nursing Home Regulation in Maryland ……………………………………………… 3

The Plaintiffs ……………………………………………………………………… 5

    Plaintiff Irene Connor (Pseudonym) …………………………………………… 5

    Plaintiff Michael Nevin (Pseudonym) …………………………………………… 6

    Plaintiff Alex Noonan (Pseudonym) …………………………………………… 6

    Plaintiff Herman Dressel (Pseudonym) ………………………………………… 7

    Plaintiff Richard Hollman (Pseudonym) ……………………………………… 7

ARGUMENT ……………………………………………………………………… 8

I.   BECAUSE THE PLAINTIFFS AND PROPOSED CLASS MEMBERS LACK STANDING,
    CLASS CERTIFICATION SHOULD BE DENIED …………………………………… 8

      A.   Plaintiffs Have Alleged Their Injuries Were Caused by the Independent Actions of
           the Nursing Facilities, not by the Department ……………………….…..... 8

      B.   The Plaintiffs' Definition of the Proposed Class Does Not State an Injury…… 11

II.   PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO PROVE—SUBJECT TO
    RIGOROUS ANALYSIS—THAT THE REQUIREMENTS OF RULE 23 HAVE BEEN
    SATISFIED………………………………………………………………….…..... 12

      A.   Ascertainability…………………………………………………………… 13

      B.   Numerosity…………………………………………………………………. 14

      C.   Commonality……………………………………………………………… 15

      D.   Typicality…………………………………………………………………… 22

      E.   Adequacy of Representatives…………………………………………….… . 24

      F.   Rule 23(b)……………………………………………………………….…... 25

CONCLUSION ……………………………………………………………………… 27

# TABLE OF AUTHORITIES

## CASES

*Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997)……………………………..3, 27, 28, 29

*Baehr v. Creig Northrop Team, P.C.,* 953 F.3d 244 (4th Cir.), *cert. denied,* 141 S. Ct. 373 (2020).
.................................................................................................................................. 1, 9

*Bond v. Marriott Intern., Inc.,* 296 F.R.D. 403 (D.Md. 2014)…………………………...22, 24, 25

*Broth. of Teamsters v. United States,* 431 U.S. 324 (1977)........................................................... 24

*Califano v. Yamasaki,* 442 U.S. 682 (1979). ............................................................................... 14

*Dieter v. Microsoft Corp.,* 436 F.3d 461 (4th Cir. 2006)........................................................ 3, 26

*Doe v. Obama,* 631 F.3d 157, 161-62 (4th Cir. 2011)...................................................................11

*East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395 (1977)…………………….12, 24

*East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395 (1977) ................................... 28

*EQT Prod. Co. v. Adair,* 764 F.3d 347 (4th Cir. 2014) ............................................................. 13

*Gen. Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982)………………………….2, 13

*Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom* ........................ 23

*Ginwright v. Exeter Fin. Corp.,* 280 F. Supp. 3d 674 (D.Md. 2017)……………………...4,29, 31

*Griffin v. Dugger,* 823 F.2d 1476 (11th Cir. 1987). ...................................................................... 1, 9

*Hammond v. Powell,* 462 F.2d 1053 (4th Cir. 1972)....................................................................... 15

*Shook v. Bd. of County Commissioners of County of El Paso,* 543 F.3d 597 (10th Cir. 2008)..... 26

*In re Zetia (Ezetimibe) Antitrust Litig.,* 7 F.4th 227 (4th Cir. 2021) ..................................... 13, 15

*Incumaa v. Ozmint,* 507 F.3d 281 (4th Cir. 2007)......................................................................... 7

*Kadel v. Folwell,* 100 F.4th 122 (4th Cir. 2024),......................................................................13, 14

*Krakauer v. DISH Network, LLC,* 925 F.3d 643 (4th Cir. 2019). ............................................ 8, 12

*Linda R.S. v. Richard D.,* 410 U.S. 614 (1973) .......................................................................... 10

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). ................................................................... 8

*Murthy v. Missouri,* 144 S.Ct. 1972 (2024)…………………………………………..1,8, 10, 11

*Noel v. N.Y.C. Taxi & Limousine Comm'n,* 687 F.3d 63 (2d Cir. 2012)................................. 18, 19

*Pashby v. Cansler,* 279 F.R.D. 347 (E.D.N.C. 2011) ................................................................. 22

*Reeves v. Queen City Transp., Inc.,* 10 F.Supp.2d 1181 (D.Colo. 1998) .................................... 18

*Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208 (1974)…………………….12, 24

*Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26 (1976)…………………………...1,9, 10

*Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311 (4th Cir. 2006) ........................................ 13

*Tyler v. City of Manhattan,* 849 F. Supp. 1429 (D. Kan. 1994) ................................................. 18

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) .................... 2, 12, 13, 14, 15, 16, 17, 19, 21

*Wendel v. Florida Dep't of Highway Safety and Motor Vehicles,* 80 F. Supp. 3d 1297 (M.D. Fla.
2015) ............................................................................................................................. 18

## STATUTES

28 C.F.R. § 483.10(a)(2) ............................................................................................................. 4

28 C.F.R. § 483.12(b)(1) ........................................................................................ 4
28 C.F.R. § 483.24 ................................................................................................. 5
28 C.F.R. § 483.24(a) ............................................................................................ 4
28 C.F.R. § 483.24(b)(2) ........................................................................................ 4
28 C.F.R. § 483.25(c) ............................................................................................ 4
42 C.F.R. § 483.70(c) ............................................................................................ 4
42 C.F.R. Part 488 ................................................................................................. 4
42 U.S.C. § 1395aa(a) ........................................................................................... 3
42 U.S.C. § 1396r(g) ............................................................................................. 3
42 U.S.C. § 1396rI(1)(A)(v)(I) .............................................................................. 4
45 C.F.R. § 84.1 .................................................................................................... 3
Md. Code Ann., Health-Gen. § 19-1408 ............................................................... 3
Md. Code Ann., Health Occ. § 19-1801(1) .......................................................... 17
Md. Code Ann., Health-Gen. § 19-318 (LexisNexis 2023) .................................. 3

## RULES

Rule 23 ........................................................................ 1,2, 12, 13, 15, 16, 128, 24, 25
Rule 23(b) ................................................................................. 1,3,13,14,25,26,27

## LAW REVIEW ARTICLE

Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U.L.Rev. 97, 131-32 (2009) ....................................................................................................... 16, 17
Thomas M. Byrne, *Class Actions,* 58 Mercer L.Rev. 1171 (2007)............................ 26

## INTRODUCTION

The Plaintiffs are four residents of nursing facilities in Maryland and one individual who resides in his home, who have alleged that their rights, under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.,* and the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.,* have been violated.  They seek injunctive and declaratory relief.  They have moved for class certification of over 9,000 individuals with mobility impairments who reside in nursing facilities in Maryland.  The motion for class certification filed by the Plaintiffs fails for five reasons: (1) the Plaintiffs and the proposed class members lack standing; (2) there is no commonality among the proposed class, *see* Rule 23(a)(2); (3) the Plaintiffs' claims are not typical of the proposed class, *see* Rule 23(a)(3); (4) the Plaintiffs are not adequate representatives, *see* Rule 23(a)(4); and (5) the Plaintiffs have not met the requirements of Rule 23(b)(2).  The Plaintiffs' motion should be denied.

"[A]ny analysis of class certification must begin with the issue of standing." *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir. 1987).  If the named plaintiffs lack standing, the class lacks standing. *Baehr v. Creig Northrop Team, P.C.,* 953 F.3d 244, 252-53 (4th Cir.), *cert. denied,* 141 S. Ct. 373 (2020).  The Plaintiffs fail to establish standing, because they allege their injuries were caused by the independent actions of the nursing facilities at which they reside, not by the Defendant Maryland Department of Health (the "Department).[1] *See Murthy v. Missouri,* 144 S.Ct. 1972, 1986 (2024); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37 (1976).  The Plaintiffs trace their injuries directly to the nursing facilities, for example, "The *facility* further imperiled Mr. [Nevin]'s safety by assigning him a roommate with a history of physical aggression

---

[1]   The Plaintiffs filed their class action against the Maryland Department of Health and the Secretary of Health.  The Secretary was sued in her official capacity.  For the sake of simplicity, this document refers to the Department and the Secretary together as the "Department."

against which Mr. [Nevin] is unable to defend given his disabilities."  ECF 32-2 at 15 (emphasis added) (internal citation omitted).

The Plaintiffs have also failed to satisfy the Rule 23 requirements for class certification. Rule 23(a)(2) concerns commonality.  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 349-50 (2011) (quoting *Gen. Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157 (1982)). With respect to injuries, there are, *at least,* three different categories.  The first category is comprised of 11 proposed class members (the five Plaintiffs, ECF 32-17–22, and six other declarants, ECF 32-22–27), who have purportedly suffered real physical and psychosocial injuries. ECF 32-2 at 21.  The second category is comprised of proposed class members whose nursing facilities have been recently surveyed by the Department, and who, therefore, cannot claim an injury connected to the Department not conducting a timely survey.  In between is the third category, proposed class members who do not have a real injury, but who, according to the Plaintiffs' proposed expert, Marie Boltz, PhD, RN, GNP-BC, are at an "increased [ ] risk of harm." ECF 32-3 at ¶ 55.  The Plaintiffs have not demonstrated that each proposed class member has "suffered the same injury."  *Wal-Mart,* 564 U.S. at 350.

The Plaintiffs also failed to demonstrate typicality.  Rule 23(a)(3).  The Plaintiffs' claims must be typical of the claims of every other proposed class member.  *Dieter v. Microsoft Corp.,* 436 F.3d 461, 466 (4th Cir. 2006).  "[W]hen the variations in claims strikes at the heart of the respective causes of actions, we have readily denied class certification."  *Id.* at 467.  As described above, there are, at least, three variations.  Further, under Rule 23(a)(4), a "class representative must be part of the class and possess the same interest and suffer the same injury."  *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625-26 (1977) (internal quotation marks omitted).  The

2

differences between the purported real injuries of the Plaintiffs and six other declarants and the non-injuries of the other proposed class members prevent the Plaintiffs from meeting the requirements of Rule 23(a)(4).

Finally, for the Plaintiffs' proposed class to be certified, in addition to satisfying the four requirements of Rule 23(a), they must satisfy one of the elements of Rule 23(b).  The Plaintiffs have attempted to meet Rule 23(b)(2). The Plaintiffs' effort at satisfying Rule 23(b)(2) fails because the Plaintiffs seek an injunction in which the Department is ordered to comply with certain provisions of law.  ECF 1 at 47-49.  "A claim for an injunction that simply orders a defendant to comply with the TCPA [Telephone Consumer Protection Act] and follow the law is not [ ] proper for class certification under Rule 23(b)(2)."  *Ginwright v. Exeter Fin. Corp.,* 280 F. Supp. 3d 674, 690 (D.Md. 2017).  The Plaintiffs have not demonstrated that they meet the requirements of Rule 23, therefore, class certification should be denied.

## BACKGROUND

### Nursing Home Regulation in Maryland

The Department, through its unit, the Office of Health Care Quality ("OHCQ"), is responsible for licensing nursing facilities operating in Maryland.  Md. Code Ann., Health-Gen. § 19-318 (LexisNexis 2023).   Through OHCQ, the Department oversees licensed nursing facilities to ensure compliance with state law and regulations, including facility surveys and complaint investigations.  Health-Gen. § 19-1408.   The Department, through OHCQ, is also designated by the Centers for Medicare and Medicaid Services ("CMS") as the state survey agency in Maryland for the purpose of certifying and recertifying nursing facilities to receive funding from the Medicare and Medicaid programs.  *See* 42 U.S.C. § 1395aa(a); 42 U.S.C. § 1396r(g)*;* 42 C.F.R. Part 488.   OHCQ also conducts surveys of nursing facilities and investigates complaints from

nursing facility residents in its role as the CMS-designated state survey agency to ensure compliance. *Id.* According to a Declaration submitted by the Plaintiffs, federal law requires the State to conduct a standard survey of a licensed nursing facility at least once every "15 months." ECF 32-3 at ¶ 16.

The Plaintiffs are four residents of nursing facilities in Maryland and one individual who lives at his home. ECF 1 ¶¶ 14-18; ECF 32-20 at ¶ 3. The connection between the Department and nursing facilities is not one where the Department is liable for violations committed by nursing facilities. The nursing facilities, where four of the Plaintiffs reside, are not owned or operated by the Department. Dep't's Ex. 1 at ¶ 7. The nursing facilities are not agents of the Department, and the nursing facilities' employees are not State employees. *Id.* The nursing facilities at which four of the Plaintiffs reside are responsible for providing the Plaintiffs' mobility services.[2] Among the

---

[2] 42 U.S.C. § 1396r[1](1)(A)(v)(I) ("A *nursing facility* must protect and promote the rights of each resident, including . . . [t]he right—to reside and receive services with reasonable accommodation of individual needs and preferences, . . . .") (italics added); 28 C.F.R. § 483.10(a)(2) (a "*facility* must protect and promote the rights of each resident, including . . . the right to be free of . . . discrimination . . . .") (italics added); 28 C.F.R. § 483.12(b)(1) ("The *facility* must develop and implement written policies and procedures that . . . [p]rohibit and prevent . . . neglect . . . of residents . . . .") (italics added); 28 C.F.R. § 483.24 ("Each resident must receive and the *facility* must provide the necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care") (italics added); 28 C.F.R. § 483.24(a) ("the *facility* must provide the necessary care and services to ensure that a resident's abilities in activities of daily living do not diminish unless circumstances of the individual's clinical condition demonstrate that such diminution was unavoidable") (italics added); 28 C.F.R. § 483.24(b)(2) ("The *facility* must provide care and services in accordance with paragraph (a) of this section for the following activities of daily living: . . . (2) Mobility—transfer and ambulating, including walking") (italics added); 28 C.F.R. § 483.25(c) ("(1) The *facility* must ensure that . . . (3) [a] resident with limited mobility receives appropriate services, equipment, and assistance to maintain or improve mobility with the maximum practicable independence . . . .") (italics added); 28 C.F.R. § 483.35 ("The *facility* must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.") (italics added); 42 C.F.R. § 483.70(c) ("*facilities* are obliged to meet the applicable provisions of other HHS regulations, including . . . nondiscrimination on the basis of disability (45 CFR part 84))" (italics

many responsibilities pertaining to caring for mobility-impaired residents, the nursing facilities must provide its residents with care and services consistent with their plans of care.  28 C.F.R. § 483.24.  The Plaintiffs rely upon the nursing facilities to provide their needed mobility services.  And the nursing facilities are alleged to often fail to provide the Plaintiffs with their needed mobility services.  The Department has not failed to provide the Plaintiffs with any of their needed mobility services, because the Department is not a provider of the Plaintiffs' services at nursing facilities.  Four Plaintiffs (and the mother of one Plaintiff) provided declarations, described below, alleging that the *nursing facilities* failed to provide them with their needed mobility assistance.

**The Plaintiffs**

**Plaintiff Irene Connor (Pseudonym)**

Plaintiff Irene Connor is a 54-year-old woman.  ECF 32-3 at ¶ 17.  Ms. Connor states she has a mobility impairment and resides at a nursing facility in Maryland.  ECF 32-17 at ¶ 6.  Ms. Connor states, "Because I am at risk for falling, my Plan of Care requires nursing staff to anticipate my toileting needs, and to perform frequent rounds each shift, in order to keep me safe.  However, staff do not anticipate my toileting needs.  Staff do not perform frequent rounds."  *Id.* at ¶ 9.  According to Ms. Connor, the nursing facility also is slow to respond to her call light: "when I use my call light, I wait 30 to 40 minutes, sometimes an hour for staff to respond."  *Id.* at ¶ 10.  Ms. Connor also states that, on occasion, the nursing facility has made Ms. Connor wait hours for incontinence care, *id.* at ¶ 11; the nursing facility did not timely respond to an emergency with Ms. Connors' ventilator, *id.* at ¶ 12; and the nursing facility often uses one staff member, instead of the required two staff to use the mechanical lift to transfer her out of her bed, *id.* at ¶ 13.  In

---

added); 45 C.F.R. § 84.1 ("The purpose of this part is to effectuate section 504 of the Rehabilitation Act of 1973, . . . .").

September 2023, Ms. Connor filed a complaint with the Department concerning the lack of hot water in the facility.  *Id.* at 15.

### Plaintiff Michael Nevin (Pseudonym)

Plaintiff Michael Nevin (pseudonym) is a 61-year-old man.  ECF 32-3 at ¶ 16.   Mr. Nevin states he has a mobility impairment and resides at a nursing facility in Maryland.  ECF 32-18 at ¶¶ 3, 5, 10.  According to Mr. Nevin, the nursing facility does not comply with his Plan of Care, and he often does not receive appropriate incontinence care.  *Id.* at ¶ 6.  He says that he often waits over an hour for the nursing facility staff to respond to his call light.  *Id.* ¶ 7.  Mr. Nevin states, "I depend on staff to move me about the facility and common areas so I can meet with other residents.  However, staff members are not always available."  *Id.* at ¶ 10.  According to Mr. Nevin, "Since March 2023, the nursing facility has not consistently provided me with mobility assistance."  *Id.* at ¶ 11.  Mr. Nevin further provided that, because of his confinement to his bed, he is deprived of many positive experiences: "I feel deprived of the joys and simple pleasures of being human.  To my knowledge, this violates my Plan of Care."  *Id.* at ¶ 14.  According to Mr. Nevin, "in January 2024, the nursing facility assigned me a roommate who was blind and displayed aggressive tendencies."  *Id.* at ¶ 15.  Because of his disability, he says that he was constantly fearful that he would be attacked by the roommate.  *Id.*  The roommate has since left the facility*,* but, according to Mr. Nevin, the experience exacerbated his preexisting conditions."  *Id.* at ¶ 17.

### Plaintiff Alex Noonan (Pseudonym)

Plaintiff Alex Noonan (pseudonym) is an 85-year-old man. ECF 32-19 at ¶ 3.  After surgery, Mr. Noonan was admitted to a nursing facility in Maryland, in 2020, and has lived there since. Due to his diagnoses, he has mobility-related disabilities.  *Id.* at ¶ 6.  According to Mr. Noonan, "Nursing facility staff frequently tell me there are not enough staff to help me leave my bed," *id.*

at ¶ 8; and "[w]hen I do leave my bed, often there is only one staff person helping me transfer out of bed.  I have fallen while transferring from my bed to my wheelchair," *id.* at ¶ 10.   According to Mr. Noonan, "I have developed bed sores, which *I attribute to the problems I've had getting facility staff* to respond to my incontinence needs quickly and not repositioning me throughout the day." *Id.* at ¶ 15 (emphasis added).  Mr. Noonan does not indicate that he filed a complaint with the Department.  ECF 32-19.

**Plaintiff Herman Dressel (Pseudonym)**

Mr. Dressel was a resident at a nursing facility in Maryland.  ECF 32-20 at ¶ 3.  However, according to Mr. Dressel, "I was discharged from the facility on May 30, 2024 and am currently living in the community with my wife."  *Id*.  Mr. Dressel's claims against the Department are thus moot.  *See Incumaa v. Ozmint,* 507 F.3d 281, 286-87 (4th Cir. 2007) ("[T]he transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief.").

**Plaintiff Richard Hollman (Pseudonym)**

Plaintiff Richard Hollman is a resident of a nursing facility in Maryland.  ECF 32-21 at ¶ 5.  Mr. Hollman is in a persistent vegetative state due to a traumatic brain injury.  ECF 32-3 at ¶ 46.  Due to his condition, he has a mobility impairment.  ECF 32-21 at ¶ 4.  Mr. Hollman's mother drafted a declaration, stating that for more than 20 years, "I was happy with the care that he received.  However, the quality of care that [he] receives at the facility has gotten much worse over approximately the past two years."  *Id.* at ¶ 9.  According to Mr. Hollman's mother, "It used to be that most of the nursing staff at the facility were employees of the facility.  Now the facility hires more staff from temporary staffing agencies."  *Id.* at ¶ 10.  Ms. Hollman is "concerned that *the*

*facility* does not follow [Mr. Hollman's] Plan of Care." *Id.* at ¶ 13 (emphasis added).  Ms. Hollman

states, "I can advocate for [Mr. Hollman's] Plan of Care to protect him from pressure ulcers and

indignity, but I rely on *staff* to implement the Plan of Care."  *Id.* at ¶ 18 (emphasis added).

According to Ms. Hollman, Mr. Hollman developed a new stage 2 pressure ulcer in January 2024.

Ms. Hollman states that the nursing facility staff does not provide him with proper incontinence

care. *Id.* at ¶ 21.

## ARGUMENT

### I. BECAUSE THE PLAINTIFFS AND PROPOSED CLASS MEMBERS LACK STANDING, CLASS CERTIFICATION SHOULD BE DENIED.

"[A]ny analysis of class certification must begin with the issue of standing."  *Griffin v.*

*Dugger,* 823 F.2d 1476, 1482 (11th Cir. 1987).  If the named plaintiffs lack standing, the class lacks

standing. *Baehr v. Creig Northrop Team, P.C.,* 953 F.3d 244, 252-53 (4th Cir. 2020).  To establish

standing, (1) the plaintiff must have suffered an injury in fact that is concrete, particularized, and

actual or imminent; (2) the injury was likely caused by the defendant; and (3) the injury would

likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

The Plaintiffs have sued the Department, but the Plaintiffs' memorandum on class certification

shows that the injuries and harm the Plaintiffs purportedly suffered were not caused by the

Department.  *See Murthy v. Missouri,* 144 S.Ct. 1972, 1986 (2024).  Further, the definition of the

proposed class does not state any injury or harm, thereby standing cannot be conferred on the

proposed class members. *See Krakauer v. DISH Network, LLC,* 925 F.3d 643, 652 (4th Cir. 2019).

### A. Plaintiffs Have Alleged Their Injuries Were Caused by the Independent Actions of the Nursing Facilities, not by the Department.

"[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the

independent action of some third party not before the court.'" *Murthy v. Missouri,* 144 S.Ct. 1972,

1986 (2024) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37 (1976)). The Plaintiffs' memorandum factually alleges that their injuries were caused by the independent actions of the nursing facilities, not by the Department.  Each Plaintiff describes the failures by their nursing facilities.  They trace and attribute their injuries directly to the nursing facilities and their nursing facility staff.  For instance,

- "Because I am at risk for falling, my Plan of Care requires nursing staff to anticipate my toileting and to perform frequent rounds each shift, in order to keep me safe.  However, staff do not anticipate my toileting needs.   Staff do not perform frequent rounds."  Ms. Connor's Declaration, ECF 32-17 at ¶ 9;

- "My understanding is that my Plan of Care requires that the nursing facility staff anticipate my care needs and respond promptly to my requests for assistance and incontinence care.  Notwithstanding this, I often go eight hours before receiving incontinence care."   Mr. Nevins' Declaration, ECF 32-18 at ¶ 6 (emphasis added);

- "I have developed bed sores, *which I attribute to the problems I've had getting facility staff* to respond to my incontinence needs quickly and not repositioning me throughout the day."  Mr. Noonan's Declaration, ECF 32-19 at ⌐ 15 (emphasis added).

- "I can advocate for [Mr. Hollman's] Plan of Care to protect him from pressure ulcers and indignity, but I rely on staff to implement the Plan of Care."   Mr. Hollman's mother's Declaration, ECF 32-21 at ¶ 18.  "[Mr. Hollman] developed a new stage 2 pressure ulcer in January 2024." *Id.* at ¶ 19.  "[I]t took me approximately three and a half hours of actively working to find staff to change [Mr. Hollman] . . . ." *Id.* at ¶ 21.

The Plaintiffs attribute each example of an injury or harm suffered by the Plaintiffs to the nursing facility where the Plaintiff resides.  The Department is not authorized to provide the services that

the Plaintiffs claim were denied, and there is no allegation that the Department is authorized to provide the needed mobility services.  The nursing facilities are responsible for providing their needed mobility services.[3]  Even the Plaintiffs' proposed expert, Marie Boltz, Ph.D., RN, GNP-BC, indicates that, even when a survey is untimely, for there to be harm to a mobility-impaired resident, it is "when *nursing facilities* violate resident rights."  Pl.s' Ex. 1 at ¶ 54 (emphasis added).  And the Plaintiffs explicitly state that the nursing facilities failed to provide those services.   The nursing facilities, from their independent actions, allegedly caused the harm the Plaintiffs have allegedly suffered.  The Plaintiffs, therefore, do not have standing.  *See Murthy,* 144 S.Ct. at 1986 (injuries that result from independent actions by a third party defeats standing); *Simon,* 426 U.S. at 41-42  ("the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.").

Additionally, the connection between alleged untimely surveys by the Department and the harm the Plaintiffs allegedly suffered is purely speculative, and thus there is no standing.  *Doe v. Obama,* 631 F.3d 157, 161-62 (4th Cir. 2011). During a survey, even if the Department did find violations related to the Plaintiffs' mobility impairments, it would still be the nursing facilities, and not the Department, who would have to take action to redress each of the violations.   The Department does not have authority to directly provide the nursing services itself to redress the violations, nor has it been alleged that it does have authority.   Thus, the redressability of the Plaintiffs' claims is speculative.  *See, e.g., Linda R.S. v. Richard D.,* 410 U.S. 614, 618 (1973) (mother's suit against district attorney to enforce child support statute was "too speculative" to confer standing, because enforcement could result in the father being jailed, as opposed to him

---

[3]    *See* footnote 2.

10

providing child support payments.).  Additionally, the Plaintiffs' requested relief for enforcement measures to be taken against nursing facilities that are not in compliance, precludes conferring standing on the Plaintiffs, because "a private citizen lacks a judicially recognizable interest in the prosecution . . . of another."  *Id.* at 619.[4]

Although the injuries the Plaintiffs claim they have sustained were allegedly caused by the nursing facilities, and not the Department, the Plaintiffs have asked for extraordinary relief in which the Court, essentially, oversees the Departments' regulatory duties pertaining to 222 nursing facilities,[5] including the discretionary decisions to impose remedial and enforcement measures concerning every nursing facility in the State covering every nursing home resident in the State regardless of whether they have a mobility impairment or not.  With that in mind, the U.S. Supreme Court had this to say in *Murthy:*

> The plaintiffs, without any concrete link between their injuries and the defendants' conduct, ask us to conduct a review of the years-long communications between dozens of federal officials, across different agencies, with different social medical platforms, about different topics.  This Court's standing doctrine prevents us from 'exercis(ing such) general legal oversight' of the other branches of government.

*Murthy,* 144 S.Ct. at 1997.  Because the Plaintiffs lack standing, class certification should be denied.

> **B.      The Plaintiffs' Definition of the Proposed Class Does Not State an Injury.**

---

[4]     Plaintiff Mr. Dressel lives at home, not at a nursing facility.  Pl.s' Ex. 18 at ¶ 3.  He, therefore, does not have standing, because his claimed injury would not be redressed by Court relief.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

[5]      A directory of licensed nursing facilities in Maryland can be found at: https://app.smartsheet.com/b/publish?EQBCT=08adff96ac8c4d18a97bf909162a2250

"Article III bars the court from certifying a class if the class is defined such that many members of the class will lack standing." *Krakauer,* 925 F.3d at 652. "The question for us is whether this class definition, by its terms, stated an injury that is sufficient to support federal jurisdiction." The Plaintiffs define the proposed class as: "Residents of nursing facilities, who have disabilities with mobility impairment, and who live in nursing facilities that operate under oversight authority of MDH." Pl.s' Memo. at 21. This class definition does not state an injury. Just because one has a mobility impairment and resides in a nursing home in Maryland that is regulated by the Department does not mean that one has suffered a concrete, particularized injury sufficient for Article III standing. The Department has surveyed nursing facilities where there was not an evident violation of residents' mobility-impaired disability rights, or, if there were, the violation was rare, isolated, and minor. *See* Department's Exibits 2-4. The definition of the proposed class, by its terms, does not state an injury sufficient to support federal jurisdiction, thus the class lacks standing, *see Krakauer,* 925 F.3d at 652, therefore, class certification should be denied.

## II.     PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO PROVE—SUBJECT TO RIGOROUS ANALYSIS—THAT THE REQUIREMENTS OF RULE 23 HAVE BEEN SATISFIED.

A class action lawsuit is an exception to the general rule that "litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart,* 564 U.S. at 348 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979). "[T]o justify a departure from that rule, 'a class representative must be part of the class and "possess the same interest and *suffer the same injury*" as the class members.'" *Id.* (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974))) (emphasis added). To ensure that the named plaintiffs are appropriate representatives of the class,

Rule 23 has the following requirements: ascertainability, numerosity, commonality, typicality, adequate representation, and one of three elements of Rule 23(b).

A class can only be certified after the court determines after a "rigorous analysis" that the Rule 23 requirements have been met. *Wal-Mart,* 564 U.S. at 351 (quoting *Falcon,* 457 U.S. at 161). "Rule 23 does not set forth a mere pleading standing. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—this is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart,* 564 U.S. at 350. The Plaintiffs carry the burden of proving that all of the requirements for a class action are met. *See Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311, 321 (4th Cir. 2006) ("[I]t is the *plaintiff* who bears the burden of showing the class *does comply* with Rule 23.") (emphasis in original); *In re Zetia (Ezetimibe) Antitrust Litig.,* 7 F.4th 227, 236 n.6 (4th Cir. 2021); *Gariety v. Grant Thornton, LLP,* 368 F.3d 356, 362 (4th Cir. 2004) ("The plaintiffs who propose to represent the class bear the burden of demonstrating that the requirements of Rule 23 are satisfied.").

### A.   Ascertainability.

"Rule 23 contains an implicit threshold requirement that the members of the proposed class be 'readily identifiable.'" *EQT Prod. Co. v. Adair,* 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell,* 462 F.2d 1053, 1055 (4th Cir. 1972)). Class certification should be denied if the court cannot readily identify the class members. *EQT Prod. Co., v. Adair,* 764 F.3d at 358. "A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* This requirement is often referred to as "ascertainability." *Id.*

In *Kadel v. Folwell,* 100 F.4th 122, 161 (4th Cir. 2024), the court held, "[t]here is no threshold ascertainability requirement *in this Rule 23(b)(2) case,* which seeks only declaratory and

injunctive relief from a *discriminatory policy."* (Emphasis added.) This language in *Kadel* seems to suggest that in some Rule 23(b)(2) cases, but not all, the ascertainability requirement does not need to be satisfied. This language in *Kadel* could suggest that the ascertainability requirement does not need to be satisfied in Rule 23(b)(2) cases that involve a discriminatory policy. In *Kadel,* the discriminatory policies of North Carolina and West Virginia were evinced by the health insurance plans operated by the States, which purposely targeted transgender individuals for discrimination. *Kadel,* 100 F.4th at 143-154.

The Plaintiffs have sought class certification under Rule 23(b)(2). The Plaintiffs did not attempt to meet the "ascertainability" requirement. In footnote 8, on page 22 of the Plaintiffs' memorandum, the Plaintiffs, relying on *Kadel,* seem to contend that they are seeking to satisfy Rule 23(b)(2) and are not required to satisfy the ascertainability requirement because they seek only declaratory and injunctive relief from a discriminatory policy. The Plaintiffs could be correct on this point. But the Plaintiffs do not identify a "discriminatory policy" of the Department, nor has the Department ever had a "policy" to discriminate, and, unlike *Kadel,* there certainly is no Department intent or purpose of discrimination. *Kadel,* 100 F.4th at 152, 161. Notwithstanding the language in *Kadel,* it is possible that the ascertainability requirement is not required for all Rule 23(b)(2) cases and that the language in *Kadel* unintentionally suggests that it is not required only in cases that involve a discriminatory policy. Either way, the Department wants it to be clear that it does not have, and never has had, a policy to discriminate.

### B.    Numerosity

"A party seeking class certification must affirmatively . . . prove that there are in fact sufficiently numerous parties" to justify their class action lawsuit. *Wal-Mart,* 564 U.S. at 350. "'As a general guideline, . . . a class that encompasses fewer than 20 members will likely not be

certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.'" *In re: Zetia (Ezetimibe) Antitrust Litigation,* 7 F.4th at 234 (4th Cir. 2021) (quoting 1 *Newberg on Class Actions* § 3:12 (5th ed. 2021)).  The Plaintiffs' defined class is comprised of individuals residing in Maryland nursing facilities with mobility impairments.  ECF 32-2 at 1, 21, 23.  With approximately 222 nursing facilities in Maryland (ECF 32-2 at 8), the Department does not question that there are at least 40 individuals residing in nursing facilities in Maryland with mobility impairments.

### C.    Commonality.

The Plaintiffs have not met Rule 23(a)(2)'s commonality requirement.  Under Rule 23(a)(2), the party seeking class certification must demonstrate that "there are questions of law or fact common to the classes."  Under *Wal-Mart,* Rule 23(a)(2) commonality requires the plaintiff to demonstrate that the proposed class members "have suffered the same injury" and produce questions of law or fact that are central to drive a class-wide resolution of the case "in one stroke."  *Wal-Mart,* 564 U.S. 349-50.  The Plaintiffs have not satisfied the requirements of Rule 23(a)(2).

**"Commonality requires the plaintiff to demonstrate that the class members have 'suffered the same injury.'"** *Wal-Mart,* 564 U.S. at 349-50 (emphasis added).  The Plaintiffs' commonality argument (ECF 32-2 at 23-26) does not appear to address this requirement; thus Plaintiffs have not met their burden in demonstrating that they have satisfied the commonality requirement.  *Gariety,* 368 F.3d at 362 ("The plaintiffs who propose to represent the class bear the burden of demonstrating that the requirements of Rule 23 are satisfied.").

Not only have the Plaintiffs failed to demonstrate that the proposed class members have suffered the same injury, but the Plaintiffs have also not made a sufficient showing that the proposed class members (other than the five representative Plaintiffs and six declarants) have

suffered any real injury. The Plaintiffs define the class as "Residents of nursing facilities who have mobility impairment, and who live in nursing facilities that operate under the oversight authority of MDH [the Department's]." ECF 32-2 at 21-22. The Plaintiffs' class definition does not have any indicator of a real injury. Residing in a nursing home regulated by the Department and having a mobility impairment (or any other impairment) does not set forth an actionable injury of any kind. The Department's exhibits 2 through 4 are examples of Statements of Deficiencies from surveys where no evident violation was found pertaining to the disability rights of mobility-impaired individuals. And by the Plaintiffs own measure, there were 48 nursing facilities surveyed within the last 16 months (the Department's calculation is the Department conducted 65 annual surveys of nursing facilities in the last year (Dep't's Ex. 1 at ¶ 4), and thus the Plaintiffs cannot claim that the Department's lack of a timely survey caused injury in these facilities. ECF 32-2 at 8-9.

Under Rule 23(a)(2), the plaintiffs must show that "there are questions of law or fact common to the class." "The language is easy to misread since "'(a)ny competently crafted class complaint literally raises common 'questions.'"" *Wal-Mart,* 564 U.S. at 349 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U.L.Rev. 97, 131-32 (2009)). The plaintiff's claim must depend on a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The U.S. Supreme Court, again, quoted Nagareda:

> What matters to class certification . . . is not the raising of common "questions" —even in droves— but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the genera of common answers.

*Wal-Mart,* 564 U.S. at 350 (quoting Nagareda, *supra,* at 132) (emphasis in original).  The Court

considers dissimilarities to determine whether there is even a single common question.  *Wal-Mart,*

564 U.S. at 359.  The Plaintiffs' have offered three questions.  They do not satisfy the rules set

forth in *Wal-Mart.*

  First, the Plaintiffs ask, "do Plaintiffs and the proposed class members have a 'disability'

within the meaning of the ADA and RA [Rehabilitation Act]?"  ECF 32-2 at 25.  This is the type

of question the U.S. Supreme Court stated was insufficient:

> For example:  Do all of us plaintiffs indeed work for Wal-Mart?  Do
> our managers have discretion over pay?   Is that an unlawful
> employment practice?  What remedies should we get?  Reciting
> these questions is not sufficient to obtain class certification.

*Wal-Mart,* 564 U.S. at 349.  This question by the Plaintiffs fails to address a critical issue that will

move us toward a resolution on the validity of their claims and general resolution to this litigation

or address whether all the proposed class members have suffered the same injury.  *Id.*  The

Plaintiffs' definition of the class already states that they have a disability: "Plaintiffs seek to

represent a class comprised of 'Residents of nursing facilities, who have **disabilities** with mobility

impairment, . . . .'"  ECF 32-2 at 21 (emphasis added).    The question simply tells us what is

already in the definition of the proposed class.  This is only a self-fulfilling, circular question and

answer.  And it is redundant.  And individuals with disabilities populate assisted living programs,

Md. Code Ann., Health Occ. § 19-1801(1), psychiatric hospitals, residential disabilities programs,

as well as home residences.  Countless individuals in Maryland have a disability.  Resolution of

this litigation is not going to be determined by answering this question.  It does not address the

proposed class's injuries, and, in terms of the Supreme Court's requirements for commonality, it

is woefully insufficient.  *Wal-Mart,* 564 U.S. at 349-50.

Second, the Plaintiffs ask, "are Plaintiffs and the proposed class members qualified to receive the benefits of a public service, program, or activity?" ECF 32-2 at 25.  Again, this question does not drive this litigation forward.  Every individual residing in a nursing home, like every individual residing in the State, is entitled to the "benefits of a public service, program, or activity," such as clean water, electricity, public transportation, emergency health services, law enforcement, and the services of a fire department.  The question is so broad that it is meaningless.  *Wal-Mart,* 564 U.S. at 349-50.  And it certainly does not address whether the proposed class members each suffered the same injury, nor does it propel resolution to this litigation.  *Id.*

While not mentioned in the question, the Plaintiffs discuss the Department's oversight and enforcement activities.  ECF 32-2 at 25.   But numerous federal court decisions hold that government regulatory agencies are not liable, under Title II of the ADA or Section 504 of the Rehabilitation Act, for its regulation of its licensees, outside of limited circumstances that are not applicable here.  *See Noel v. N.Y.C. Taxi & Limousine Comm'n,* 687 F.3d 63, 72 (2d Cir. 2012) (holding that public entity is not liable under ADA and Rehabilitation Act for inaccessible taxi companies it licenses and regulates); *Wendel v. Florida Dep't of Highway Safety and Motor Vehicles,* 80 F. Supp. 3d 1297 (M.D. Fla. 2015) (holding that State motor vehicle administration is not liable for discrimination by a DUI school it licensed); *Reeves v. Queen City Transp., Inc.,* 10 F.Supp.2d 1181, 1187 (D.Colo. 1998) (holding that public utility company is not liable under Title II for inaccessible bus company it licenses); *Tyler v. City of Manhattan,* 849 F. Supp. 1429, 1441-42 (D. Kan. 1994) (holding city is not liable for inaccessible restaurants and liquor stores it licenses and inspects). In any event, the Plaintiffs' second question does not satisfy the commonality requirements of Rule 23(a)(2).

Third, the Plaintiffs ask, "does [the Department]'s administration of its responsibilities under the NHRA and RBRA deny Plaintiffs and the proposed class members the benefit of oversight and enforcement of their rights on the basis of their disabilities?"  ECF 32-2 at 26.  This question violates another precept of *Wal-Mart*: commonality "does not mean merely that they have all suffered a violation of the same provision of law."  *Wal-Mart,* 564 U.S. at 350.  That is especially so in this case, where the alleged lapse of regulatory activities is not actionable under the ADA or Rehabilitation Act.  *See, e.g., Noel,* 687 F.3d at 72.  Moreover, this third question demonstrates the lack of commonality among the proposed class members.  The Plaintiffs' own Memorandum indicates that a significant number of nursing facilities were surveyed in a timely manner (at least 48 facilities in the last 16 months).  ECF 32-2 at 8-9.   The Declaration of Health Reed, from the Department's Office of Health Care Quality, states that, in the past year, the Department conducted 65 annual surveys of nursing facilities in the last one-year period.  Dep't's Ex. 1 at ¶ 4.  This by itself defeats the Plaintiffs' claim for commonality.  There are a significant number of proposed class members whose nursing facilities were surveyed within the appropriate time frame, which means, not only that they did not suffer a violation of law; it also means that their circumstances with respect to the "NHRA and RBRA" are dissimilar from other proposed class members in nursing facilities whose nursing facilities were not timely surveyed.  *See Bond v. Marriott Intern., Inc.,* 296 F.R.D. 403, 408 (D.Md. 2014) (commonality was barred, because "[p]lan participants who have already been paid benefits equal to or in excess of what they would have received under ERISA vesting have no viable cause of action in this case.").

Further, after subtracting those whose nursing facilities were recently surveyed, even those remaining lack commonality because it cannot be reasonably said that their alleged injuries are the same.  Although the Plaintiffs do not address the commonality "same injury" requirement in its

commonality section, the Plaintiffs state that commonality and typicality merge (ECF 32-2 at 27), and in its typicality section the Plaintiffs inaccurately assert that, when annual surveys and complaint investigations are not conducted in a timely manner, "'mobility-impaired residents are at particular risk given their special needs'" and experience harm like the Plaintiffs experienced." ECF 32-2 at 28.  This is not accurate and does not hold up under rigorous analysis.  In fact, it is contradicted by the declaration the Plaintiffs cite to support the assertion.  The Plaintiffs' assertion cites to paragraph 54 of Plaintiffs' Exhibit 1 (ECF 32-3), which is the Declaration of Marie Boltz, Ph.D., RN, GNP-BC.  Paragraph 54 of Dr. Boltz's declaration actually states, when annual surveys and complaint investigations are not conducted in a timely manner, "mobility-impaired residents are at particular risk given their special needs.   In the absence of such surveillance and investigation, **when nursing facilities violate resident rights,** the harms experienced by Plaintiffs are typical of mobility impaired residents."   (Emphasis added.)   The Plaintiffs' memorandum simply left out the core of their expert's statement, that, in order for the residents to experience harm like the Plaintiffs, **"*nursing facilities"*** have to violate the residents' rights.  Unlike Plaintiffs' assertion, simply being a mobility-impaired resident in a nursing facility in Maryland does not automatically mean that the resident will suffer harm like the Plaintiffs.  The Department's exhibits 2-4 are Statements of Deficiencies from surveys in which there were no evident violations of disability rights of mobility-impaired individuals, or, if there were, they were relatively minor and isolated.   The nursing facility must first violate their rights.  This was further explained in paragraph 55, in which Dr. Boltz gives the opinion that the failure to conduct timely surveys "**increased the risk** of harm for immobile residents." ECF 32-3 at ¶ 55 (emphasis added.)  This does not mean that there is always harm to every mobility-impaired resident when the survey is not timely conducted.  The mere risk of harm is not comparable to the real injuries the Plaintiffs

purportedly actually suffered.  The two—those with real injuries or harm and those at an increased risk of harm—cannot be reconciled.  There is no commonality.

Even further, the Plaintiffs' use of anecdotal evidence to show that the proposed class members have suffered the same harm as the Plaintiffs is woefully insufficient.  The Plaintiffs assert that the proposed class members experience harm like the Plaintiffs "is confirmed by press reports and declarations from proposed class members."[6]  ECF 32-2 at 28.  The Plaintiffs offer six declarations.  According to the Plaintiffs, there are "more than 9,000 people" in the proposed class.  ECF 32-2 at 1.  Out of the over 9,000 proposed class members, the Plaintiffs offer, *including* the five Plaintiffs, 11 declarations, claiming that those 11 residents have suffered real harm in nursing facilities related to their mobility impairments.[7]  Thus, approximately, there is one account for every 818 proposed class members.  In *Wal-Mart,* the U.S. Supreme Court used *International Broth. of Teamsters v. United States,* 431 U.S. 324 (1977), as an example of what would constitute sufficient anecdotal evidence.  *Wal-Mart,* 564 U.S. at 358.  In *Teamsters,* there was roughly "one account for every eight members of the class."  *Id.*  There were 40 accounts for 334 class members.  *Id.*  Eleven accounts, from residents specifically chosen by the Plaintiffs, out of more than 9,000 proposed class members, does not remotely suggest that all of the more than 9,000 proposed class

---

[6]    The press reports are two articles, each concerning one resident.  These two residents are not proposed class members because they are deceased.  ECF 32-2 at 20-21.

[7]    The Plaintiffs allege that they have sustained real injuries and harm that are also dissimilar.  The alleged injuries span the gamut from a resident with dementia entering a Plaintiff's room and defecating, ECF 32-2 at 15; to a pressure sore sustained by a resident who is in a vegetative state, *id.* at 19; to a lack of hot water, *id.* at 13; to a privacy curtain being continuously closed, *id.* at 15; to insufficient incontinence care, *id.* at 13; to being assigned an unsuitable roommate, *id.* at 15.

members suffered the same injury.  *See id.*  At best, it demonstrates that 11 out of 9,000 proposed class members purportedly suffered a real injury, which were not caused by the Department.[8]

Whether the proposed class members allegedly suffered real injuries as the Plaintiffs depends upon the highly individualized circumstances unique to that nursing facility resident.  The analysis would have to first see if the nursing facility in which a mobility impaired resident resides was surveyed by the Department within the statutory framework, whether the nursing facility violated the resident's rights concerning the care that the resident needs, whether that violation was connected to their mobility impairment, and whether that violation caused an injury or harm akin to the injuries the Plaintiffs purportedly suffered.   Thus, this is a highly individualized analysis, unsuitable for class certification.  *See Bond,* 296 F.R.D. at 408.[9]

### D.     Typicality.

The Plaintiffs' claims must be typical of the claims of every other proposed class member. Rule 23(a)(3); *Dieter v. Microsoft Corp.,* 436 F.3d 461, 466 (4th Cir. 2006).  "[W]hen the variations in claims strikes at the heart of the respective causes of actions, we have readily denied class

---

[8]     Not even all the claims of the Plaintiffs can be said to have commonality, solely on the basis that Mr. Dressel does not currently live in a nursing facility.  ECF 32-21 at ¶ 3.

[9]     The Plaintiffs end their commonality section by citing four U.S. district court cases, including one unreported case, contending that commonality has been found for "conduct applying uniformly across the class." ECF 32-2 at 26.  This contention disregards the fact that the Department has surveyed, according to the Plaintiffs' figures, approximately 48 nursing facilities in the past 16 months, and 65 within the last year using the Department's calculation, thus the Department's conduct is not spread uniformly across the class.  Also, three of the cases cited by the Plaintiffs concern plaintiffs who are in the custody of the State and where the State's conduct caused the harm, while, here, the cause of the alleged harm were the separate nursing facilities, of which there are approximately 222.  In the end, this demonstrates that the pertinent circumstances of the proposed class members in the Plaintiffs' case must be analyzed on an individualized basis.  The other case cited by the Plaintiffs concerns a facial challenge to a new Medicaid rule, *Pashby v. Cansler,* 279 F.R.D. 347 (E.D.N.C. 2011), which is not remotely comparable to the Plaintiffs' claims.

certification." *Id.* at 467.  Here, we have three main variations.  As described above, there are the Plaintiffs (and six other declarants) who have purportedly suffered real injuries.  Then there are the proposed class members who live in nursing facilities recently surveyed by the Department, who cannot claim to be injured from an untimely survey.  Then there are the remaining proposed class members, who have no injury, and who, according to the Plaintiffs' expert, Dr. Boltz, are merely at an increased risk of harm.  ECF 32-3 at ¶ 55.  These variations defeat the Plaintiffs' effort to meet the typicality requirement of class certification.

As shown in the analysis of commonality, above, the Plaintiffs have misstated the declaration of its expert, Dr. Boltz.  The Plaintiffs claim that the proposed class members suffer the same harm that the Plaintiffs purportedly suffered simply by being a mobility-impaired resident of a nursing facility in Maryland (when surveys are not timely conducted).  The Plaintiffs rely on, and partly quote, Dr. Boltz.  ECF 32-3 at 27-28.  Dr. Boltz's declaration, however, does not support the Plaintiffs' assertion.  As mentioned above, Dr. Boltz stated, that, when the Department's surveys are untimely, and "**when nursing facilities violate resident rights,** the harms experienced by Plaintiffs are typical of mobility impaired residents."  ECF 32-3 at ¶ 54 (emphasis added).  At best, the untimely surveys only "increased the risk of harm for immobile residents."  ECF 32-3 at ¶ 55.  The difference between the purported real harm allegedly suffered by the Plaintiffs and the alleged risk of harm for the other proposed class members (minus the six declarants and residents whose nursing facilities were recently surveyed) nullifies the Plaintiffs' effort to prove typicality.

In *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 632 (3d Cir. 1996), *aff'd sub nom., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997), an asbestos action, the court of appeals ruled that the plaintiffs did not meet the typicality requirement, because "some plaintiffs may ultimately contract mesothelioma, some may get asbestosis, some will suffer less serious diseases, and some

will incur little or no physical impairments.  Given these uncertainties, which will ultimately turn into vastly different outcomes, the futures plaintiffs share too little in common to generate a typical representative."  Likewise, the representative Plaintiffs share far too little with the proposed class members, which includes an untold number with no current injury.

Moreover, the Plaintiffs reliance on six declarations from non-Plaintiffs is insufficient. When used in a typicality analysis, the six declarants do not prove typicality.  Six examples other than the Plaintiffs' are simply too weak to demonstrate typicality.   The declarations of six residents specially chosen by the Plaintiffs does not prove that the Plaintiffs' claims are typical for the over 9,000 proposed class members. *See Wal-Mart,* 564 U.S. at 358.

The differences between the Plaintiffs' circumstances and those of the proposed class negate the Plaintiffs claim for typicality.  Unlike 9,000 proposed class members, the Plaintiffs have already explicitly attributed the cause of their injuries to the nursing facilities.  The representative Plaintiffs will be hard-pressed to prove the Department is responsible for their injuries considering the Plaintiffs have made clear that the nursing facilities caused their injuries.

### E.   Adequacy of Representatives.

Under Rule 23(a)(4), the representative party must demonstrate that they "will fairly and adequately protect the interests of the class."   "'[A] class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625-26 (1997) (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216 (1974))).

In *Amchem,* the U.S. Supreme Court found that the adequacy of representation requirement of Rule 23(a)(4) was not met because of the diversity injuries of the class.  The class included

those who were "currently injured" from their exposure to asbestos products and those who were "exposure-only," who did not have a current injury from asbestos products.   Likewise, the Plaintiffs do not have the "same injury" as others in the proposed class.   In the Plaintiffs' case, there are the Plaintiffs who have purported real injuries, such as a pressure ulcer (ECF 32-21 at ¶ 19); there are proposed class members who have no real injury nor potential injury, because their nursing facilities have been recently surveyed (ECF 32-2 at 8-9; Dep't's Ex. 1 at ¶ 4); and there are proposed class members who do not have a real injury, but who, according to Dr. Boltz, are at an "increased [ ] risk of harm" (ECF 32-3 at ¶ 55).

In addition to there not being the same injury, the interests of these different categories of proposed class members diverge.   There is no relief that is needed for the proposed class members whose nursing facilities have been recently surveyed; the Plaintiffs, with purported real injuries, will need a plan of correction or a corrective action or an enforcement action, *see* ECF 32-2 at 8; and for those with the "increased [ ] risk of harm," there does not need to be a plan of correction or a corrective action plan or an enforcement action.   Because of the diverse injuries and interests in this matter, the Plaintiffs do not meet the adequacy of representation requirement of Rule 23(a)(4).  *See Amchem,* 521 U.S. at 625-29.

## F. Rule 23(b)

To be certified as a class, the Plaintiffs must satisfy all of the requirements of Rule 23(a) and one of the three elements of Rule 23(b).   The Plaintiffs have attempted to satisfy Rule 23(b)(2), which requires the Plaintiffs to demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   The Plaintiffs have failed to satisfy Rule 23(b)(2) in two ways.   First, this case presents individual issues that destroy the

necessary cohesiveness that Rule 23(b)(2) requires because the class members' entitlement to relief depends on individual circumstances.  *See Shook v. Bd. of County Commissioners of County of El Paso,* 543 F.3d 597, 608 (10th Cir. 2008).   Second, Rule 23(b)(2) is not met when the relief sought is simply to comply with the law.  *Ginwright v. Exeter Fin. Corp.,* 280 F. Supp. 3d 674, 690 (D.Md. 2017).

First, in *Shook,* Judge Gorsuch explained that the injunctive relief sought by the Plaintiffs cannot depend on individualized circumstances.  *Shook,* 543 F.3d at 608.   Class members' entitlement to the relief sought that depends on individual circumstances destroys the class cohesiveness that is necessary for satisfaction of Rule 23(b)(2). *Id.*  "[W]here 'differences in proof or individualized issues exist pertaining to each class member, courts have rejected class certification . . . (for) failure to meet Rule 23(b)(2)'s requirement that relief apply to the class as a whole." *Id.* (quoting Thomas M. Byrne, *Class Actions,* 58 Mercer L.Rev. 1171, 1173 (2007)). Here, there are class members whose nursing facilities were recently surveyed, and thus they are not entitled to any relief.  ECF 32-2 at 8-9; Dep't's Ex. 1 at ¶ 4.  This "destroys the class cohesiveness" needed to satisfy Rule 23(b)(2).  *Shook,* 543 F.3d at 608.   Further, the Plaintiffs' case also includes proposed class members who have alleged real injuries as well as proposed class members who are allegedly only at an increased risk of harm.  ECF 32-3 at ¶ 55.  The relief that pertains to these two groups are different, as the group with purported real injuries will need plans of correction or corrective actions or enforcement actions, while the proposed class members who are only at an alleged increased risk of harm will not need any of those remedial measures.  Thus, Rule 23(b)(2) has not been satisfied.  *Shook,* 543 F.3d at 608.

Second, the Plaintiffs' effort at satisfying Rule 23(b)(2) fails because the Plaintiffs seek an injunction in which the Department is ordered to comply with certain provisions of law.  ECF 1 at

26

47-49.  "A claim for an injunction that simply orders a defendant to comply with the TCPA [Telephone Consumer Protection Act] and follow the law is not [ ] proper for class certification under Rule 23(b)(2)."  *Ginwright v. Exeter Fin. Corp.,* 280 F. Supp. 3d 674, 690 (D.Md. 2017). Because the Plaintiffs' injunction request seeks only what is already required by law, class certification should be denied.  *Id.*

## CONCLUSION

The Plaintiffs' Motion for Class Certification should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

*/s/* David E. Wagner
DAVID E. WAGNER
Assistant Attorney General
Federal Bar No. 13386
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
david.wagner@maryland.gov
(410) 767-5205 (telephone)
(410) 333-7894 (facsimile)

/s/ Nicole Lugo Clark
NICOLE LUGO CLARK
Federal Bar No. 26983
Assistant Attorney General
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
Nicole.LugoClark@maryland.gov
(410) 767-5292 (direct)
(410) 333-7894 (facsimile)

27

/s/ Brandy J. Gray
BRANDY J. GRAY
Federal Bar No. 28455
Assistant Attorney General
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
Brandy.Gray1@maryland.gov
(410) 767-1861 (direct)
(410) 333-7894 (facsimile)

Attorneys for the Maryland Department
of Health and Secretary of Health

## CERTIFICATE OF SERVICE

I hereby certify that, on this 6th day of September, 2024, the Defendants' Memorandum of

Law in Support of Opposition to Motion for Class Certification was filed through the ECF system

and served electronically on counsel for Plaintiffs via the Court's ECF system.

/s/ David E. Wagner
DAVID E. WAGNER
Federal Bar No. 13386