# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| IRENE CONNOR, et al., | * | |
| | * | |
| **Plaintiffs** | * | |
| | * | Civ. No.: MJM-24-1423 |
| v. | * | |
| | * | |
| MARYLAND DEPARTMENT OF | * | |
| HEALTH, et al., | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This matter is before the Court on the Maryland Department of Health ("MDH") and MDH Secretary Laura Herrera Scott's (together, "Defendants") motion to dismiss the putative Class Action Complaint filed by plaintiffs Irene Connor, Michael Nevin, Alex Noonan, Herman Dressel, and Richard Hollman[1] (collectively, "Plaintiffs"). ECF 36. Plaintiffs have also filed a motion to certify the class. ECF 32. The motions are fully briefed and ripe for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For reasons explained below, Defendants' Motion to Dismiss shall be denied, and Plaintiffs' Motion for Class certification shall be granted.

---

[1] Plaintiffs filed a motion to seal the unredacted version of their Complaint and to proceed on the public record by pseudonym. ECF 2. Plaintiffs argued that the facts of this case involve sensitive personal medical information regarding each Plaintiff and voiced concerns of potential retaliation. ECF 2-1. Defendants filed a response in opposition to the motion, ECF 24, but then withdrew their opposition to give the parties an opportunity to negotiate a protective order, ECF 25. The Court has granted the motion. ECF 57.

## I.    PROCEDURAL HISTORY

On May 15, 2024, Plaintiffs filed a Class Action Complaint against the Maryland Department of Health ("MDH") and MDH's Secretary Laura Herrera Scott, in her official capacity. ECF 1. Plaintiffs seek declaratory and injunctive relief against Defendants under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") for alleged failures to conduct statutorily mandated annual surveys and investigate complaints within statutorily prescribed time frames. *Id*. ¶ 2. On July 19, 2024, Plaintiffs filed a Motion for Class Certification seeking certification of a class consisting of "[r]esidents of nursing facilities who have disabilities with mobility impairment, and who live in nursing facilities that operate under the oversight authority of the Maryland Department of Health." ECF 32, 32-1. On July 22, 2024, Defendants filed a Motion to Dismiss, ECF 36, and a response in opposition to Plaintiffs' Motion for Class Certification, ECF 42. Plaintiffs filed a response in opposition to Defendants' Motion to Dismiss, ECF 45, and a reply to Defendants' response in opposition to the Motion for Class Certification, ECF 50. Defendants filed a reply in support of their Motion to Dismiss. ECF 52. Finally, the Court granted leave for attorney Toby S. Edelson to file a brief of *amicus curiae* in support of Plaintiffs' opposition to Defendants' Motion to Dismiss. ECF 59, 60.

## II.    FACTUAL BACKGROUND

MDH is the designated state survey agency for the State of Maryland responsible for certifying nursing facilities in Maryland to receive funding through participation in the Medicare and Medicaid programs and is responsible for specific oversight and enforcement functions imposed by the Nursing Home Reform Act ("NHRA"). 42 U.S.C. § 1395aa(a); 42 C.F.R. § 488.11. Specifically, MDH is required to conduct an annual survey of each Medicaid- and Medicare-participating nursing facility to certify compliance with federal standards for staffing, safety, and

quality of care, 42 U.S.C. § 1396r(g)(1)(A), (g)(1)(C), (g)(4); 42 C.F.R. § 488.26(c)(1); and investigate complaints of resident neglect and abuse and noncompliance with federal standards, 42 C.F.R. §§ 488.332, 488.335. The survey process uses "resident and patient outcomes" to establish compliance and specifically involves "directly observ[ing] the actual provision of care and services to residents and/or patients, and the effects of that care, to assess whether the care provided meets the needs of individual residents and/or patients." 42 C.F.R. § 488.26(c)(2). State law also requires MDH to make site visits and to conduct annual unannounced surveys of nursing facilities and promptly investigate complaints of harm to residents. Md. Code Ann., Health–Gen. § 19-1408(a), (b). MDH must make "information respecting all surveys and certifications made respecting nursing facilities, including statements of deficiencies," available to the public. 42 U.S.C. § 1396r(g)(5)(A)(i). Each state is required to establish certain remedies for noncompliance with federal standards for quality of care and protection and promotion of resident rights and to take remedial action when deficiencies are found. *See generally* 42 U.S.C. § 1396r(h). Remedies include termination or denial of federal funds, fines, appointment of outside management, state monitoring, a directed plan of correction, transfer of residents, and closure of the facility. *See id.*; 42 C.F.R. § 488.406; Md. Code Ann., Health–Gen. § 19-1402(a).

Plaintiffs and members of the putative class are mobility-impaired residents of Medicaid- and Medicare-participating nursing facilities in Maryland. ECF 1 ("Compl."), ¶¶ 1, 14–18. Plaintiffs allege that MDH fails to complete annual surveys of these nursing facilities and investigate residents' complaints of nursing facility residents within mandated time frames. *Id*. ¶¶ 4–6. "MDH's performance in timely completing annual surveys is among the worst" in the country, and "[m]any serious complaints alleging harm go uninvestigated for months or years . . . ." *Id*. ¶¶ 4–6, 59. Specifically, MDH had not completed an annual survey in 181 of Maryland's

225 Medicaid- and Medicare-participating nursing facilities in the 16 months before the Complaint was filed, *id*. ¶ 54, and more than 100 nursing facilities had not been surveyed in four years, *id*. ¶ 56. The lack of MDH oversight has unique impacts on Plaintiffs due to their heightened need for care by, and increased reliance upon, nursing facility staff, which stem from their mobility impairments. *Id*. ¶ 7. Plaintiffs rely on nursing staff assistance for hygiene and incontinence care, socialization, receipt of pain medication, and even, in some instances, to eat and drink water, which makes them uniquely vulnerable to performance failures and staffing shortages at their facilities. *Id*. ¶¶ 7–8. Plaintiffs allege that nursing facilities in Maryland have a record of poor performance "over numerous review cycles[,]" particularly in Black communities, and MDH's failure to detect and address violations as required under the NHRA results in "unique and unaddressed harm" to Plaintiffs "due to the nature of their disability." *Id*. ¶¶ 9–10.

The Complaint details each Plaintiff's experience at a nursing facility in Maryland and reliance on facility staff for basic needs, including being transferred in and out of bed, regular repositioning in bed and incontinence care, personal hygiene, nutrition, medication management, movement to common areas, attendance of community events. *Id*. ¶¶ 67–149. Deficiencies in the quality of care and protection of resident rights at these facilities have caused, and placed Plaintiffs at risk of, pressure ulcers, skin infections, falls, psychosocial harm, and other medical complications. *Id.* Some Plaintiffs have been confined to their beds or their rooms for months. *Id*. ¶¶ 89, 92, 106, 107. At the time the Complaint was filed in May 2024, the most recent statutorily mandated survey that had been conducted at any of these facilities was in November 2022. *Id*. ¶ 123. A survey had not been completed at one facility since November 2020. *Id*. ¶ 83. Plaintiffs allege that if MDH complied with its obligations by conducting annual surveys and timely

investigating complaints, it would discover violations and be required to take corrective action. *Id.* ¶ 66.

## III.    MOTION TO DISMISS

Defendants request that the Court dismiss Plaintiffs' Complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure or, alternatively, for failure to state a claim pursuant to Rule 12(b)(6). The Court addresses both purported grounds for dismissal, in turn.

### A.  Standing

#### 1.  Standard of Review

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction under Rule 12(b)(1). *See Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). "The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction." *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019).

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed in one of two ways: either a facial challenge . . . or a factual challenge." *Id.* (citations omitted) (internal quotations omitted). A facial challenge asserts "that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction." *Id.* A defendant's facial challenge "will be evaluated in accordance with the procedural protections afforded under Rule 12(b)(6), which is to say that the facts alleged in the Complaint will be taken as true . . . ." *In re Jones v. Md. Dept. of Pub. Safety*, No. 1:21-cv-01889-JRR, 2024 WL 493269, at *3 (D. Md. Feb. 8, 2024).

#### 2.  Discussion

Defendants argue that the Court lacks jurisdiction because the Complaint fails to allege sufficient facts to confer Plaintiffs' standing to bring suit. ECF 36-1 at 8–12.

Article III of the United States Constitution extends judicial power to the courts to decide actual cases and controversies. *Spokeo v. Robins*, 578 U.S. 330, 337 (2016). The requirement of Article III standing ensures that the federal courts do not extend their power beyond actual cases and controversies. *Id.* at 338 (citations omitted). The "'irreducible constitutional minimum' of standing consists of three elements." *Id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61). "At least one plaintiff must demonstrate standing for each claim and form of requested relief." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)). The plaintiff "bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)). At the pleading stage, the plaintiff must clearly allege facts in support of each element. *Id.* (citation omitted).

### a.  Injury in Fact

Here, Plaintiffs allege that they have been deprived of "meaningful access to and the benefit of MDH's nursing facility oversight and enforcement activities[,]" which are prescribed by federal and state law to detect noncompliance with applicable safety and quality standards and violations of Plaintiffs' rights as nursing facility residents. Plaintiffs further allege that, given their mobility impairments, they have suffered unique risks and harms at nursing facilities in Maryland resulting from violations that MDH has failed to detect due to its uniquely deficient performance in conducting annual surveys of nursing facilities and timely investigations of resident complaints.

There is no dispute that the physical, social, and emotional harms and risks alleged in the Complaint are sufficiently "concrete, particularized, and actual or imminent" to satisfy the "injury

in fact" requirement for standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Defendants argue, however, that the alleged denial of MDH's oversight and enforcement functions is not "concrete" and is "entirely abstract . . . ." ECF 52-2 at 6. The Court disagrees.

While it is well established that a "concrete" injury must be "real" and "not 'abstract[,]'" "'[c]oncrete' is not . . . necessarily synonymous with 'tangible.'" *Spokeo*, 578 U.S. at 340. The U.S. Supreme Court has recognized the "important role[]" that "the judgment of Congress" plays "[i]n determining whether an intangible harm constitutes injury in fact[.]" *Id.* Indeed, "Congress is well positioned to identify intangible harms that meet minimum Article III requirements," and it "may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Id.* at 341 (quoting *Lujan*, 504 U.S. at 578). Although "a bare procedural violation, divorced from any concrete harm," is inadequate to constitute an injury in fact, *id.*, a procedural violation may constitute an injury in fact if "the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of his standing[,]" *Hodges v. Abraham*, 300 F.3d 432, 444 (4th Cir. 2002) (quoting *Lujan*, 504 U.S. at 573 n.8); *see also Murphy by Murphy v. Minnesota Dep't of Hum. Servs.*, 260 F. Supp. 3d 1084, 1100–01 (D. Minn. 2017)).

It is clear that the procedural requirements of the NHRA are designed to protect and promote a wide range of rights possessed by residents of nursing facilities and to assure quality of services provided in nursing facilities. *See generally* 42 U.S.C. § 1396r. Here, Plaintiffs allege sufficient facts to show that the "concrete interest" they have in the rights and quality of services protected by the NHRA has been injured and remains under threat by MDH's failure to satisfy its oversight and enforcement obligations under the statute and its implementing regulations. The injury created by MDH's procedural failures is connected to a variety of concrete physical, social,

and emotional harms and risks identified in the Complaint for each of the named Plaintiffs. *See* Compl. ¶¶ 67–149. According to these allegations, each Plaintiff has been affected "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Thus, Plaintiffs' claim to injury based on MDH's failure to meet its oversight and enforcement obligations respecting nursing facilities in Maryland is sufficiently concrete and particularized to state an injury in fact for purposes of standing.

b. <u>Causation and Redressability</u>

As noted above, to confer standing, an injury in fact must be "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560–61). Causation and redressability "are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. "The 'fairly traceable' requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). However, the burden imposed by the "fairly traceable" standard is "relatively modest" at the motion-to-dismiss stage, *DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)), and is "not equivalent to a requirement of tort causation[,]" *Friends of the Earth*, 204 F.3d at 161 (citation omitted). Standing does not require the plaintiff to "show that a particular defendant is the only cause of their injury[.]" *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992).

In cases where government regulations "require or forbid some action by the plaintiff[,]" standing to sue the regulating entity "is usually easy to establish." *All. for Hippocratic Med.*, 602

8

U.S. at 382. "By contrast, when (as here) a plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,' 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *Id.* (quoting *Lujan*, 504 U.S. at 562). "When the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Id.* at 383 (quoting *Lujan*, 504 U.S. at 562). In such a case, the plaintiff "cannot rely on speculation about the unfettered choices made by independent actors not before the courts[,]" but, instead, "must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Id.* (cleaned up, citations omitted). "[T]he causation inquiry can be heavily fact-dependent and a 'question of degree,'" and, therefore, "[d]etermining causation in cases involving suits by unregulated parties against the government is admittedly not a 'mechanical exercise.'" *Id.* at 384 (citations omitted). The Supreme Court "has identified a variety of familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff." *Id.* Several examples identified in *Alliance for Hippocratic Medicine* include "when the government regulates (or under-regulates) a business" and "the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain," including customers. *Id.* at 384–85.

At this early stage of the litigation, the Court finds the facts alleged in the Complaint sufficient to draw a chain of causation between MDH's oversight and enforcement failures and Plaintiffs' particularized and unique injuries and risks as mobility-impaired residents of nursing facilities. The Complaint supports a reasonable inference that the nursing facilities where Plaintiffs reside have reacted to the lack of oversight and enforcement by MDH in ways that have caused them harm and put them at risk of greater harm. Plaintiffs' allegations demonstrate that they stand

to benefit from MDH's oversight and enforcement functions and that the fulfillment of these functions would predictably prevent the harms and risks they have suffered in their nursing facilities. The enforcement remedies available to MDH are far-reaching, including termination and denial of federal funding, outside management or monitoring, transfer of residents, and even closure of the facility. Compl. ¶ 39 (citing 42 U.S.C. § 1396r(h)(2); 42 C.F.R. § 488.406; Md. Code Ann., Health–Gen. § 19-1402(a)). The threat of having federal funding terminated or being shut down supports a reasonable prediction that nursing facilities would respond to consistent annual surveys, timely investigations of complaints, and any corrective plans by MDH in ways that would be put an end to Plaintiffs' personal risks and harms. In this action, Plaintiffs seek an injunction requiring Defendants to conduct annual surveys, investigate complaints in a timely manner, and take related enforcement actions.

Plaintiffs' allegations suffice to show that their injuries are "fairly traceable" to Defendants' deficient regulation of nursing facilities in Maryland and are "likely to be redressed" by the judicial decision they seek in this case. *Spokeo*, 578 U.S. at 337. The chain of causation is not too attenuated or speculative. It is only the regulated nursing facilities themselves that stand between Plaintiffs and MDH, and, if the facts alleged in the Complaint are accepted as true, it is hard to imagine that MDH's fulfillment of its oversight and enforcement obligations would not bring Plaintiffs relief from their alleged personal injuries.

In sum, at this early stage of the case, the Court finds the Complaint sufficient to satisfy the requirements of standing. Defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(1) shall be denied.

### B. Failure to State a Claim

#### 1. Standard of Review

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may file a motion to dismiss a complaint for failure to state a claim upon which relief may be granted. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not include "detailed factual allegations," but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (cleaned up).

When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court may consider documents "explicitly incorporated into the complaint by reference," "those attached to the complaint as exhibits," and "document[s] submitted by the movant that [were] not attached to or expressly incorporated in a

11

complaint, so long as [they were] integral to the complaint and there is no dispute about [their] authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citations omitted). "A document is integral to the complaint if its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Faulkenberry v. U.S. Dep't of Def.*, 670 F. Supp. 3d 234, 249 (D. Md. 2023) (cleaned up).

### 2. Discussion

Counts I and II of the Complaint each assert a methods-of-administration violation, under the ADA and Section 504 of the RA, respectively. ECF 1.

### a. Legal Background

Claims brought under Title II of the ADA and Section 504 of the RA "can be combined for analytical purposes because the analysis is substantially the same." *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (citation omitted). ADA Title II provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prevail on a claim of discrimination under ADA Title II, a plaintiff must show that she: (1) has a disability or is regarded as having a disability; (2) is qualified to participate in or to receive the benefits of a public service, program, or activity; and (3) was denied such participation or benefits, "or otherwise discriminated against," based on her disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016); *see also Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020). To establish a disability, a plaintiff must show "(1) that he has a physical or mental impairment, (2) that this impairment implicates at least one major life activity, and (3) that the limitation is substantial." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 254 (4th Cir. 2006) (citing 42 U.S.C. §

12102(2)(A)). Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

ADA Title II and RA Section 504 claims may be pursued on a theory of disparate impact. *Brown v. DPSCS*, 383 F. Supp. 3d 519, 551–52 (D. Md. 2019) (quoting *A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008)). "Title II prohibits not only intentional discrimination against disabled individuals, but also any policies or practices that have a disparate impact on disabled individuals." *Smith-Berch, Inc. v. Baltimore Cnty., Md.*, 68 F. Supp. 2d 602, 621 (D. Md. 1999). "A cause of action based upon disparate impact arises where facially neutral rules or policies are applied in a way that affects the protected class differently from other groups." *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 911 F. Supp. 918, 939 (D. Md. 1996), *aff'd*, 124 F.3d 597 (4th Cir. 1997).

Public entities are forbidden from "'utilizing standards, criteria, or methods of administration' that disparately impact the disabled, without regard to whether such conduct has a rational basis." *Pathways Psychosocial v. Town of Leonardtown, MD*, 133 F. Supp. 2d 772, 788 (D. Md. 2001) (citing 42 U.S.C. § 12112(b)(3)(A)). Specifically, public entities are prohibited by regulation from methods of administration that subject disabled individuals "to discrimination on the basis of disability" or have the "purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i),(ii); *see also State of Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277 (D. Conn. 2010); *Timothy B. v. Kinsley*, No. 1:22-CV-1046, 2024 WL 1350071, at *2 (M.D.N.C. Mar. 29, 2024) ("'methods of

administration' regulation prohibits public entities from utilizing 'criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination.") (citing 28 C.F.R. § 35.130(b)(3)(i)). The regulation "applies to written policies as well as actual practices, and is intended to prohibit both blatantly exclusionary policies or practices as well as policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate." *Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020) (quoting *Cota v. Maxwell–Jolly*, 688 F. Supp. 2d 980, 995 (N.D. Cal. 2010)).

Actionable methods of administration include omissions. *Id.* at 665. Congress designed the RA, the predecessor statute to the ADA, to address not only "invidious animus," but also, more commonly, "thoughtlessness and indifference—[ ] benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985); *see also Dunn*, 318 F.R.D. at 665 ("Title II [of the ADA] imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled.") (quoting *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004)). "The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when plaintiffs can show that it has the effect of discriminating." *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *50 (M.D. La. Mar. 31, 2021).

b.  Analysis

The Complaint in this case states plausible methods-of-administration claims under the ADA Title II and RA Section 504. First, Plaintiffs and members of the putative class are individuals with disabilities—specifically, mobility impairments. Compl. ¶¶ 1, 75, 87, 103, 125, 144; *see also* 29 C.F.R. § 1630.2(g)(1)(i), (i)(1)(i) (defining "disability" to include "[a] physical

14

or mental impairment that substantially limits one or more of the major life activities of such individual[,]" such as "[c]aring for oneself" and "walking"). Second, Plaintiffs and each member of the putative class, as residents of Maryland-based nursing facilities, are qualified to receive the benefits of MDH's oversight and enforcement activities as federal protections mandated by the NHRA. Compl. ¶¶ 24–25; *see also Levy v. Mote*, 104 F. Supp. 2d 538, 543 (D. Md. 2000) ("Although Title II of the ADA does not define the phrase 'services, programs, or activities,' courts have held that the phrase 'encompasses virtually everything that a public entity does.'") (citation omitted); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 303 (E.D.N.Y. 2008) (finding that plaintiff nursing home residents "are part of the class for whose particular benefit the NHRA was enacted" and that the NHRA creates an enforceable federal right). The objectives of MDH's oversight and enforcement responsibilities under the NHRA include ensuring that the care provided in nursing facilities meets the residents' needs, protecting residents from serious harm, and promoting "efficiency and quality within the health care delivery system." Compl. ¶¶ 25–26. The issue is whether Plaintiffs sufficiently allege that Defendants have utilized methods of administration that, in effect, defeat or impair the foregoing objectives and thereby deny Plaintiffs, as individuals with disabilities, the benefits of MDH's oversight and enforcement activities. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(3)(ii). The Court finds the Complaint to be sufficient to state such a claim.

As explained in Part III.A.2.b *supra*, the facts alleged in the Complaint draw a causal chain from MDH's failure to fulfill oversight and enforcement obligations imposed by the NHRA to specific harms and risks suffered by Plaintiffs that are unique to nursing facility residents with mobility impairments. First, Plaintiffs allege MDH has generally failed to conduct statutorily required annual surveys of nursing facilities and timely investigations of complaints from nursing facility residents. Plaintiffs allege that they are harmed by MDH's "delayed complaint

investigations" that often result in findings of no violations "due only to difficulties locating documents, staff turnover, or the subsequent discharge or death of the resident." Compl. ¶ 60. Additionally, Maryland is one of only four states in the country that has failed to conduct annual surveys in over 70% of its nursing facilities, and more 100 of its 225 Medicaid- and Medicare-participating nursing facilities went without a survey in the four years before Plaintiffs filed suit. Plaintiffs cite data from Centers for Medicare & Medicaid Services ("CMS") showing that MDH had not completed a statutorily required annual survey in 181 of Maryland's 225 licensed nursing facilities in the 16 months before the Complaint was filed. *Id.* ¶ 54. According to the Complaint, each of the nursing facilities where the named Plaintiffs reside went between 18 months and three-and-a-half years without a survey before the Complaint was filed.

Next, Plaintiffs allege specific harms and risks unique to mobility-impaired individuals that plausibly arise from noncompliance with quality standards and violations of their rights as nursing facility residents. As mobility-impaired residents, Plaintiffs are particularly vulnerable to such violations because they are uniquely reliant upon nursing facility staff for a range of basic needs, including personal hygiene, getting in and out of bed, repositioning in bed, incontinence care, medication management, and socialization. The alleged violations have resulted in pressure ulcers, skin infections, falls, psychosocial harm, and other medical complications, and heightened risks of such harms.

Third, the facts in the Complaint support a reasonable inference that the foregoing risks and harms would not occur if it were not for MDH's failure to conduct annual surveys and timely investigations of complaints as required under the NHRA. Plaintiffs plausibly allege that MDH would discover and redress the violations if it complied with its statutory obligations to conduct annual surveys, promptly investigate complaints, and take enforcement action.

16

In sum, Plaintiffs allege that MDH's failure to satisfy its statutory oversight and enforcement duties has uniquely severe impacts on mobility-impaired nursing facility residents, imposing upon them higher levels of harm and special injuries not suffered by residents who do not have mobility impairments. Thus, Plaintiffs plausibly allege that Defendants' methods of administering their oversight functions, whether by commission or omission, "have the . . . effect of defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[,]" in violation of 28 C.F.R. § 35.130(b)(3)(ii).

Defendants argue that MDH's liability under ADA Title II and RA Section 504 for its licensing and certification activities is governed by 28 C.F.R. § 35.130(b)(6), not by § 35.130(b)(3). Section 35.130(b)(6) prohibits a public entity from "administer[ing] a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability," or "establish[ing] requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(6). Defendants point out that the "programs or activities" of licensees are not covered by this regulation, *id.*, and argue that MDH is not liable under this regulation for the conduct of nursing facilities.

Defendants' arguments are misplaced. First, the Court agrees that MDH's licensing and certification activities are governed by § 35.130(b)(6), but that does not mean that MDH's responsibility for oversight of nursing facilities is not, at the same time, governed by § 35.130(b)(3). Defendants state no reason and cite no authority for the proposition that it cannot be liable under multiple regulations for acts and omissions in its oversight of nursing facilities that have disparate impacts on persons with disabilities. This Court is persuaded that § 35.130(b)(3) applies to MDH's oversight of nursing facilities in Maryland and forbids MDH from methods of

administering its oversight functions in ways that subject mobility-impaired residents to disparate harms and risks based on their disabilities.

Second, Plaintiffs' claims do not seek to hold Defendants liable for any discriminatory actions of individual nursing facilities. Plaintiffs do not claim, for example, money damages for any personal injuries sustained by individual Plaintiffs or members of the proposed class. The claims are asserted against Defendants for their own deficient performance of their oversight and enforcement functions, which is plausibly alleged to have disparate impacts on nursing facility residents with mobility impairments.

Other courts have rejected the same arguments Defendants present here. In *Disability Advocates, Inc. v. Paterson*, for instance, plaintiff residents of adult care facilities brought ADA claims against the State of New York and state agencies for administering its mental health service system "in a manner that results in thousands of individuals with mental illness living and receiving services in allegedly segregated settings." 598 F. Supp. 2d 289, 318 (E.D.N.Y. 2009). The district court rejected the defendants' arguments that they could not be liable for the conduct of privately operated adult homes. *Id.* The plaintiff "d[id] not challenge the conduct of adult homes licensed and certified by the State; instead, it challenge[d] the manner in which [the State] administer[ed] New York's mental health service system." *Id. See also Price v. Shibinette*, No. 21-CV-25-PB, 2021 WL 5397864, at *9 (D.N.H. Nov. 18, 2021) (rejecting argument that plaintiffs' integration mandate methods-of-administration claims fail "because they are premised on the actions and omissions of private actors . . . for which defendants cannot be held liable" where "the complaint plausibly alleges that defendants' own actions or omissions are responsible for the service gaps" by "failing to monitor service gaps, and failing to respond to those gaps by changing their methods of administration"). Plaintiffs here, like those in *Disability Advocates* and *Price*, challenge MDH's

administration of its oversight and enforcement functions and its disparate impact on nursing facility residents with mobility impairments, and they seek injunctive relief against Defendants' allegedly discriminatory practices. Unlike the plaintiffs in the cases relied upon by Defendants here, Plaintiffs do not seek to hold Defendants liable for the conduct of third parties.

The Court finds that Plaintiffs have plausibly alleged facts sufficient to state a methods-of-administration claim against Defendants. Defendants' motion to dismiss shall be denied.

## IV.    MOTION FOR CLASS CERTIFICATION

Plaintiffs move to certify a class comprised of mobility-impaired residents of nursing facilities in Maryland. For reasons stated *infra*, the court finds that class certification is warranted and shall grant the motion.

### A.  Standard of Review

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seeking to certify a class must meet four requirements of Rule 23(a) and satisfy one of the enumerated conditions of Rule 23(b). *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Under Rule 23(a), a class must (1) be so numerous that joinder of all members is impracticable; (2) have questions of law or fact common to the class; (3) have class representatives with claims or defenses that are typical of the claims and defenses of the class; and (4) have class representatives that will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)) (internal quotation marks omitted). In addition to satisfying all four requirements under Rule 23(a), Plaintiffs must also

satisfy one of the enumerated conditions under Rule 23(b). As relevant to this case, a class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

When determining whether to grant class certification, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The court must conduct a "rigorous analysis" before certifying a class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id*. at 351. Still, Rule 23 does not allow for courts "to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (citations omitted). The court must strictly confine its analysis to whether the Rule 23 prerequisites for class certification have been satisfied. *Id*. at 466.

### B. Discussion

To be certified as a class under Rule 23, Plaintiffs must show that the class is numerous, the injuries are common to all class members, the claims alleged are typical of all class members, and the class representatives and their attorneys can adequately represent the entire class. Fed. R. Civ. P. 23(a). Here, Plaintiffs propose a class of at least 9,000 mobility-impaired individuals residing in 222 nursing facilities in Maryland. Defendants concede that Plaintiffs satisfy the numerosity requirement of Rule 23(a)(1).

Defendants contest whether Plaintiffs satisfy the commonality, typicality, and adequacy of representation requirements of Rule 23(a)(2), (3), and (4). The analyses of these requirements

"tend to merge." *Falcon*, 457 U.S. at 158 n.13. Commonality and typicality "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical . . . ." *Id.* All three requirements tend to confirm that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence[,] . . . although the [adequacy-of-representation] requirement also raises concerns about the competency of class counsel and conflicts of interest." *Id.*

### 1. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A single common question will suffice[.]" *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021) (citing *Wal-Mart*, 564 U.S. at 359). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. The plaintiff's and class members' "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Although Rule 23(a)(2) "speaks in terms of common questions, 'what matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Peters*, 2 F.4th at 242 (quoting *Wal-Mart*, 564 U.S. at 350).

"[T]he commonality requirement is not a high bar[.]" *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 53–54 (D. Md. 2020) (quoting *Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 533 (D. Md. 2011)). "Minor differences in the underlying facts of individual class members'

cases do not defeat a showing of commonality where there are common questions of law." *Id.* at 53 (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997)). "[F]actual differences among class members' cases will not preclude certification if the class members share the same legal theory." *Jonathan R. v. Justice*, 344 F.R.D. 294, 304 (S.D.W. Va. 2023) (citing *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 344 (4th Cir. 1998)).

The Court finds that Plaintiffs' claims, on behalf of all members of the proposed class, present a common question and depend upon a common contention "capable of classwide resolution[.]" *Wal-Mart*, 564 U.S. at 350. The common factual and legal question is whether MDH's administration of its oversight and enforcement obligations under the NHRA deny mobility-impaired residents of nursing homes in Maryland the benefit of a service, program, or activity based on their disability, in violation of ADA Title II and RA Section 504. *See* 42 U.S.C. § 12132 ("No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). The common answer Plaintiffs offer is that the class members are denied this benefit by deficiencies in MDH's discharge of its oversight and enforcement responsibilities and the disparate impacts these failures have on Plaintiffs as mobility-impaired nursing facility residents.

To support this common contention, Plaintiffs offer a declaration from each Plaintiff and other members of the proposed class; the Declaration of Marie Boltz, Ph.D, RN, GNP-BC; and a number of publicly available reports and procedural and operational manuals. *See* ECF 32-3

through 32-27, 33-1 through 33-11, and 50-1. Plaintiffs cite CMS data showing that MDH had not completed an annual survey in 174 of Maryland's 222 Medicaid- and Medicare-participating nursing facilities within the 16-month period preceding the filing of Plaintiffs' motion.[2] ECF 32-2 at 8–9. Maryland is one of only two states in which annual surveys had not been conducted at more than half of its nursing facilities within the three-year period, and more than 40% of its nursing facilities within the four-year period, before Plaintiffs filed their motion. ECF 32-2 at 9. Only 6,685 of 13,173 resident complaints and facility-reported incidents from nursing facilities were investigated within the three fiscal years preceding Plaintiffs' motion. *Id.* at 9; ECF 32-9. Plaintiffs aver that MDH's failure to conduct timely annual surveys and complaint investigations compromise the investigations "through loss of evidence, staff turnover, or the discharge or death of the complaining resident, and lead to violations remaining undiscovered and uncorrected, thereby harming residents." ECF 32-2 at 9–10 (citing ECF 32-10, 32-11, and 32-12). CMS data also reflects findings of numerous specific deficiencies at Maryland nursing facilities that specifically and uniquely impact mobility-impaired residents, including deficiencies in assistance with personal hygiene, incontinence care, repositioning, transfers, prevention and management of skin breakdown, response to call lights, and care planning. ECF 50-1 (citing CMS deficiency count reports).

Dr. Boltz is a professor of nursing and licensed nursing home administrator and registered nurse with 39 years of experience of patient care in nursing facilities, specialized training in geriatrics and chronic care, and experience serving as a federal monitor evaluating quality of care to nursing home residents and compliance with federal regulations. ECF 32-3, ¶¶ 2–8. She

---

[2] In a declaration submitted by Defendants, the deputy director of the Long-Term Care Unit in MDH's Office of Health Care Quality ("OHCQ") attests that OHCQ conducted 65 annual surveys in the 15 months before Defendants' opposition brief was filed. ECF 42-3, ¶ 4. Accepting this figure, more than two-thirds of Maryland's 222 nursing facilities went without an annual survey in that 15-month period.

interviewed Plaintiffs and reviewed records from nursing facilities related to each Plaintiff's medical treatment, health care needs, functional capabilities, and required level of support; reports of deficiencies from past surveys conducted by MDH at the nursing facilities; and other nursing facility records. *Id.* ¶¶ 10–14. Dr. Boltz found that each Plaintiff demonstrated mobility impairments and had suffered harms and risks "uniquely related to their mobility impairment" arising from noncompliance with federal standards for nursing facilities, including social isolation, anxiety, depression, falls, skin breakdown, urinary tract infection, respiratory complications, and humiliation. *Id.* ¶¶ 15–48, 54. Plaintiffs' own declarations and the declarations of other mobility-impaired nursing facility residents detail these harms and risks, as well as MDH's failure to respond to their complaints. ECF 32-17 through 32-27, and 33-1 through 33-11. Other problems described in the residents' declarations include failures by nursing facility staff to respond to call lights, deficient incontinence care, and various other deviations from residents' plans of care. *See generally id.* Dr. Boltz notes, from her experience, that "thorough and timely surveys and complaint investigations can identify violations so that corrective actions can be taken to protect resident rights and mitigate the risks of immobility, while supporting the protection of resident rights." ECF 32-3, ¶ 53. Dr. Boltz concludes that MDH's "failure to conduct timely and thorough annual surveys of the nursing facilities [reviewed in her report] and to conduct timely investigations of the Plaintiffs' complaints resulted in a lack of oversight and increased risk of harm for immobile residents." *Id.* ¶ 55.

Plaintiffs' contention that MDH's deficient administration of its responsibilities under the NHRA relies upon a legal theory applicable to the entire proposed class: that MDH's actions and omissions violate the methods-of-administration regulation, 28 C.F.R. § 35.130(b)(3). This regulation prohibits public entities from using "methods of administration" that subject "qualified

individuals with disabilities to discrimination on the basis of disability" or have the "purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i),(ii). Plaintiffs do not merely assert that they and the class members "suffered a violation of the same provision of law." *Wal-Mart*, 564 U.S. at 350. They assert that MDH violated the methods-of-administration regulation *in the same way*: failing to conduct statutorily required annual surveys of Maryland nursing facilities and timely investigations of complaints arising from these facilities. Plaintiffs claim that MDH's failures disparately subject the entire class of mobility-impaired nursing facility residents to a common set of harms and heightened risks. To redress the common deprivation of MDH's oversight, Plaintiffs seek an injunction requiring Defendants to conduct annual surveys on a twelve-month cycle, investigate complaints within the time frames prescribed by statute, and complete enforcement activities to ensure compliance with federal and state standards. Compl. at 48–49. This relief would give Plaintiffs and all class members the benefit of MDH's services, program, or activities Plaintiffs claim they are unlawfully denied in violation of ADA Title II and RA Section 504. Ultimately, then, the common question Plaintiffs present in this litigation is "capable of classwide resolution[.]" *Wal-Mart*, 564 U.S. at 350.

Defendants argue that Plaintiffs cannot establish commonality because the circumstances of each Plaintiff and member of the proposed class are "highly individualized," including "real injuries" in some instances and only "an increased risk of harm" in others. ECF 42-1 at 20–21. This Court is not persuaded. While there is some variation among the specific personal harms and risks of harm suffered by members of the proposed class, Plaintiffs do not challenge the individual instances in which each class member suffered a personal harm or risk at a nursing facility. Further, the relief Plaintiffs seek will not require individualized inquiry into the personal circumstances of

individual members of the proposed class. The injury Plaintiffs claim is common to the entire class is deprivation of MDH's oversight and enforcement functions, and the injunctive relief they seek targets that deprivation by requiring Defendants to conduct statutorily mandated oversight and enforcement activities. The declarations submitted by Plaintiffs reflect a range of personal harms and risks that, according to Dr. Boltz's declaration, fall within the category of harms and risks that are unique to nursing facility residents with mobility impairments and are aggravated by MDH's failures in oversight and enforcement. *See* ECF 32-3, 32-17 through 32-27, and 33-1 through 33-11. In this litigation, Plaintiffs challenge MDH's deficient oversight and enforcement activities, and the relief they seek would apply uniformly to benefit the entire class. *See Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311, 331 (4th Cir. 2006) (citing *In re Monumental Life Ins. Co.,* 365 F.3d 408, 416 (5th Cir. 2004) ("Of course, certification under Rule 23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive relief they request."). Plaintiffs need only identify one common contention based on a common legal theory capable of class-wide resolution to satisfy Rule 23(a)(2). Having done that, what factual differences exist among members of the proposed class cannot defeat Plaintiffs' showing of commonality. *See Peters*, 2 F.4th at 242 (citing *Wal-Mart*, 564 U.S. at 350). For these reasons, the Court rejects Defendants' argument that variety among the class members' personal circumstances and injuries defeats commonality.[3]

---

[3] As Plaintiffs point out, other courts in similar cases have rejected the same argument Defendants advance here. *See Kenneth R. ex rel. Tri-Cnty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 267 (D.N.H. 2013) ("Substantial evidence suggests that the State's policies and practices have created a systemic deficiency in the availability of community-based mental health services, and that that deficiency is the source of the harm alleged by all class members."); *B.D. by next friend Wellington v. Sununu*, No. 21-CV-4-PB, 2024 WL 4227544, at *15 (D.N.H. Sept. 18, 2024) (rejecting defendants' argument that plaintiff's claims "turn on highly individualized inquiries regarding the 'legality of hundreds of [foster] placement decisions' that defeat commonality" where plaintiff "does not challenge any particular placement decision" or seek individualized relief but, rather, "challenge specific acts and omissions in the defendants' operation of its foster care program that allegedly expose all class members to an ADA violation").

Defendants argue that "a significant number of nursing facilities were surveyed in a timely manner[,]" and this fact "by itself defeats the Plaintiffs' claim for commonality." ECF 42-1 at 19. Defendants' only support for this fact is the statement of a MDH official that surveys were conducted at approximately 29% of Maryland's nursing facilities in the 15-month period before Defendants' filed their opposition brief. ECF 42-3, ¶ 4. The declaration, thus, confirms that, within that 15-month period, more than two-thirds of Maryland's nursing facilities lack what should have been an annual survey. Defendants fail to address, however, Plaintiffs' data showing that, as a general matter, surveys are not being conducted on an annual basis with any consistency and complaints from nursing facility residents are not being investigated within time frames prescribed by federal and state law. Plaintiffs point out that, although MDH had, in 2024, completed surveys at three specific nursing facilities identified in Defendants' opposition and exhibits attached thereto, each of those "annual" surveys were the first conducted at the respective facility since 2019. ECF 50 at 8 (citing CMS data). The Court finds the data Defendants offer in rebuttal inadequate to defeat Plaintiffs' showing of commonality.

In sum, the Court finds that commonality requirement of Rule 23(a)(2) is satisfied in this case.

### 2.  Typicality

Next, the Court looks to whether the injuries suffered by the named Plaintiffs are typical of the injuries suffered by the class. Rule 23(a)(3) requires "claims or defenses of the representative parties" to be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). The

typicality analysis requires the court to "compare the named plaintiff's claims or defenses with those of absent class members." *In re Marriott Int'l Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 148 (D. Md. 2022) (cleaned up). The court must determine "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *J.O.P.*, 338 F.R.D. at 55 (quoting *Hewlett*, 185 F.R.D. at 217). The named plaintiff's claims "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter*, 436 F.3d at 466–67. The named plaintiff's claims and those of other class members "need not be 'perfectly identical or perfectly aligned[.]'" *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (quoting *Deiter*, 436 F.3d at 467). A "claim may differ factually and still be 'typical' of the claims of class members if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members[.]" *J.O.P.*, 338 F.R.D. at 55 (quoting *Bullock v. Bd. of Educ. of Montgomery Cnty.*, 210 F.R.D. 556, 560 (D. Md. 2002)). The named plaintiff's "pursuit of his own interests 'must simultaneously tend to advance the interests of the absent class members.'" *Ealy*, 514 F. App'x at 305 (4th Cir. 2013) (quoting *Deiter*, 436 F.3d at 466). The typicality analysis "tends to merge with the commonality and adequacy-of-representation requirements." *Deiter* 436 F.3d at 466.

Here, Plaintiffs have established a "sufficient relationship" between the injury they assert and conduct by Defendants that affect the proposed class as a whole, such that Plaintiffs' claims are typical of those among class members. *J.O.P.*, 338 F.R.D. at 55. Named plaintiffs Irene Connor, Michael Nevin, Alex Noonan, and Richard Hollman, and all proposed class members are mobility-impaired residents of nursing facilities in Maryland subject to oversight from MDH. Given their mobility impairments, Plaintiffs and all class members share a "risk of common

complications" that is created and aggravated by MDH's failure to provide statutorily required oversight of these nursing facilities and enforce standards imposed by state and federal law. ECF 32-3, ¶¶ 48, 55. Based on her experience and an examination of the named Plaintiffs' medical records, Dr. Boltz opines that that the harms and risks "experienced by Plaintiffs are typical of mobility impaired residents." *Id.* ¶¶ 10, 54. Dr. Boltz's conclusions are corroborated by the individual declarations of each Plaintiff and other mobility-impaired residents of nursing facilities in Maryland, which reflect a common set of unique harms and risks associated with their mobility impairments. ECF 32-17 through 32-27, and 33-1 through 33-11. These harms and risks relate to noncompliance with federal standards that are likely to be identified and corrected by timely surveys and complaint investigations by Defendants, which they have failed to provide. ECF 32-3, ¶ 53. Thus, Plaintiffs' claims are connected with the same acts and omissions by Defendants that "give[] rise to the claims of other class members[.]" *J.O.P.*, 338 F.R.D. at 55. The named Plaintiffs and the members of the proposed class "are similarly situated legally and factually," and Plaintiffs have made a sufficient showing that MDH "pursued the same course of conduct as to all class members." *In re Marriott Int'l*, 341 F.R.D. at 149. Plaintiffs' "pursuit of [their] own interests" in this litigation "simultaneously tend[s] to advance the interests of" all members of the proposed class. *Ealy*, 514 F. App'x at 305 (4th Cir. 2013) (quoting *Dieter*, 436 F.3d at 466). The injunction Plaintiffs seek here tends to advance the interests of all mobility-impaired residents of nursing facilities in Maryland.

Defendants argue that variations among the specific harms and risks sustained by each Plaintiff and class member individually Plaintiffs defeat typicality. ECF 42-1 at 23–24. This argument fails for the same reason it fails to rebut commonality. In this case, Plaintiffs claim a common injury based on MDH's failure to exercise statutorily mandated oversight and seek relief

in the form of an injunction requiring it to conduct the oversight it presently fails to provide. Each Plaintiff's claim to this relief is typical for the entire class. What variety exists among the specific harms and risks suffered by Plaintiffs and the class members as individual residents of specific nursing facilities does not "strike[] at the heart" of the causes of action asserted in this case. *Deiter*, 436 F.3d at 467. To support their argument, Defendants cite the *Amchem* case, an asbestos action where the plaintiffs sought money damages, which would require individualized assessment of each class member's specific physical injuries. ECF 42-1 at 23–24 (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)). The instant case, in contrast, involves a claim for declaratory and injunctive relief that will apply evenly to each Plaintiff and each member of the proposed class. The named Plaintiffs' claims to this relief are, as noted above, typical of all class members' claims.

In sum, the Court finds that the typicality requirement of Rule 23(a)(3) is met in the instant case.

### 3. Adequacy of Representation

The Court next turns to whether the adequacy-of-representation requirement has been satisfied. Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625. To defeat adequacy of representation, a conflict of interest "must be fundamental" and "go to the heart of the litigation." *Gunnells*, 348 F.3d at 430–31 (cleaned up). "Representation is adequate if: (1) the named plaintiffs' interests are not opposed to those of other class members, and (2) the plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *J.O.P.*, 338 F.R.D. at 55 (citation omitted); *see also In re Marriott Int'l*, 341 F.R.D. at

30

150 (court must "determine: (1) whether the named plaintiffs . . . have any conflicts of interest with other class members; and (2) whether the named plaintiffs . . . will prosecute the action vigorously on behalf of the entire class") (citation omitted).

Here, first, Plaintiffs' interests in this litigation "are not opposed" to the interests of the proposed class. To the contrary, as explained in Parts IV.B.1 and 2 *supra*, Plaintiffs' interests are aligned with those of the class members. The Court finds no "fundamental" conflict of interest between Plaintiffs and the members of the proposed class, nor have Defendants identified any such conflict. Second, Plaintiffs' attorneys are "qualified, experienced and able" to prosecute their ADA and RA claims on a class-wide basis. *J.O.P.*, 338 F.R.D. at 55. Plaintiffs' counsel include attorneys with substantial experience with class actions and other forms of complex civil litigation, as well as expertise with issues related to access to health care and public benefit programs. Additionally, each Plaintiff or their guardian attests that she or he has been advised of their responsibilities as class representatives and is prepared to satisfy those responsibilities. The Court is satisfied, and has no reason to doubt, that Plaintiffs "will prosecute the action vigorously on behalf of the entire class." *In re Marriott Int'l*, 341 F.R.D. at 150. Defendants' arguments that the class members' injuries are too diverse for Plaintiffs to represent them adequately fail for the same reasons that argument fails to rebut commonality and typicality. *See* Parts IV.B.1 and 2 *supra*; *Falcon*, 457 U.S. at 158 n.13 (analyses of commonality, typicality, and adequacy of representation "tend to merge"). Accordingly, the Court finds that the adequacy-of-representation requirement of Rule 23(a)(4) is met in this case.

### 4. Rule 23(b)(2)

Finally, Plaintiffs bring this class action under Rule 23(b)(2). Plaintiffs claim that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." . . . In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Wal-Mart*, 564 U.S. at 360–61 (citation omitted). "'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Id.* at 361 (quoting *Amchem*, 521 U.S. at 614).

Here, Plaintiffs seek a declaratory judgment that Defendants' conduct violates Plaintiffs' rights under the ADA and RA, as well as injunctive relief requiring Defendants to conduct annual surveys of nursing facilities, investigate complaints in a timely and accurate manner, and make available to the public information respecting all nursing facility surveys. Compl. at 47–49. The declaratory and injunctive forms of relief Plaintiffs seek would provide a remedy to all members of the class and are therefore "indivisible" in nature. *Wal-Mart*, 564 U.S. at 360. There are no claims for different injunctions or declaratory judgments for different members of the class, nor claims for individualized awards of money damages. Thus, Defendants' argument that the case "presents individual issues that destroy the necessary cohesiveness that Rule 23(b)(2) requires" has no merit. ECF 42-1 at 25–26. *See J.O.P.*, 338 F.R.D. at 57 (Rule 23(b)(2) satisfied where plaintiffs challenge policies that "apply generally to the class, and the requested relief . . . 'would provide the same relief to all class members'") (citation omitted).

Defendants next argue that "Rule 23(b)(2) is not met when the relief sought is simply to comply with the law." ECF 42-1 at 26 (citing *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674, 690 (D. Md. 2017)). This argument is misplaced. The Court agrees that vague and overbroad "obey-the-law injunctions run afoul of the traditional equitable principle—codified in Federal Rule of Civil Procedure 65(d)—that an injunction 'state its terms specifically[ ] and . . . describe in reasonable detail . . . the act or acts restrained or required.'" *Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 708 (M.D.N.C. 2023); *see also Davison v. Loudoun Cnty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 722–23 (E.D. Va. 2017), *aff'd sub nom. Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), *as amended* (Jan. 9, 2019) ("[I]njunctions that simply require their subjects to follow the law are generally overbroad.") (citation omitted). On this basis, courts have rejected "vague 'obey the law' provisions" in injunctions proposed by plaintiffs. *Id.* at 708–09; *see also Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d at 690 ("A claim for an injunction that simply orders a defendant to comply with the TCPA and follow the law is not a proper for class certification under Rule 23(b)(2)."). The injunction Plaintiffs seek in the instant case does not suffer from the vagueness and overbreadth that has invalidated "obey-the-law" injunctions in other cases. Here, Plaintiffs do not seek a vague and overbroad directive that Defendants comply with the ADA, RA, or the methods-of-administration regulation. Instead, Plaintiffs seek a directive that Defendants to comply with particular requirements imposed by the NHRA and Maryland law to conduct annual surveys of nursing facilities in Maryland and timely investigations of complaints. The injunction Plaintiffs request here is specific and tailored specifically to the discriminatory and unlawful conduct alleged in this case.

For the reasons stated above, the Court finds that all Rule 23(a) and (b)(2) conditions for class certification are met in this case. Plaintiffs' motion for class certification shall be granted.

## V.     CONCLUSION

For the reasons stated above, the Court will grant Plaintiffs' Motion to Certify the Class (ECF 32) and deny Defendants' Motion to Dismiss (ECF 36).

A separate Order will follow.

_4/22/25_
Date

_____
Matthew J. Maddox
United States District Judge